**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | |
|---|---|
| NICHOLAS LESKOVISEK, by his next friend, LORI STANLEY, and CHAD UNDERWOOD, by his next friend, KIM UNDERWOOD, | No. 17-cv-03251 |
| Plaintiffs, | Hon. Judge Colin S. Bruce |
| v. | Hon. Mag. Judge Eric I. Long |
| ILLINOIS DEPARTMENT OF TRANSPORTATION and ILLINOIS DEPARTMENT OF CENTRAL MANAGEMENT SERVICES, | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
<u>PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ................................................. 3

ARGUMENT ................................................................................................................... 35

   A.    Standard *Prima Facie* Case in ADA Cases ................................................. 36

   B.    The ADA Prohibits the Use of Certain Qualification Standards, Employment Tests, and Other Selection Criteria (Count III) ........................................................... 37

      1.    Defendants' Test and Interview Processes Constitute Employment Tests and Other Selection Criteria .............................................................................. 39

      2.    Defendants' Application Process Screens out Nick and Chad ........................ 39

      3.    Defendants Have Not (and Cannot) Raise a Genuine Issue of Material Fact as to Whether its Hiring Process is Job-Related and Consistent with Business Necessity ............. 48

   C.    Defendants Failed to Provide Plaintiffs with a Reasonable Accommodation (Count I). 54

CONCLUSION ................................................................................................................ 57

CERTIFICATE OF COMPLIANCE ............................................................................. 58

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................ 36

*Atkins v. Salazar*, 455 F. App'x 385 (5th Cir. 2011) ................................................ 49

*Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626 (7th Cir. 1998) ...................................... 54

*Belk v. Sw. Bell Tel. Co.,* 194 F.3d 946 (8th Cir. 1999) ............................................. 49

*Bradley v. Pizzaco of Nebraska, Inc.*, 939 F.2d 610 (8th Cir. 1991) ............................. 48

*Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176 (7th Cir. 1993).................... 36

*Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281 (7th Cir. 1996) ........................ 56

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)........................................................ 35

*Chic. Reg'l Council of Carpenters v. Thorne Assoc., Inc.*, 893 F.Supp.2d 952 (N.D. Ill. 2012)... 39

*Cripe v. City of San Jose*, 261 F.3d 877 (9th Cir. 2001) ............................................ 49

*Dothard v. Rawlinson*, 433 U.S. 321, 331, 97 S.Ct. 2720, 2728, 53 L.Ed.2d 786 (1977) ............ 48

*Edwards v. BNSF Ry. Co.*, 2015 WL 6690020 (C.D. Ill. Nov. 2, 2015)........................ 36, 38, 39

*EEOC v. Aurora Health Care, Inc.*, 2015 WL 2344727 (E.D. Wis. May 14, 2015) ......... 38, 39, 49

*EEOC v. Chevron Phillips Chemical Co., LP*, 570 F.3d 606 (5th Cir. 2009)................. 55

*EEOC v. Creative Networks, L.L.C.*, 912 F. Supp. 2d 828 (D. Ariz. 2012).................... 37

*EEOC v. Sears, Roebuck & Co.,* 417 F.3d 789 (7th Cir. 2005). ............................... 54, 55

*Fitzpatrick v. City of Atlanta*, 2 F.3d 1112 (11th Cir. 1993) ...................................... 48

*Garcia v. Woman's Hosp. of Texas,* 97 F.3d 810 (5th Cir.1996) ................................. 48

*Gile v. United Airlines, Inc.*, 213 F.3d 365 (7th Cir. 2000).......................................... 56

*Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291 (7th Cir. 1997) .............................. 35

*Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685 (7th Cir. 1998) ............. 38, 45, 49, 50, 53

*Lewis v. City of Chicago*, No. 98-cv-5596 (N.D. Ill.),................................................ 46

*Lewis v. New York City Transit Auth.* 12 F.Supp.3d 418 (E.D.N.Y. 2014) .................. 48

*Lynch v. Freeman,* 817 F.2d 380 (6th Cir.1987) ...................................................... 48

*Nichols v. Ill. Dept. of Transp. and Ill. Dept. of Cent. Mgmt. Servs.*, 152 F.Supp.3d 1106 (N.D. Ill. 2016)................................................................................................. 55

*Roberts v. City of Chicago*, 817 F.3d 561 (7th Cir. 2016) ...................................... 46, 47

*Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990) ...................................... 23

*Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055 (7th Cir. 2014)............................ 54

*Valle v. City of Chi.*, 982 F.Supp. 560 (N.D. Ill. 1997)........................................... 40

*Williams v. ABM Parking Servs. Inc.*, 296 F.Supp.3d 779 (E.D. Va. 2017) ................. 45

*Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737 (7th Cir. 2006) ........ 46

*Wright v. Ill. Dep't of Children & Family Servs.*, 798 F.3d 513 (7th Cir. 2015) .......... 49, 51

**Statutes**

Americans with Disabilities Act of 1990

42 U.S.C. § 12111(9)(B).................................................................. 56

42 U.S.C. § 12112(b)(2) ................................................................. 55

42 U.S.C. § 12112(b)(5). ............................................................ 2, 54

42 U.S.C. § 12112(b)(6). ............................................................ 2, 38

42 U.S.C. § 12112(d) ...................................................................... 46

42 U.S.C. § 12113(a) ...................................................................... 49

42 U.S.C. § 12201(a) ...................................................................... 45

Rehabilitation Act of 1973

29 U.S.C. § 794.............................................................................. 45

**Regulations**

29 C.F.R. § 1630.10 ....................................................................... 38

29 C.F.R. § 1630.2(o)(1)(i) ............................................................. 54

29 C.F.R. § 1630.6. ........................................................................ 55

29 C.F.R. App. § 1630.9.................................................................. 54

29 C.F.R. Pt. 1630, App. § 1630.10 ......................... 38, 39, 49, 51, 52, 53

45 C.F.R. Pt. 84, App. A; 42 Fed. Reg. 22685, 22688-89 (May 4, 1977) ...................................... 45

**Other Authorities**

EEOC Technical Assistance Manual, Title I of the ADA, § 4.3.2 (1992) ........................ 39, 45, 46

**Rules**

Fed. R. Civ. P. 56(a)...................................................................... 35

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs move for summary judgment as to liability on two claims: Count III, which asserts that Defendants violated the Americans with Disabilities Act because their job application process screens out Plaintiffs for consideration for permanent employment and is not job-related and consistent with business necessity; and Count I, which asserts that Defendants failed to provide Plaintiffs with a reasonable accommodation for their job application process.

## INTRODUCTION

Nicholas (Nick) Leskovisek and Chad Underwood are two young men with autism. Both have significant limitations in their ability to express themselves, as Nick is non-verbal and Chad has severely limited verbal skills. Both Nick and Chad also have substantial limits in their executive functioning skills, which relate to their ability to learn, make decisions, plan, and stay organized.

Nick and Chad worked for several years doing data entry in the Illinois Department of Transportation's (IDOT) Statistical Coding Unit (Stats Unit). Nick and Chad did not just do this work, they did it well, performing better than many permanent IDOT employees doing similar tasks. Nick and Chad were not permanent IDOT employees. They participated in a program administered by IDOT to provide training to people with disabilities to help them qualify for full-time competitive employment, and were assigned to the Stats Unit after their data entry skills became apparent. During their time in the Stats Unit, Nick and Chad performed data entry tasks comparable to permanent IDOT employees with the job title of Office Associate Option II.

Nick and Chad wanted to become permanent IDOT employees and their supervisors wanted to hire them on a permanent basis. To achieve this goal under Defendants' standard hiring process, Nick and Chad had to achieve a certain score on an automated test administered by the

Illinois Department of Central Management Services (CMS) and do well in a *Rutan* structured interview, which is administered by IDOT and subject to CMS rules and requirements. Nick and Chad – and others, including management-level IDOT employees – knew that despite their strong demonstrated job skills, their disabilities prevented them from meaningfully competing in Defendants' job application process.

Recognizing the futility of subjecting themselves to a test and interview in which they could not be successful and that would screen them out of consideration for permanent employment, Nick and Chad asked Defendants to modify these requirements as a reasonable accommodation under the Americans with Disabilities Act (ADA). IDOT stated that it did not object to Nick's and Chad's requests so long as certain conditions were met. However, CMS refused to provide any accommodations, leaving Nick and Chad with no meaningful way to seek permanent employment with IDOT.

Plaintiffs brought a five-count complaint under the ADA against IDOT and CMS.[1] Count III asserts that Defendants violated the ADA by utilizing an application process with "qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability" which Defendants cannot show are "job-related for the position in question" or "consistent with business necessity." 42 U.S.C. § 12112(b)(6) (Section 102(b)(6)). Count I asserts that Defendants failed to provide Plaintiffs with a reasonable accommodation to the testing and interview process and failed to engage in the interactive process. 42 U.S.C. § 12112(b)(5).

Plaintiffs seek summary judgment on these two claims because the overwhelming evidence demonstrates that Defendants' testing and interview requirements operate as selection

---

[1] Plaintiffs do not seek summary judgment on their other claims, which are replete with genuine issues of material fact.

2

criteria that automatically and unnecessarily screen out Nick and Chad from consideration for permanent employment because of their autism. Further, Defendants' evidence fails to create a genuine issue of material fact as to whether their test or interview is job-related and consistent with business necessity for the permanent positions which Nick and Chad sought. To the contrary, the evidence shows that the CMS tests have little or no relevance to the work actually done by employees in the Stats Unit, as the tests are not even designed to test for job skills required for this specific position. Similarly, Defendants cannot show that the ability to respond to complex questions, as required by the *Rutan* structured interview, is necessary for the positions Nick and Chad sought in the Stats Unit, a conclusion supported by the availability of alternative and accessible ways to assess Nick's and Chad's job qualifications, such as a hands-on demonstration.

Both IDOT and CMS have long recognized the barriers that their testing and interview requirements create for individuals with significant disabilities. But despite identifying these issues, Defendants failed to modify their hiring process to provide meaningful opportunities for Nick, Chad or other individuals with similar disabilities to compete for permanent employment— either in response to Plaintiffs' requests for a reasonable accommodation under the ADA or otherwise. For these reasons, Plaintiffs respectfully request that summary judgment be granted on Counts I and III of their Complaint.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### *Nick and Chad: Disabilities and Limitations*

1.      Nick has Autism Spectrum Disorder (ASD). Defendants' Answer to Plaintiffs' First Amended Complaint and Affirmative Defenses (Answer), ECF No. 22, ¶1a,8. He was diagnosed before he turned three years old. Ex. 11, Deposition of Lori Stanley (Stanley Dep.), 10:1-3.

2.      Nick is non-verbal and has significant deficits in expressive language. His primary

form of communication is vocalization (such as soft sounds that are not words) and gestures (such

as pointing or giving high fives). Ex. 1, Plaintiff Nicholas Leskovisek's First Supplemental

Objections and Answers to Defendant IDOT's First Set of Interrogatories (Nick/IDOT Interrog.),

2c; Ex. 21/22, Declaration of Laura Owens, Ph.D. (Owens Decl.) ¶8; Ex. 12, Deposition of Laura

Owens, Ph.D. (Owens Dep.) 15:23-16:9; Ex. 13, Deposition of Jessica Keldermans (Keldermans

Dep.), 174:16-22; Ex. 14, Deposition of Barry Lowy (Lowy Dep.), 57:6-10.

3.      Nick is largely unable to engage in written communication. He can write or use a

communication board, but only for simple requests, such as a grocery list. Ex. 11, Stanley Dep.

52:22-53:22; Ex. 1, Nick/IDOT Interrog. 2c.; Ex. 21/22, Owens Decl. ¶8.

4.      Nick has substantial deficits in executive functioning[2] that impair his ability to

plan, stay organized, and make decisions. Ex. 1, Nick/IDOT Interrog. 2d-e; Ex. 21/22, Owens

Decl. ¶27.

5.      Chad has Autism Spectrum Disorder. Answer, ECF No. 22, ¶1a,8. He was

diagnosed around the age of three. Ex. 15, Deposition of Kim Underwood (Underwood Dep),

14:5-10.

6.      Chad is verbal, but his expressive language skills are significantly limited. While

he is able to say words, he is unable to have a conversation or put those words together into a

cohesive sentence. Ex. 2, Plaintiff Chad Underwood's First Supplemental Objections and

Answers to Defendant IDOT's First Set of Interrogatories (Chad/IDOT Interrog.) 2b; Ex. 21/22,

Owens Decl. ¶16; Ex. 12,Owens Dep. 25:24-26:8; Ex. 14, Lowy Dep., 57:11-23. Chad also has

---

[2] Executive functioning relates to the set of mental skills that include working memory, flexible
thinking and self-control, skills used to learn, focus, handle emotions, and make decisions. Ex.
21/22, Owens Decl. ¶27.

echolalic tendencies, where, instead of answering a question, he repeats the last part of the question asked. Ex. 21/22, Owens Decl. ¶18.

7.      Chad is unable to answer complex questions either by speaking or by writing. Ex. 2, Chad/IDOT Interrog. 2b; Ex. 15, Underwood Dep. 50:24-52:21; Ex. 21/22, Owens Decl. ¶20.

8.      Chad has substantial deficits in executive functioning that impair his ability to plan, stay organized, and make decisions. Ex. 2, Chad/IDOT Interrog. 2d-e; Ex. 21/22, Owens Decl. ¶27.

9.      One of the necessary diagnostic criteria for Autism Spectrum Disorder is "[p]ersistent deficits in social communication and social interaction across multiple contexts, as manifested by… [d]eficits in social-emotional reciprocity, ranging, for example, from abnormal social approach and failure of normal back-and-forth conversation… to failure to initiate or respond to social interactions." Diagnostic and Statistical Manual of Mental Disorders (DSM), 5th Edition, at p. 50.[3]

***Nick's and Chad's Work Experience at IDOT***

10.      Nick and Chad participated in the Student Professionals with Disabilities (SPWD) program, which was administered by IDOT in collaboration with School District 186 and United Cerebral Palsy Land of Lincoln. The SPWD program was intended to provide job training and employment experience to individuals with disabilities, with the goal of enabling them to obtain permanent, competitive employment. Answer, ECF No. 22, ¶¶12-13.

11.      Due to their demonstrated skill in data entry, Nick and Chad were assigned to work in IDOT's Traffic Safety Division, Statistical Coding Unit (Stats Unit). Nick and Chad began

---

[3] The DSM (5th edition) diagnostic criteria for Autism Spectrum Disorder is available: https://www.autismspeaks.org/autism-diagnosis-criteria-dsm-5

working in the Stats Unit in early 2011 and August 2013, respectively. Answer, ECF No. 22, ¶¶14-15; Ex. 45, Keldermans email dated 8/16/2013, Def No. 3183-84, *84.

12.     The Stats Unit's main responsibility was to enter data from vehicle crash reports submitted by law enforcement agencies across the State. Ex. 13, Keldermans Dep., 155:25-156:9; Ex. 26, Keldermans letter dated 3/16/2012, Def. No. 719-720; Answer, ECF No. 22, ¶16.

13.     Nick and Chad, along with 10-15 other IDOT employees, performed this data entry function. Answer, ECF No. 22, ¶17.

14.     The permanent IDOT employees who performed this data entry function held the job title of Office Associate. Ex. 46, Hillen emails with Office Associate job description dated 6/13/2014, Def. No. 3202-3205, 3210-3211 (confirming that the correct job description describing Nick's and Chad's duties was the description for Office Associate and stating "Nick and Chad both perform the duties of the office associates within the Stat Coding Unit"); Ex. 13, Keldermans Dep., 129:19-23.

15.     At all times relevant to this litigation, Jessica Keldermans served as the Bureau Chief of the Traffic Safety Division. Ex. 13, Keldermans Dep., 16:18-25; 19:25-20:5. Among her responsibilities was overseeing the Stats Unit, ensuring the quality of its work, and getting the data entered. Ex. 13, Keldermans Dep., 20:6-14; 21:17-22:20. Keldermans regularly reviewed reports that indicated the production rate of the Stats Unit employees. Ex. 13, Keldermans Dep., 28:23-30:4; 162:3-163:14.

16.     Keldermans testified that as Bureau Chief, she knows the job of Office Associate Option II in the Stats Unit. She knows what makes someone a good employee, what skills they need to have, and what responsibilities they need to do. Ex. 13, Keldermans Dep., 123:18-124:5; 47:21-48:11.

6

17.    Nick and Chad completed "all the usual duties required for" the position of Office Associate. Ex. 62, Social Security Administration Work Activity Questionnaire for Nicholas Leskovisek, signed by Jessica Keldermans (SSA Questionnaire), PL001439-1442; Ex. 13, Keldermans Dep., 131:6-11 (explaining that Nick's and Chad's job duties were not modified); 147:8-24; 151:21-152:4 (Q: If you had been asked to fill out [the SSA] form for Chad would your answers have been the same? A: Yes. Q: Is there anything on this form that you filled out for Nick that would have had a different answer for Chad? A. No, I think I would have done the same."); Ex. 46, Hillen emails with Office Associate job description dated 6/13/2014, Def. No. 3202-3205, 3210-3211 ("the duties are not modified they do data entry of all incoming crash reports just like the remainder of the unit").

18.    Nick and Chad were able to "complete all the job duties without special assistance" for the role of Office Associate and within "the same amount of time as employees in similar positions." Ex. 63, SSA Questionnaire, PL001439-1442; Ex. 13, Keldermans Dep., 147:25-148:21; 151:21-152:4 (explaining that she would have given the same answers if asked about Chad); Ex. 16, Deposition of Bruce Harmening (Harmening Dep.), 130:7-18.

19.    Some employees who worked in the position of Office Associate Option II in the Stats Unit, in addition to Data Entry, also did Location Entry, Main Entry, and Data Correction. However, not all Office Associates performed each of these job duties; managers within the Unit had the flexibility to determine who was faster at certain functions and were able to give people different assignments. Ex. 5, Defendant IDOT's Responses to Plaintiffs' First Set of Interrogatories (IDOT Interrog.) 5, incorporating Ex. 47, IDOT Stats Unit Employee List, Def. No. 3348; Ex. 13, Keldermans Dep., 96:24-98:6; 98:25-100:5 (explaining that one permanent IDOT employee did data entry exclusively because he had a difficult time with Location Entry).

7

20.     Nick and Chad did not have "fewer [or] easier duties … lower[ed] production standards … [or] lower[ed] quality standards." Ex. 63, SSA Questionnaire, PL001439-1442; Ex. 13, Keldermans Dep., 148:22-149:13; 151:21-152:4 (explaining that she would have given the same answers if asked about Chad).

21.     Nick and Chad were 100% as productive as other similar employees who worked in the role of Office Associate. Ex. 63, SSA Questionnaire, PL001439-1442, *PL001440; Ex. 13, Keldermans Dep., 150:4-21; 151:21-152:4 (explaining that she would have given the same answers if asked about Chad).

22.     The only "special assistance" Nick and Chad needed was "supervision" through a job coach. Ex. 63, SSA Questionnaire, PL001439-1442; Ex. 13, Keldermans Dep., 149:14-16; 151:21-152:4 (explaining that she would have given the same answers if asked about Chad).

23.     Nick's and Chad's job coach did not assist them with their duties, which they performed themselves. Ex. 63, SSA Questionnaire, PL001439-1442, *1439 (stating "Nick had a job coach sit with him the whole time he was at work. The job coach did not assist with Nick's duties. Nick performed them all himself."); Ex. 13, Keldermans Dep., 149:17-25; 151:21-152:4 (explaining that she would have given the same answers if asked about Chad). Instead, Nick and Chad's job coach provided them with "interpretation or direction" (Ex. 57, Harmening 9/2/14 email, Def. No. 17786) and "observed them working, periodically checking their work for accuracy, and guided them with correcting any mistakes" (Answer, ECF No. 22, ¶18).

24.     Nick and Chad were excellent employees. They "worked hard and excelled in their positions with IDOT for over four years." Answer, ECF No. 22, ¶1b. They "demonstrated strong computer skills, especially with data entry" and were "hard-workers." Answer, ECF No. 22, ¶14;

Ex. 16, Harmening Dep., 80:2-4 (calling it "common knowledge" that "Chad and Nick were able to do data input").

25.    Nick's and Chad's contributions were valuable to the Stats Unit. Ex. 55, Keldermans email dated 12/28/2015, Def. No. 13749-50 ("Both Nick and Chad work hard and are high producers … Nick and Chad won't be working at DTS after this Thursday. The bureau's production numbers will suffer because of this as well."); Ex. 7, IDOT RTA 23.

26.    When compared to the 12-14 employees who held the position of Office Associate Option II, Nick's and Chad's production rates were regularly some of the highest. Ex. 13, Keldermans Dep., 162:25-163:14 ("They were usually at – towards the top, if not the middle – with respect to the other – the full-time employees."); Ex. 54, Stats & Location Units September Production, Def. No. 13260-13268; Ex. 24, Leskovisek Employee Evaluation, 11/26/2013, Def. No. 46 ("[Nick] continues to be a top performer in the unit."); Answer, ECF No. 22, ¶20 ("in March 2012, Nick was the third highest producer in the Unit"); Ex. 26, Keldermans letter dated 3/16/2012, Def. No. 719-720 (stating that Nick produces "at a competitive level with the 12 full-time employees within the Statistical Coding Unit" and he is "capable of performing this unit's job, duties as his numbers clearly show"); Ex. 13, Keldermans Dep., 154:23-155:23 (confirming that the letter is an "accurate reflection" of her assessment of Nick's abilities).

***Nick's and Chad's Expressed Interests in Becoming Permanent IDOT Employees***

27.    Nick and Chad expressed their desire to be considered for permanent positions doing data entry in IDOT. Answer, ECF No. 22, ¶70.

28.    Dave Dailey was IDOT's ADA Coordinator and administrator of the SPWD program. Ex. 64, Harmening email dated 7/13/2016 with attached Forti memo dated 7/18/2014, PL002245-PL002248.

29.    Dave Dailey was working toward the goal of permanent employment within IDOT for Nick and Chad. Ex. 11, Stanley Dep. 34:2-7, 34:15-19; Ex. 24, Leskovisek Employee Evaluation, 11/26/2013, Def. No. 46 ("I am working with the Bureau of Personnel to secure permanent employment within the Bureau of Traffic Safety."); Ex. 7, IDOT's First Amended Response to Plaintiffs' First Set of Requests to Admit (IDOT RTA), 27-28; Ex. 13, Keldermans Dep. 169:16-20; Ex. 15, Underwood Dep., 24:8-18.

30.    Nick's and Chad's IDOT supervisors had long been supportive of hiring them on a permanent basis. Ex. 7, IDOT RTA 27 (admitting that employees in Traffic Safety asked that Nick be placed there in a permanent position); Ex. 24, Leskovisek Employee Evaluation, 11/26/2013, Def. No. 46; Ex. 13, Keldermans Dep., 164:18-22; Ex. 53, Webber email dated 9/12/2012, Def. No. 12325 ("I just wanted to confirm my support for the permanent hiring and employment of Nick Leskovisek. Nick has done an outstanding job in his temporary capacity and would be a great asset to the agency. His work productivity and abilities are top notch."); Ex. 8, IDOT's Response to Plaintiffs' First Supp. Set of Requests to Admit (IDOT Supp. RTA), 7.

31.    In 2014, IDOT claimed in its Affirmative Action Report that it had a goal of finding permanent jobs for participants of the SPWD program, in part to address the agency's underutilization of people with disabilities. Ex. 43, Excerpt from 2014 IDOT Affirmative Action Report, Def. No. 1989, 2206.

32.    Management-level IDOT employees have stated that there are two barriers to State employment for people with significant disabilities, such as Nick and Chad. One barrier is AFSCME's bidding process. Ex. 60, Woods email dated 12/23/2011, PL001272-73; Ex. 16, Harmening Dep., 65:23-25 (limited because of Rutan and union agreements); 63:7-23 ("cognizant [sic] disabilities are a real problem because of the union and Rutan issues").

10

33.    To resolve any potential barriers resulting from AFSCME's bidding rights, Nick and Chad, through the assistance of Equip for Equality attorney Barry Lowy, contacted AFSCME to ask if it would waive posting and bidding rights for the particular positions Nick and Chad were seeking. Ex. 27, Lowy Letters dated 3/31/2014, Def. No. 721-22 (Nick); Def. No. 00795-96 (Chad); Ex. 23, Declaration of Frank Prochaska (Prochaska Decl.), ¶¶2-6.

34.    AFSCME agreed to waive its posting and bidding rights to enable Nick and Chad to secure a position doing work comparable to the work of an Office Associate if the position was classified as Office Assistant instead of Office Associate. Ex. 14, Lowy Dep., 34:7-18; Ex. 61, Prochaska email dated 5/29/2014, PL001277-78; Ex. 33, IDOT EEOC Position Statement, Def. No. 1101-1103, *1101; Ex. 23, Prochaska Decl., ¶¶9-10.

35.    IDOT did not object to moving Nick and Chad into the position of Office Assistant. Ex. 29, Forti Letter dated 7/9/2014, Def. No. 726; Ex. 33, IDOT EEOC Position Statement, Def. No. 1101-1103, *1101; Ex. 23, Prochaska Decl., ¶¶8,11-12.

36.    The other known barrier to State employment for people with significant disabilities is the State's testing and *Rutan* structured interview process. Ex. 52, Woods email dated 12/31/2012, Def. No. 12316; Ex. 7, IDOT RTA 32; Ex. 16, Harmening Dep. 63:7-15 ("cognizant [sic] disabilities are a real problem because of the union and Rutan issues"); Ex. 64, Harmening 7/13/16 email with attached 7/18/2014 Forti memo, PL002245-PL002248.

37.    Nick and Chad, through their attorney, Barry Lowy, requested accommodations and modifications under the ADA to the State's testing and interview process. Answer, ECF No. 22, ¶1g ("Defendants admit Plaintiffs requested accommodations and modifications to the testing and interview process."); ¶¶32,38,60,71; Ex. 18, Deposition of Courtnay O'Connell (O'Connell Dep.), 100:23-101:17 ("It was a request for an accommodation under the ADA.").

*Defendants' Hiring Processes, Including Testing and Interviewing*

38.     One purported goal of Defendants' job application process and associated

requirements is to hire qualified people. Ex. 18, O'Connell Dep., 45:10-14; Ex. 17, Deposition of

Jeffrey Shuck (Shuck Dep.), 42:20-24 ("The whole idea is to ensure that the people who are

working for the State are well qualified to perform the duties they're being paid to perform for the

taxpayers of the State."). Another purported goal is to establish a system to test and rank

candidates according to their relative fitness. Ex. 17, Shuck Dep., 43:4-10.

39.     For many positions within State government – including the positions of Office

Associate and Office Assistant – individuals must first take a test[4] (administered by CMS) and

then participate in a *Rutan* structured interview (administered by the hiring agency). Affidavit of

Jennifer Peterson (Peterson Aff.), ECF No. 32-2, ¶¶4,6,8; Affidavit of Karen Siciliano (Siciliano

Aff.)., ECF No. 34-1, ¶¶ 5,7,9.

40.     The automated test and *Rutan* structured interview are prerequisites to many

permanent State employment positions and constitute eligibility criteria within the meaning of the

ADA. Answer, ECF No. 22, ¶¶64,78.

41.     Automated tests for certain classifications – including Office Associate and Office

Assistant – are given on a regularly scheduled basis. Ex. 49, Guide to the CMS Employment

Process, Def. 3380-82 (noting that "Group A titles are the job titles for which exams are given on

a regular scheduled basis"); Ex. 48, CMS Information, Def. 3378-79 (showing that Office

---

[4] The term "open competitive exam" is the term for various types of pre-employment assessments
administered by CMS, including the computer-based "automated test" required for certain titles,
including Office Associate or Office Assistant. Ex. 6, CMS 1st Interrog. 7; Ex. 49, Guide to the
CMS Employment Process, Def. No. 3380-3382. Throughout discovery, the Parties used both
terms to refer to the same test; thus, for clarity in this Motion, Plaintiffs use both terms to refer to
the test required by CMS for individuals pursuing Office Associate or Office Assistant positions.

Associate and Office Assistant Tests are "Group A Titles" that require automated multiple choice testing).

42.     Job applicants are permitted to take the automated test for a particular job classification even if there is no current vacancy or posted job. Answer, ECF No. 22, ¶30 ("Applicants may test for a particular job classification regardless of whether there is a position currently vacant or being advertised in that classification."); Ex. 13, Keldermans Dep., 106:23-107:5.

43.     Applicants must receive a passing letter grade (A, B, or C) to be placed on a list called an "eligible list" or an "Open Competitive" list for the class under which the specific vacancy is grouped. Peterson Aff., ECF No. 32-2, ¶4; Siciliano Aff., ECF No. 34-1, ¶5; Ex. 6, Defendant CMS Responses to Plaintiffs' First Set of Interrogatories (CMS First Interrog.), 7.

44.     For some titles, instead of using an automated test as an initial screening mechanism, CMS determines applicants' qualifications by reviewing their training and experience as listed on their application form and/or their completion and submittal of a Supplemental Questionnaire. Ex. 49, Guide to the CMS Employment Process, Def. No. 3380-3382, *3382; Ex. 20, Deposition of Brandon Singer (Singer Dep.), 104:25-105:8 (explaining that for "training and experience titles… there's no test required … their application is basically their test. So the graders are reviewing their education and their work history listed within their application to determine qualifications"); 111:5-9 ("Administrative assistant is a title graded solely off of training and experience to where CMS examining is reviewing education, work history, or a combination of both to determine that applicant's grade").

### Job Classifications of Office Associate and Office Assistant

45.     Positions within State employment are grouped into job title classifications, such as Office Assistant and Office Associate. These job title classifications apply across-the-board to

all State agencies that fall within CMS's personnel administration. Peterson Aff., ECF No. 32-2, ¶¶3-4,13-14.

46.    In 2014 and 2015, there were 1,585 and 1,561 employees, respectively, across various State agencies with jobs within the classification of Office Associate. Ex. 6, CMS First Interrog., 11, incorporating Ex. 44, Chart of Office Assistant/Office Associate Position, Doc. No. 3117.

47.    There are significant differences in job responsibilities among the many types of positions that fall within the broader job classification of Office Associate. Some employees with the classification of Office Associate must, for example: edit correspondence for content and grammar, act as a receptionist, respond to inquiries in person or by phone, sign letters, make travel arrangements, prepare expense claims, transcribe dictation, serve as a designated lead worker to staff engaged in difficult clerical work, assign and review work, provide input to the supervisor about others' work, prepare and maintain spreadsheets, determine needs and make routine operational decisions to assure compliance, and compose correspondence—all responsibilities that are *not required* for employees with the classification of Office Associate in the Stats Unit, where Nick and Chad worked. Ex. 36, CMS Classification for Office Associate, Def. No. 1131-1132; Ex. 56, Position Description for the position of Office Associate Option II number 30015-23-55-102-00-01, Def. No. 17128-9 (requiring serving as a receptionist, ensuring clarity in all correspondence); Ex. 13, Keldermans Dep., 124:9-126:11 (explaining tasks that are not required in the Stats Unit).

48.    In 2014 and 2015, there were 812 and 779 employees, respectively, across various State agencies with jobs that fell within the classification of Office Assistant. Ex. 6, CMS First

Interrog., 11, incorporating Ex. 44, Chart of Office Assistant/Office Associate Position, Doc. No. 3117.

49.     There are significant differences in job responsibilities among the many types of positions that fall within the broader job classification of Office Assistant. Some employees with the classification of Office Associate must, for example: proofread for grammar and punctuation, act as a receptionist, answer phones, transport materials of significant value by automobile, transcribe previously recorded dictation, serve as a lead worker, assign and review work, provide input to the supervisor, and more—all responsibilities that are *not required* for employees with the classification of Office Associate in the Stats Unit, where Nick and Chad worked. Ex. 34, CMS Classification for Office Assistant, Def. No. 1127-28; Ex. 13, Keldermans Dep., 124:9-126:11 (explaining tasks that are not required in the Stats Unit).

50.     The CMS open competitive tests, including the ones for the classifications of Office Associate and Office Assistant, are not designed to be position-specific or agency-specific; instead, they purport to test for knowledge and skills across *all* Office Associate and Office Assistant positions throughout all State agencies. Peterson Aff., ECF No. 32-2, ¶13-14; Siciliano Aff., ECF No. 34-1, ¶17-18; Ex. 6, CMS First Interrog. 7; Ex. 9, CMS Response to Plaintiffs' First Set of Requests to Admit (CMS RTA) 23 ("[T]he automated test CMS administers for the Office Associate position applies to a general class of positions across State government and is not tailored specifically to the Office Associate, Option II, position within IDOT's Coding Unit.").

### *CMS Automated Test*

51.     The CMS automated test for the position of Office Associate has a total of 60 multiple choice questions, plus an additional skills-based test depending on the option level. Peterson Aff., ECF No. 32-2, ¶8; Siciliano Aff., ECF No. 34-1, ¶9.

52.     The CMS automated test for Office Associate has approximately 20 questions related to English Usage. As an example, one English Usage question asks:



Ex. 65, Automated Test for Office Associate (CMS Test), Excerpts, CMS Test, PL002161.

53.     The CMS automated test for Office Associate has approximately 16 questions related to Math. As an example, one Math question asks:



Ex. 65, CMS Test, PL002185.

54.     The CMS automated test for Office Associate has approximately 16 questions related to Records Management. As an example, one Records Management question asks:



Ex. 65, CMS Test, PL002202.

55.     The CMS test has approximately 10 questions related to Written Instructions, where 

. Ex. 65, CMS Test, PL002225-26. Among those,

███████████████████████████████████████

████████. Ex. 65, CMS Test, PL002233-2236.

56.     Most questions on the CMS automated test for the position of Office Associate

relate to skills that are not required for employees in the Stats Unit. Keldermans testified that the

following skills – all of which are included on the CMS Test Information Guide for the

classification of Office Associate (Ex. 37, Test Information Guide for Office Associate, Def. No.

1133-34) – are not required for the position of Office Associate Option II in the Stats Unit:

    a.  Drafting documents, like memos, reports, or business correspondence. Ex. 13, Keldermans Dep., 112:12-23.

    b.  Determining the appropriate use of punctuation. Ex. 13, Keldermans Dep., 113:14-16.

    c.  Reading two different sentences and figuring out which is the most grammatically correct. Ex. 13, Keldermans Dep., 113:20-23.

    d.  Appropriately using proper syntax or sentence structure. Ex. 13, Keldermans Dep., 113:24-114:2.

    e.  Understanding mathematical principles. Ex. 13, Keldermans Dep., 114:3-5.

    f.  Doing basic mathematical computations. Ex. 13, Keldermans Dep., 114:6-8.

    g.  Applying mathematical principles to typical office situations. Ex. 13, Keldermans Dep., 114:17-19.

    h.  Filing documents. Ex. 13, Keldermans Dep., 114:20-21.

    i.  Filing documents alphabetically. Ex. 13, Keldermans Dep., 114:22-23.

    j.  Arranging data alphabetically. Ex. 13, Keldermans Dep., 114:24-25.

    k.  Understanding commonly accepted filing and record-keeping practices. Ex. 13, Keldermans Dep., 115:2-4.

    l.  Filing records chronologically. Ex. 13, Keldermans Dep., 118:5-9.

    m.  Cross-referencing files. Ex. 13, Keldermans Dep., 118:13-14.

    n.  Categorizing database in correct alphanumeric order. Ex. 13, Keldermans Dep., 118:15-17.

17

o. Reading and comprehending written instruction. Ex. 13, Keldermans Dep., 120:6-121:5 (noting that written information is available as a resource but is not used by all employees nor required for an employee to do the job).

57. CMS admits it does not know whether the "open-competitive test for Office Associate asks questions about certain job skills that are not required for the position of Office Associate, Option II, within IDOT's Coding Unit." Ex. 9, CMS RTA 23. CMS further admits it does not know whether the "open-competitive test for Office Associate asks questions about certain job skills that are not required for employees in IDOT's Coding Unit doing Data Entry, Location Entry and Data Correction." Ex. 9, CMS RTA 25.

58. Twelve other CMS tests for other job classifications share at least six of the questions used on the open competitive test for Office Associate, including the position of Executive Secretary. Siciliano Aff., ECF No. 34-1, ¶¶ 34-36,40-42.

59. In approximately 2006, IDOT alerted CMS to the fact that the CMS test for the position of Office Associate included skills that are not necessary for the position of Office Associate Option II in the Stats Unit. Ex. 13, Keldermans Dep., 67:22-70:18.

60. The CMS automated test for the job classification of Office Assistant uses the same multiple choice questions as the CMS test for the job classifications of Office Aide and Office Clerk. Peterson Aff., ECF No. 32-2, ¶7; Siciliano Aff., ECF No. 34-1, ¶8.

61. The CMS test for the classification of Office Assistant / Office Aide / Office Clerk has 60 multiple choice questions, plus additional skills-based testing depending on the option level. Peterson Aff., ECF No. 32-2, ¶6; Siciliano Aff., ECF No. 34-1, ¶7. This test has approximately 10 questions related to Mathematics; 10 related to English Usage; 20 related to Filing; 14 questions related to Interpersonal Skills, and 14 questions related to Written Instructions. Ex. 35, Test Information Guide for Office Assistant, Def. No. 1129-30.

18

62.    Most of the questions on the CMS automated test for the position of Office Assistant relate to skills that are not required for employees in the Stats Unit. The Bureau Chief of the Traffic Safety Division, Jessica Keldermans, testified that the following skills – all of which are included on the CMS Test Information Guide for the classification of Office Assistant (Ex. 35, Test Information Guide for Office Assistant, Def. No. 1129-30) – are not required for the job title of Office Associate Option II in the Stats Unit:

  a.    Performing mathematical calculations involving addition, subtraction, multiplication, and division. Ex. 13, Keldermans Dep., 114:9-10.

  b.    Computing currency amounts. Ex. 13, Keldermans Dep., 114:12-13.

  c.    Making computations involving decimals and percentages. Ex. 13, Keldermans Dep., 114:14-16.

  d.    Proper use of punctuation commonly encountered. Ex. 13, Keldermans Dep., 113:14-16.

  e.    Appropriate use of English, i.e., proper syntax and sentence structure. Ex. 13, Keldermans Dep., 113:24-114:2.

  f.    Arranging data alphabetically. Ex. 13, Keldermans Dep., 114:24-25.

  g.    Ordering data based on a specific numerical sequence. Ex. 13, Keldermans Dep., 118:10-12.

  h.    Categorizing data based on the correct alphanumeric order. Ex. 13, Keldermans Dep., 118:15-17.

  i.    Initiating and maintaining a positive relationship with the public. Ex. 13, Keldermans Dep., 119:2-4.

  j.    Resolving misunderstandings and handling complaints. Ex. 13, Keldermans Dep., 119:5-9.

  k.    Establishing effective relationships with the general public. Ex. 13, Keldermans Dep., 118:21-24.

  l.    Reading and appropriately acting on registration procedures. Ex. 13, Keldermans Dep., 121:6-8.

  m.    Reading and appropriately acting on mail distribution procedures. Ex. 13, Keldermans Dep., 121:9-11.

19

      n.   Reading and appropriately acting on travel directions. Ex. 13, Keldermans Dep., 121:12-14.

63.     CMS admits it does not know whether the "open-competitive test for Office Assistant asks questions about job skills that are not required for employees in IDOT's Coding Unit doing Data Entry, Location Entry and Data Correction." Ex. 9, CMS RTA 24.

***Nick and Chad Could Not Pass the CMS Automated Test without a Reasonable Accommodation***

64.     Due to their disabilities, neither Nick nor Chad could sit down for a test, read examination questions, and provide answers in response to written questions. Ex. 1, Nick/IDOT Interrog. 2e; Ex. 2, Chad/IDOT Interrog. 2e; Ex. 3, Plaintiff Nicholas Leskovisek's Objections and Answers to Defendant CMS's First Set of Interrogatories (Nick/CMS Interrog.) 3; Ex. 4, Plaintiff Chad Underwood's Objections and Answers to Defendant CMS's First Set of Interrogatories (Chad/CMS Interrog.) 3; Ex. 11, Stanley Dep. 53:23-54:7 ("Nick would not be able to read the long sentence [in a CMS test], understand it, and answer it.").

65.     Management-level IDOT employees believed that Nick and Chad could not pass the CMS automated test. Ex. 16, Harmening Dep., 124:14-16 ("I didn't see personally how [Nick or Chad] could get through a Rutan interview or an application through the regular channels."); Ex. 25, Leskovisek Employee Evaluation dated 8/30/2012, Def. No. 272 (noting that due to Nick's disability, he "is unable to test … in the usual manner"); Ex. 7, IDOT RTA 4; Ex. 11, Stanley Dep. 19:15-20, 20:3-24 (recounting conversation with Dailey, where he expressed that he did not think Nick could answer the questions on the CMS open competitive exam).

66.     Plaintiffs retained Laura Owens, Ph.D., to provide expert testimony in this case. Dr. Owens has over 30 years of experience as a national leader in the transition and disability employment field. She is a Professor at the University of Wisconsin-Milwaukee in the Department of Teaching and Learning. She is also the President of TransCen, Inc., a national

nonprofit organization that provides direct placement services to individuals with disabilities, develops and evaluates new service models through research of evidenced-based practices, and provides training and technical assistance to organizations and school districts focused on the improvement of educational and employment outcomes for individuals with disabilities. Ex. 21/22, Owens Decl. ¶¶1,4.

67.     Prior to forming her opinions in this case, Dr. Owens conducted a comprehensive evaluation of the CMS automated tests. She conducted an in-person inspection of the CMS automated test for the Office Associate title and reviewed Defendants' Test Information Guides and other materials produced by Defendants regarding the CMS test for the Office Associate and Office Assistant titles. Dr. Owens further met with Plaintiffs and their families on multiple occasions and reviewed a substantial amount of their personal records. Ex. 21/22, Owens Decl. ¶¶5-6,14-15,22,34,39.

68.     As a result of this evaluation, inspection, and review, and based on her professional knowledge and expertise, Dr. Owens concluded that Nick and Chad could not complete the CMS automated test in any meaningful way. Further, Dr. Owens concluded that the CMS automated test would not accurately measure Nick's or Chad's qualifications, skills, and abilities for a position and would prevent them from competing for a job. Ex. 21/22, Owens Decl. ¶33.

69.     Dr. Owens cited a number of reasons for her opinion. Ex. 21/22, Owens Decl. ¶34. Dr. Owens explained that as a result of Nick's and Chad's disability-related language and executive functioning deficits, neither of them could comprehend a written question, understand the purpose of the question, or make an appropriate selection. Ex. 21/22, Owens Decl. ¶35; Ex. 12,Owens Dep. 39:7-15.

70.     Dr. Owens also explained that the CMS automated tests assess skills that Nick and Chad do not have, but which are not relevant to the data entry position they were seeking permanent employment at IDOT. Ex. 21/22, Owens Decl. ¶36; Ex. 12,Owens Dep. 39:16-41:15. For instance, Dr. Owens noted that the test for the classification of Office Associate includes 20 questions about English usage, requiring individuals to ███████████████████████ ████████████████████████████████████████████████████████ ████████████ Owens Decl. ¶36. Because of their language deficits, Nick and Chad would not understand these questions and would not be able to choose the correct answer. Owens Decl. ¶36. Similarly, Dr. Owens explains that the CMS test for the position of Office Assistant includes 14 questions about interpersonal skills. As a result of their autism-related limitations, Nick and Chad could not properly answer these questions. Owens Decl. ¶36.

71.     Dr. Owens testified that even for the subject matter that is relevant – such as data entry – the CMS automated test still does not evaluate how well an applicant performs data entry; instead, it evaluates the individual's ability to read a question, understand the question, read an answer, understand the answer, and use problem-solving skills to determine which answer is correct, which is a different skill set than what is required for data entry itself and one that Nick and Chad do not have because of their autism. Ex. 21/22, Owens Decl. ¶37; Ex. 12,Owens Dep. 40:17-23.

72.     Dr. Owens concluded: "[I]t is my opinion that Nick and Chad would not be able to participate in a CMS open competitive exam in a meaningful way due to their disability-related limitations. As a result, the CMS open competitive exam, as currently administered, would act as a total barrier to employment for any position for Nick and Chad." Ex. 21/22, Owens Decl. ¶39.

22

73.    Finally, she opined that, based on her extensive professional experiences working with individuals with ASD and similar disabilities, "others with ASD with comparable limitations would experience similar barriers as a result of the limitations outlined here." Ex. 21/22, Owens Decl. ¶40.

### The Rutan Structured Interview

74.    The *Rutan* structured interview process is a prerequisite to employment for certain jobs with the State of Illinois. Answer, ECF No. 22, ¶64.

75.    The *Rutan* structured interview process is named for the U.S. Supreme Court case, *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990), which held that hiring, promotion, transfer, and recall of employees may not be based on party affiliation or support and, instead, must be based on the merits and qualifications of candidates. Answer, ECF No. 22, ¶26. The *Rutan* decision does not reference people with disabilities. *See Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990); Ex. 19, 30(b)(6) deposition of Wendy Butler as a representative of Defendant CMS (Butler Dep.), 105:6-14.

76.    The State created a structured interview process for applicants for most State positions. Answer, ECF No. 22, ¶1f. The State's *Rutan*-related requirements are laid out by executive orders and internal documents. Ex. 17, Shuck Dep., 18:12-21.

77.    One goal of the *Rutan* structured interview process is to screen an applicant for State employment to determine if the applicant has the ability to perform the job. Answer, ECF No. 22, ¶29.

78.    CMS controls certain aspects of the *Rutan* structured interview process, as it develops the content used to train other hiring agencies, conducts trainings about the *Rutan* interview process for hiring agencies, and certifies employees from other state agencies to conduct *Rutan* interviews. Ex. 18, O'Connell Dep., 35:2-8; 38:9-39:7. CMS also makes

recommendations about the types of interview questions state agencies may ask and provides training for agencies in interview techniques. Ex. 6, CMS First Interrog. 4.

79.     The hiring agency develops the specific questions and tailors the scoring within the parameters set by CMS, Administrative Order (1990) and Administrative Order 2 (2009). Ex. 6, CMS First Interrog. 4.

80.     State agencies are required to develop "a standardized questionnaire." A group of interviewers for the agency conducts "a structured employment interview using a standardized interview questionnaire and note pertinent responses from the candidates that can be compared and evaluated in a consistent manner." Ex. 38, *Rutan* Administrative Order Number 2 (1990), Def. No. 1136-41, *1137. "[E]verybody has to have the same interview"; questions must be "exactly" the same. Ex. 19, Butler 30(b)(6) Dep., 99:11-16.

81.     The *Rutan* interview is then scored based on how the applicant responds to the questions. Ex. 19, Butler 30(b)(6) Dep., 57:15-17.

82.     As an example of the type of questions in a *Rutan* interview, one question for the position of Office Associate Option II in the Stats Unit asks: "█████████████████████ ██████████████████████████████████████████████████████." Ex. 50, Rutan Interview Questions, Def. No. 5487-92, *90. However, the Bureau Chief of IDOT's Traffic Safety Division admitted that this question is not relevant to the job in question because "the data entry unit, the coding unit, doesn't do math." Ex. 13, Keldermans Dep., 63:7-64:15.

83.     Interviewers asked applicants for the position of Office Associate Option II about their planning abilities because the criteria provided that the "█████████████████████ ██████████████████████████████████████████████████████ ███████████." Ex. 50, Rutan Interview Questions, Def. No. 5487-92. The Bureau Chief of IDOT's

Traffic Safety Division admitted that this criteria was not relevant to the job because "the data entry people don't technically enter the fatal [crash] information." Ex. 13, Keldermans Dep., 65:4-67:9.

### Nick and Chad Could Not Have Performed Well in a Traditional Rutan Structured Interview

84.     Nick and Chad cannot demonstrate their ability to perform a job through the *Rutan* structured interview process due to their significant limitations in expressive language. Ex. 1, Nick/IDOT Interrog. 2d ("Plaintiff's limitations in his ability to communicate and speak preclude him from engaging in an interview."); Ex. 2, Chad/IDOT Interrog. 2 (explaining Chad's limitations in responding to questions and engaging in an interview); Ex. 11, Stanley Dep. 52:3-18 ("Q: [I]f someone was to approach him and say, Nick, can you tell me about the data entry work that you did at IDOT, how would he respond? A: He would give you a high five and smile. There probably would not be any words because he would not know any of those words to answer.").

85.     Management-level IDOT employees believed that Nick and Chad could not succeed in a *Rutan* interview. Ex. 16, Harmening Dep., 124:14-16 ("I didn't see personally how [Nick and Chad] could get through a *Rutan* interview or an application through the regular channels."); 62:5-22 (naming Nick and Chad as examples of participants "in the [SPWD] program that were just absolutely unable to interview, communicate to interview"); Ex. 26 Leskovisek Employee Evaluation dated 8/30/2012, Def. No. 272 (noting that due to Nick's disability, he "is unable to … interview in the usual manner"); Ex. 7, IDOT RTA 4.

86.     Dr. Owens reviewed Defendants' produced materials explaining the *Rutan* structured interview process as well as sample questions and criteria from past *Rutan* interviews. Ex. 21/22, Owens Decl. ¶5,31.

25

87.     As a result of this review, her meetings with Plaintiffs and their families, her analysis of the documents relating to Plaintiffs, and based on her professional knowledge and expertise, Dr. Owens concluded that Nick and Chad could not participate in a *Rutan* structured interview in any meaningful way. Further, Dr. Owens concluded that the interview would not accurately assess Nick's and Chad's qualifications, skills, and abilities for a position and, instead, would prevent them from getting a job they were otherwise qualified to do. Ex. 21/22, Owens Decl. ¶23,31; Ex. 12,Owens Dep. 35:15-36:2.

88.     Dr. Owens cited several reasons for her opinion. Ex. 21/22, Owens Decl. ¶24. She testified that Nick's and Chad's autism causes them to have severe deficits in expressive language, which prevent them from responding to complex questions in any meaningful way, either verbally or in writing. Ex. 21/22, Owens Decl. ¶¶25-26. She explained that Nick is non-verbal and communicates primarily through vocalization and gestures; as such, he could not respond verbally to any questions. Similarly, Dr. Owens explained that Chad's verbal abilities are limited such that he could respond only with a one-word answer, most likely repeating the last word of the sentence or question. Owens Decl. ¶25.

89.     Dr. Owens also testified that, while Nick and Chad both have good receptive language skills for simple questions, comments, and commands, they have deficits in receptive language that would prevent them from comprehending and processing complex questions, including questions that have been asked in *Rutan* structured interviews. She explained that Nick and Chad are concrete thinkers who do not understand abstract questions. She gave an example of a *Rutan* interview question which asked: "███████████████████████████████ ██████████████████████ and explained that Nick and Chad would not understand the concepts of "██████████████." She also explained that it would be impossible for Nick and

26

Chad to understand the question: "███████████████████████████████████████
████████████████████████████████." Ex. 21/22, Owens Decl. ¶28.

90.     Dr. Owens testified that, while Nick and Chad are able to sit quietly and patiently
while working on their computers, they are unable to sit quietly in an interview setting, listening
to questions for an extended period of time. Ex. 21/22, Owens Decl. ¶29; Ex. 12, Owens Dep.
36:8-38:2.

91.     Dr. Owens concluded: "[I]t is my opinion that Nick and Chad would not be able to
participate in the *Rutan* structured interview in a meaningful way due to their disability-related
limitations. As a result, the Rutan structured interview would act as a total barrier to employment
for any position for which Nick and Chad would apply." Ex. 21/22, Owens Decl. ¶31.

92.     Finally, Dr. Owens opined that, based on her professional experiences working
with individuals with ASD and similar disabilities, "others with ASD with comparable limitations
would experience similar barriers as a result of the limitations outlined here." Ex. 21/22, Owens
Decl. ¶32.

### IDOT Knew the Job Application Process Excluded People with Severe Autism, Like Nick and Chad

93.     In 2012, IDOT's Bureau Chief for the Bureau of Personnel Management Michael
Woods, Jr., wrote: "[A] severely autistic person, from my research and understanding, will likely
never be able to be hired into a CMS code title."[5] Ex. 52, Woods email dated 12/31/2012, Def.
No. 12316; Ex. 7, IDOT RTA 32.

94.     Bruce Harmening, IDOT's former Bureau Chief of Investigations and Compliance,
former Special Assistant to Chief Counsel, and former Ethics Officer, testified about the SPWD

---

[5] A CMS code title is a position subject to the Personnel Code. Ex. 32, CMS EEOC Position
Statement, Def. No. 824-834. *831.

program and its difficulty in moving individuals with cognitive disabilities into full-time

positions. In his deposition, Harmening testified:

> A. [C]ognizant [sic] disabilities are a real problem because of the union and Rutan issues.

> Q. Okay. And when you say because of the Rutan issues, was it that someone who has a severe cognizant [sic] disability is likely unable to take the CMS open competitive test?

> A. That, and do an interview. A person that can't communicate has a difficult time competing in an interview when [compared to people with physical disabilities].

Ex. 16, Harmening Dep., 63:6-17; 64:2-8.

95.    For years, IDOT has been aware that people with certain disabilities face

significant barriers to obtaining permanent employment. On July 18, 2014, IDOT Chief Counsel

Michael A. Forti sent to incoming acting IDOT Secretary Erica J. Borggren a memo prepared by

Harmening that provided a "candid" and "[un]biased" assessment of the SPWD. Ex. 16,

Harmening Dep., 68:5-23; 75:11-14; Ex. 64, Harmening 7/13/16 email with attached 7/18/2014

Forti memo, PL002245-PL002248.

96.    Forti's memo states that it is difficult for individuals with cognitive disabilities to

compete for permanent employment now that the Supported Employment Act, which had

permitted testing and interview waivers, has been repealed. Ex. 16, Harmening Dep., 75:22-77:6;

Ex. 64, Harmening 7/13/16 email with attached 7/18/2014 Forti memo, PL002245-PL002248.

During his deposition, Harmening testified that while he does not have a personal recollection

about that particular law, his assessment of the difficulty in achieving permanent employment for

students with cognitive disabilities is the same as discussed in the memo. Ex. 16, Harmening

Dep., 76:3-77:6.

97.    Mr. Harmening further testified that it was "impossible under the circumstances

and the laws and policies to place" participants of the SPWD program who had "cognitive

disabilities" in permanent positions, even though the individuals had demonstrated their ability to be successful in "some state jobs." Ex. 16, Harmening Dep., 78:21-79:24.

***CMS Knew the Job Application Excluded People with Severe Autism, Like Nick and Chad***

98.    When the General Assembly enacted the Supported Employment Act, 5 ILCS 390, it found that "a number of severely handicapped people are unable to compete successfully in State open competitive merit examinations." CMS was aware of this law. Ex. 10, CMS Response to Plaintiffs' First Supplemental Set of Requests to Admit (CMS Supp. RTA), 8.

99.    In December 2011, years before Nick and Chad requested accommodations for Defendants' job application process, Mike Woods, Jr., the Bureau Chief for IDOT's Bureau of Personnel Management at the time, sent CMS employees an email stating: "Requiring individuals with cognitive disabilities to competitively interview against each other is unreasonable … [t]he intent of Rutan was to prevent political influence from entering into the hiring process. As I'm sure everyone would agree, the law was not intended to thwart individuals with disabilities from gaining meaningful employment." Ex. 10, CMS Supp. RTA 14; Ex. 60, Woods email dated 12/23/2011, PL001272-73.

100.    Former CMS Legal Counsel Jeffrey Shuck recognized that there are individuals with various disabilities, including those who "were non-verbal for various reasons" who have disabilities that "might make participation in the normal testing and/or interviewing process problematic." Ex. 17, Shuck Dep., 30:15-31:6; 53:10-12 (discussing individuals with "severe disabilities that interfere with the normal testing and interview process").

101.    CMS has acknowledged that an individual whose disability affects their interview skills or who has significant struggles with social interaction would be at a significant disadvantage during the interview process. Ex. 19, Butler 30(b)(6) Dep., 55:21-56:3 (answering "Potentially, yes" to the question: "So would it be fair for me to say that a person who does not

29

have a disability which affects their interview abilities or interview skills, would, generally

speaking, present significantly better than a candidate that has a disability that affects their

interview skills?"); 56:11-20 (agreeing "[g]enerally, yes" that a person with a disability that

causes significant struggles with social interaction would be at a "significant disadvantage as

compared to a job applicant who doesn't have any such disability"); 57:18-21 ("[I]f you cannot

verbally respond to a question, and that is the only format that is – that is offered – then yes, you

would be at a disadvantage.").

102.    CMS has "generally agree[d]" that "there are people with disabilities who are able

to perform the essential functions of the job that they're applying for, but by reason of their

disability are unable to satisfactorily pass or perform well on the Rutan interview process" and

that "a non-traditional accommodation would increase their ability to perform in an interview."

Ex. 19, Butler 30(b)(6) Dep., 69:4-19; 70:10-20.

103.    CMS oversees and participates in the Disability Hiring Initiatives Committee (the

Committee). Members of the Committee felt that "non-traditional accommodations" for "open

competitive employment testing" needed to be explored because there were candidates with

certain disabilities who needed such accommodations in order to compete for State agency jobs.

Ex. 19, Butler 30(b)(6) Dep., 74:6-9; 74:22-75:2; Ex. 40, CMS Disability Hiring Initiative Report

(July 2011-July 2012), Def. No. 1805-1814, *1813-14.

104.    The Committee also decided to explore non-traditional accommodations for the

"structured Rutan interview process." Ex. 40, CMS Disability Hiring Initiative Report (July 2011-

July 2012), Def. No. 1805-1814, *1813-14. In 2012, the Committee identified a future directive to

establish an "exploratory committee to research the demonstration of job skills by applicants as a

reasonable accommodation for applicants with disabilities (i.e., developmental disabilities, brain

injuries, speech impairments, etc.) participating in the Rutan interview process." Ex. 41, CMS

Disabled Hiring Initiative Report (July 2012-July 2013), Def. No. 1815-1825, *1825.

105.    The Committee determined that a demonstrative interview would be effective at

assessing the actual job skills of a disabled job applicant. Ex. 17, Shuck Dep., 49:13-50:2.

106.    However, this alternative demonstrative interview was not implemented. Ex. 17,

Shuck Dep., 49:13-50:2; Ex. 19, Butler 30(b)(6) 186:25-187:2.

107.    According to the most recent CMS Disabled Hiring Initiate Report, it remains a

directive in 2019/2020 to "explore and research and implement the demonstration of job skills by

applicants as a reasonable accommodation for applicants with disabilities participating in the

Rutan interview process." Available at:

www2.illinois.gov/cms/About/Reports/Documents/2019_Disabled_Hiring_Initiative.pdf (dated

September 1, 2019), p. 9.

***Plaintiffs' Requests for Accommodations to Application and Interactive Process***

108.    On June 11, 2014, Nick and Chad, through their attorney Barry Lowy, contacted

IDOT and requested a reasonable accommodation to IDOT's job application process. Answer,

ECF No. 22, ¶¶1g,32-33,60,71; Ex. 28, Lowy letters dated 6/11/2014, Def. No. 724-5 (Nick); Def.

No. 798-99 (Chad).

109.    Mr. Lowy explained that, due to their autism, Nick and Chad were "simply

incapable of passing the entrance test required by CMS and … incapable of interviewing for the

position." Ex. 28, Lowy Letters dated 6/11/2014, Def. No. 724-5 (Nick); Def. No. 798-99 (Chad);

Ex. 3, Nick/CMS Interrog. 2c/d; Ex. 4, Chad/CMS Interrog. 2c/d ("Due to Plaintiff's disability, it

would have been futile for him to take the State's required examination or participate in an

interview without accommodations. Accordingly, instead of engaging in this futile gesture,

Plaintiff, through his attorney Barry Lowy, contacted Defendants to request a reasonable accommodation to the examination and interview process."); Answer, ECF No. 22, ¶¶32-33.

110.    Mr. Lowy further explained that the testing and interview requirements, as applied to Nick and Chad, were not job-related and consistent with business necessity, as both men had already demonstrated their ability to perform the essential functions of the position and had done so for a period beyond the probationary employee period. Thus, he requested that IDOT waive for Nick and Chad the required testing and interview requirements as a reasonable accommodation. Ex. 28, Lowy letters dated 6/11/2014, Def. No. 724-5 (Nick); Def. No. 798-99 (Chad); Answer, ECF No. 22, ¶34.

111.    On July 9, 2014, IDOT's Chief Counsel Michael Forti responded stating that IDOT "does not object to a waiver of the testing and interviewing requirements," but "IDOT does not administer these requirements." Forti wrote: "[Y]our request to waive testing and interviewing would properly be made to CMS." Ex. 29, Forti letter dated 7/9/2014, Def. No. 726; Answer, ECF No. 22, ¶¶36-37.

112.    In July 2014, IDOT was willing to hire Nick and Chad so long as CMS waived the CMS open competitive test and the *Rutan* interview requirements, and AFSCME stood by its agreement to waive its bidding rights. Ex. 8, IDOT Supp. RTA 13; Ex. 33, IDOT EEOC Position Statement, Def. No. 1101-03, *1101.

113.    On August 28, 2014, Mr. Lowy contacted CMS to request a reasonable accommodation to the job application. Answer, ECF No. 22, ¶¶1g,38,60,70; Ex. 30, Lowy letters dated 8/28/2014, Def. No. 727-728 (Nick); 801-803 (Chad).

114.    Mr. Lowy explained that, due to their autism, Nick and Chad were "unable to interview or test in the standard fashion required by CMS." Mr. Lowy further explained that the

testing and interview requirements, as applied to Nick and Chad, were not job-related and consistent with business necessity, as both men had already demonstrated their ability to perform the essential functions of the position. Ex. 30, Lowy letters dated 8/28/2014, Def. No. 727-728 (Nick); 801-803 (Chad).

115.    On October 17, 2014, Mr. Shuck sent a letter to Mr. Lowy stating that CMS was in the process of researching the feasibility of bypassing the test and interview requirements generally required for *Rutan*-covered, Personnel Code-covered vacancies. Ex. 58, Shuck letter dated 10/17/2014, Def. No. 17841; Answer, ECF No. 22, ¶39.

116.    By early December, Mr. Shuck had not followed up with Mr. Lowy, so Mr. Lowy contacted him. Mr. Shuck did not return his telephone call. Answer, ECF No. 22, ¶40.

117.    On December 10, 2014, Mr. Lowy requested a "firm date" by which CMS would provide a response to Plaintiffs. Answer, ECF No. 22, ¶41; Ex. 31, Lowy/Shuck emails dated 12/10/2014-12/19/2014, Def. No. 730-32, *731.

118.    On December 19, 2014, Mr. Shuck sent an email to Mr. Lowy asking for additional information, including information about Nick's and Chad's current duties, reasonable accommodations, job coach, and evaluations. Answer, ECF No. 22, ¶42; Ex. 31, Lowy/Shuck emails dated 12/10-19/2014, Def. No. 730-32, *730.

119.    On December 19, 2014, Mr. Lowy provided Plaintiffs' job evaluations, performance studies, and information about the job coaches' role. Answer, ECF No. 22, ¶43.

120.    After December 19, 2014, neither CMS nor IDOT contacted Nick, Chad, or Mr. Lowy regarding their requests for a reasonable accommodation. Answer, ECF No. 22, ¶44.

121.    CMS never provided any substantive response to Plaintiffs' requests for reasonable accommodations. Ex. 14, Lowy Dep., 46:1-7 (Q: "Do you recall whether CMS ever gave you a

definite response about whether they could make this happen? A. No, I don't. I remember that very clearly. No. Q: No, they did not respond? A. They did not respond."); Ex. 18, O'Connell Dep., 138:15-139:4; Answer, ECF No. 22, ¶44.

122.    CMS never proposed any alternative accommodation ideas to Plaintiffs. Ex. 9, CMS RTA 19 (admitting that "in response to Plaintiffs' requests for reasonable accommodations, CMS did not propose any alternative accommodation ideas to Nick, Chad, Barry Lowy, or anyone else acting on Plaintiffs' behalf"); Ex. 14, Lowy Dep., 59:7-60:5.

123.    Indeed, after December 19, 2014, neither CMS nor IDOT contacted Nick, Chad or Mr. Lowy to seek additional information, discuss the outstanding requests for accommodations, or grant (or even deny) any aspect of the requested accommodations. Answer, ECF No. 22, ¶44.

124.    CMS stated that IDOT did not provide the information necessary to evaluate Plaintiffs' requests for reasonable accommodations. Ex. 32, CMS EEOC Position Statement, Def. No. 825-833, *830.

125.    IDOT stated that it had provided CMS with information and was unsure what additional information CMS required. Ex. 33, IDOT EEOC Position Statement, Def. No. 1101-1103, *1101.

126.    Dr. Owens provided expert testimony that reasonable accommodations exist which would enable CMS and IDOT to accurately assess Nick's and Chad's qualifications, skills and abilities. Ex. 21/22, Owens Decl. ¶41; Ex. 12,Owens Dep. 44:4-8.

127.    Dr. Owens testified that in lieu of the established testing and interview process, Nick's and Chad's abilities could be evaluated based on their past performance. Owens Decl. ¶41. With respect to the CMS test, Dr. Owens opined that Nick and Chad could be accommodated through a pre-employment examination based only on the essential functions of the skills at issue

34

and not their ability to process and respond to complex questions or a review of a video demonstrating their abilities. Owens Decl. ¶42, With respect to the Rutan interview, Dr. Owens testified that individuals with communication deficits, like Nick and Chad, can be evaluated through a hands-on interview where skills are demonstrated instead of explained or by providing responses through alternative interview strategies, such as a work sample, video resume, or a work simulation. Owens Decl. ¶43. Alternatively, information could be provided by someone with personal knowledge of the individual's abilities who has expressive language skills, such as a parent or a vocational support professional. Ex. 21/22, Owens Decl. ¶¶44; Ex. 12, Owens Dep. 44:9-47:15.

128.   Dr. Owens also explained that, through an interactive dialogue with CMS and IDOT, it is likely that additional alternative accommodations could have been identified. Ex. 21/22, Owens Decl. ¶45.

129.   Dr. Owens testified that other states have implemented programs to ensure that there are viable paths to employment for individuals whose disabilities preclude them from interviewing or testing competitively. Ex. 21/22, Owens Decl. ¶46.

## ARGUMENT

Summary judgment is appropriate where, as here, "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). Once a moving party shows the absence of a genuine issue of material fact, the non-moving party must come forward with specific evidence, not mere allegations or denials, which demonstrates the existence of a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291, 294 (7th Cir. 1997). A party moving for summary judgment "can prevail just by showing that the other party has no evidence on an issue on which that party has the burden of proof." *Brazinski v.*

35

*Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1183 (7th Cir. 1993); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (a mere "scintilla" of evidence in support of the non-movant's position is not sufficient to avoid summary judgment).

### A.     Standard *Prima Facie* Case in ADA Cases

Plaintiffs' evidence establishes the standard *prima facie* ADA case as a matter of law, as Plaintiffs have disabilities as defined by the ADA; are qualified to perform the essential functions of a job with or without an accommodation; and suffered an adverse action because of their disability. *See Edwards v. BNSF Ry. Co.*, 2015 WL 6690020 at *4 (C.D. Ill. Nov. 2, 2015).

First, Plaintiffs have ADA-protected disabilities and Defendants cannot argue otherwise. Both Nick and Chad have Autism Spectrum Disorder (SUMF ¶¶1,5) causing substantial limits in the major life activities of talking, communicating, and interacting with others (SUMF ¶¶2-3,6-7) and brain functioning. *See* 28 C.F.R. 35.108(d)(2)(iii)(E) (autism substantially limits brain function).

Second, testimony from Plaintiffs' supervisor firmly establishes that Plaintiffs were qualified for a position within the Stats Unit, either for the position of Office Associate Option II or a position reclassified as Office Assistant but doing work associated with the position of Office Associate Option II. (SUMF ¶¶13-14,17-18,20-21,24-26) They worked hard and excelled in their positions. (SUMF ¶24) Indeed, through Keldermans' testimony, Plaintiffs demonstrated that during their time in the Stats Unit, Nick and Chad completed "all the usual duties required for" the position of Office Associate Option II, within the "same amount of time" and "without special assistance" (SUMF ¶18). Nick and Chad were 100% as productive as other employees (SUMF ¶21), with production rates often towards the top when compared to other IDOT employees

36

(SUMF ¶26). As a result, their supervisors and others in IDOT management wanted to hire Nick and Chad for permanent positions. (SUMF ¶30)

Finally, Plaintiffs suffered adverse employment actions. Not only did they fail to obtain a reasonable accommodation, *see infra Section C*, they were shut out of Defendants' job application process, and thus unable to compete for permanent employment, *see infra Section B. See*, *e.g*., *EEOC v. Creative Networks, L.L.C.*, 912 F. Supp. 2d 828, 839 (D. Ariz. 2012) (describing the "'adverse employment decision' as the closing of the job opening … and the loss of opportunity even to compete for the position").

### B.    The ADA Prohibits the Use of Certain Qualification Standards, Employment Tests, and Other Selection Criteria (Count III)

As a result of their autism, Nick and Chad have significant limitations in their expressive language and executive functioning skills. (SUMF ¶¶1-8) Despite these limitations, Nick and Chad excelled in their positions within IDOT's Stats Unit, doing quality work comparable to individuals with the job title of Office Associate Option II. (SUMF ¶¶13-14,17-18,20-21,24,26) Nick and Chad wanted to become permanent IDOT employees (SUMF ¶¶27,29) and their IDOT supervisors wanted to hire them (SUMF ¶30).

Yet despite their demonstrated job skills (SUMF ¶¶13-14,17-18,20-21,24, 26), Nick and Chad could not obtain permanent employment because, to do so, they would have had to pass a CMS test full of complex questions unrelated to the job (SUMF ¶¶39-40, 52-57,62) and score well on a *Rutan* structured interview that required them to respond to complex questions that they could not answer (SUMF ¶¶40,80-84). In other words, Defendants' test and interview requirements prevented Nick and Chad from getting a job they had a proven ability to do.

This result is exactly what Congress intended to prevent with Section 102(b)(6) of the ADA, which bars employers from using "qualification standards, employment tests or other

selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6); 29 C.F.R. § 1630.10. The "purpose of this provision is to ensure that individuals with disabilities are not excluded from job opportunities unless they are actually unable to do the job." *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 698 (7th Cir. 1998) (quoting 29 C.F.R. Pt. 1630, App. § 1630.10).

To prove a *prima facie* claim under Section 102(b)(6), plaintiffs must identify the challenged employment practice and demonstrate that it screens out or tends to screen out an individual or a class of individuals with disabilities. *Edwards*, 2015 WL 6690020, at *4 (citing *Bates v. United Parcel Serv. Inc.*, 511 F.3d 974, 993 (9th Cir. 2007)). The burden then shifts to the defendant to show that the alleged discriminatory criteria is job-related for the position in question and consistent with business necessity and that such performance cannot be accomplished by reasonable accommodations. *Edwards*, 2015 WL 6690020, at *4 (citing *Bates*, 511 F.3d at 993); *EEOC v. Aurora Health Care, Inc.,* 2015 WL 2344727, at *18 (E.D. Wis. May 14, 2015) (citing *Hendricks-Robinson*, 154 F.3d at 698-99).

Summary is judgment is warranted here because there is no genuine issue of material fact as to whether Defendants' testing and interview processes are selection criteria and employment tests that screen out or tend to screen out Nick and Chad from a data entry position (either Office Associate or Office Assistant) in IDOT's Stats Unit. Nor can Defendants meet their burden to establish a genuine issue of material fact as to whether the test or interview processes are job-related and consistent with business necessity and that such performance cannot be accomplished by reasonable accommodation.

38

1.   **Defendants' Test and Interview Processes Constitute Employment Tests and Other Selection Criteria**

There is no doubt that Defendants' test and interview processes are the very type of screening mechanisms subject to Section 102(b)(6) of the ADA. *See* 29 C.F.R. Pt. 1630, App. § 1630.10 ("This provision is applicable to all types of selection criteria, including safety requirements … and employment tests."). Individuals seeking permanent employment within IDOT's Stats Unit, including for the position of Office Associate and Office Assistant, must take a CMS automated test and participate in a *Rutan* structured interview. (SUMF ¶¶39-40,74,76) Defendants admit these processes are eligibility criteria within the meaning of the ADA. (SUMF ¶40)

2.   **Defendants' Application Process Screens out Nick and Chad**

After identifying the challenged employment practice, plaintiffs must demonstrate that such practice screens out or tends to screen out an *individual* with a disability *or* a class of individuals with disabilities. *Edwards*, 2015 WL 6690020, at *4; *EEOC v. Aurora Health Care, Inc.,* 2015 WL 2344727, at *1. "[T]he exclusionary effect of a selection procedure usually must be looked at in relation to a particular individual who has particular limitations caused by a disability." EEOC Technical Assistance Manual, Title I of the ADA, § 4.3.2 (1992) (available at 7 Emp. Discrim. Coord. Forms, Pleadings and Practice Aids § 4:13)). Section 102(b)(6) is different from the traditional disparate impact analysis, such as that under Title VII of the Civil Rights Act, in that Section 102(b)(6) "may be applied to an *individual* who is screened out by a selection procedure because of disability, as well as to a class of persons." *Id.* (emphasis in original). *See also Chic. Reg'l Council of Carpenters v. Thorne Assoc., Inc.*, 893 F.Supp.2d 952 (N.D. Ill. 2012) (plaintiff successfully alleged he was screened out of a position under Section 102(b)(6) of the ADA due to an employer's fitness-for-hire test that required lifting); *Valle v. City of Chi.*, 982

F.Supp. 560, 566 (N.D. Ill. 1997) (plaintiff sufficiently asserted that his disability prevents him from completing mandatory 1.5 mile running test).

a.    **The CMS Automated Test Screens Out Nick and Chad**

There is no real dispute that Defendants' hiring process, beginning with the CMS automated test, has an exclusionary effect on Nick and Chad due to their autism. Defendants themselves acknowledge the impact their testing requirements have on people with certain disabilities, such as Nick and Chad. IDOT's former ADA Coordinator Dave Dailey wrote that Nick "is unable to test … in the usual manner." (SUMF ¶65) Former IDOT employee Bruce Harmening testified: "I didn't see personally how [Nick and Chad] could get through a Rutan interview or an application through the regular channels." (SUMF ¶65) Harmening further testified that one reason people with cognitive disabilities were unable to obtain permanent employment with the State was because they were likely unable to take the CMS open competitive test. (SUMF ¶94) Harmening, along with IDOT's Chief Counsel Michael Forti, sent a memo to IDOT's Secretary identifying the barriers participants with cognitive disabilities in the SPWD program faced in obtaining permanent employment without test and interview waivers. (SUMF ¶¶95-96)

Similarly, CMS, through its Disability Initiative Hiring Committee, identified the need to explore "non-traditional types of accommodations for open competitive employment testing," (SUMF ¶103) recognizing the very real barriers its testing procedures posed to individuals with significant disabilities, like Nick and Chad. *See* (SUMF ¶100) (CMS considered alternatives for individuals with "severe disabilities that interfere with the normal testing … process"). CMS was also aware of the General Assembly's findings in the Supported Employment Act that "a number

of severely handicapped people are unable to compete successfully in State open competitive merit examinations." (SUMF ¶98)

While Defendants' admissions independently establish the exclusionary effect the CMS automated test had on Nick and Chad due to their disabilities, Laura Owens, Ph.D. offered additional, uncontroverted expert testimony that the CMS test would not accurately assess Nick's and Chad's abilities to perform a job and, instead, would be a "total barrier" to moving forward in the hiring process. (SUMF ¶¶68,72) Dr. Owens, who has a wealth of experience in the field of disability employment (SUMF ¶66) and who conducted a comprehensive evaluation of the selection criteria at issue and Plaintiffs' skills and deficits (SUMF ¶67), explained that Nick and Chad both have substantial deficits in expressive language and executive functioning as a result of their autism (SUMF ¶¶2-4,6-8) and that these deficits prevent them from sitting down for a test, reading examination questions, and providing appropriate answers in response to questions (SUMF ¶69). Dr. Owens' testimony is consistent with the statements of Nick's and Chad's parents (SUMF ¶64) as well as Defendants' admissions (SUMF ¶¶65,93-98,100-103).

Further, Dr. Owens concluded that the CMS automated tests create unnecessary barriers because they require skills that Nick and Chad do not have because of their disability but, critically, are not required for a position within IDOT's Stats Unit. (SUMF ¶70) As examples, the CMS automated test for Office Associate asks test-takers ██████████████████████ ████████████████████████████████████████ (SUMF ¶¶52,70) This task is not possible for Nick and Chad due to their autism-related language deficits; they simply would not understand these questions, or be able to answer them correctly. (SUMF ¶70) Likewise, the CMS automated test for Office Assistant asks complex questions to assess the test-takers' interpersonal skills—another skill Nick and Chad lack due to their autism-related deficits.

(SUMF ¶70) Importantly, however, these skills are not necessary to be a successful employee in IDOT's Stats Unit—as Nick and Chad have already proven. (SUMF ¶¶17-18,20-21,56,62,70)

Dr. Owens explained that, while there is a small subset of test questions that purport to examine an individual's ability to do data entry, even these do not evaluate how well an applicant actually performs data entry. (SUMF ¶71) Instead, they evaluate the individual's ability to read a question, understand the question, read an answer, understand the answer, and use problem-solving skills to determine which answer is correct—a skill set different from what is required to perform data entry itself and one that Nick and Chad, due to their autism, do not have. (SUMF ¶71)

Defendants have proffered no evidence to rebut the abundance of evidence established by Plaintiffs. No reasonably jury could find anything other than the CMS test screened out or tended to screen out Nick and Chad from consideration for employment.

### b. The *Rutan* Structured Interview Screens Out Nick and Chad

The *Rutan* structured interview is the second aspect of the Defendants' job application process that screens out, or tends to screen out, Nick and Chad. Here, too, the evidence points to one and only one conclusion: the *Rutan* structured interview, as currently administered, would improperly disqualify Nick and Chad from consideration for permanent employment with IDOT. This conclusion is admitted by Defendants; self-evident from the facts of this case; and confirmed by expert testimony.

Nick and Chad lack the communication skills necessary to succeed in the *Rutan* structured interview process (SUMF ¶84), a truth recognized by IDOT employees (SUMF ¶85). Harmening testified that there were SPWD participants whose disabilities made them "absolutely unable to interview" and that "Chad and Nick were good examples" of this (SUMF ¶85). He further

42

testified that it was "impossible under the circumstances and the laws and policies" to hire participants of the SPWD program who had "cognitive disabilities," even though they had demonstrated their ability to be successful in "some state jobs." (SUMF ¶97) He further stated: "A person that can't communicate has a difficult time competing in an interview." (SUMF ¶94)

Similarly, CMS acknowledged the enormous barriers the *Rutan* structured interview process created for people with significant communication-related disabilities. (SUMF ¶¶100-102, 104) During the 30(b)(6) deposition of Wendy Butler as representative of CMS, CMS "generally agreed" that "there are people with disabilities who are able to perform the essential functions of the job that they're applying for, but by reason of their disability are unable to satisfactorily pass or perform well on the Rutan interview process unless they are given a non-traditional accommodation." (SUMF ¶102) CMS also admitted that an individual whose disability affects their interview skills or who has significant struggles with social interactions would be at a disadvantage during the interview process. (SUMF ¶101)

In addition to Defendants' admissions, the exclusive effect of the *Rutan* structured interview process on Plaintiffs is self-evident due to the nature of Nick's and Chad's disabilities. The *Rutan* interview process requires job applicants to participate in a structured interview where a team of interviewers asks a series of pre-selected questions verbatim and score applicants' answers. (SUMF ¶¶80-81) Simply put, due to their significant deficits in expressive language by reason of their autism spectrum disorder (SUMF ¶¶1-9), Nick and Chad cannot possibly succeed in this type of structured interview, where individuals are scored based on how they answer complex questions. (SUMF ¶¶80-81) *See also* (SUMF ¶9) (noting a necessary diagnostic criteria for autism spectrum disorder is "[p]ersistent deficits in social communication and social interaction across multiple contexts, as manifested by… [d]eficits in social-emotional reciprocity,

ranging, for example, from abnormal social approach and failure of normal back-and-forth conversation… to failure to initiate or respond to social interactions"). The deposition testimony of Nick's mother perfectly illustrates the barrier the *Rutan* interview poses. When asked how Nick would respond if asked about the data entry work he did at IDOT, she said he would likely "give you a high five and smile. There probably would not be any words because he would not know any of those words to answer." (SUMF ¶84)

Dr. Owens also considered the impact of the *Rutan* structured interview process on Nick's and Chad's employment prospects and concluded that it would prevent Nick and Chad from being considered for permanent employment. (SUMF ¶¶87,91) Dr. Owens explained that Nick's and Chad's severe deficits in expressive language prevent them from responding to complex questions in any meaningful way, either verbally or in writing. (SUMF ¶88) Nick, who is non-verbal, communicates primarily through vocalization and gestures so he cannot respond verbally to any questions. (SUMF ¶88). Chad's verbal abilities are limited such that he can only respond with a one-word answer, most likely repeating the last word of the sentence or question. (SUMF ¶88). Dr. Owens further explained that, while Nick and Chad have sufficient receptive language skills to understand simple questions, comments, and instructions, their deficits in receptive language prevent them from comprehending and processing abstract or complex terms, phrases and questions, and she pointed specifically to language used during *Rutan* structured interviews for the Office Associate position that would be "impossible for [Nick and Chad] to understand." (SUMF ¶89)

Because Plaintiffs, due to the very nature of their disabilities, cannot meaningfully answer complex questions verbally or in writing, the required *Rutan* structured interview would screen them out of consideration for permanent employment. Defendants cannot rebut the abundance of

evidence, including expert opinions, showing that the *Rutan* structured interview inherently

screens out or tends to screen out Nick and Chad from consideration for permanent employment.

### c.      Nick and Chad are Not Required to Provide Statistical Evidence to Support Their Claim

Plaintiffs anticipate that Defendants will argue that they are required to use statistical

methods of proof to establish a *prima facie* case under Section 102(b)(6). This is not correct.

Statistical evidence is not required for cases brought under Section 102(b)(6) of the ADA.

According to the Equal Employment Opportunity Commission, "[i]t is not necessary to make

statistical comparisons between a group of people with disabilities and people who are not

disabled to show that a person with a disability is screened out by a selection standard." EEOC

TAM § I-4.3.2; *see*, *e.g.*, *Hendricks-Robinson*, 154 F.3d at 698-700 (reaching conclusion under

Section 102(b)(6) without any discussion of statistical evidence regarding the impact of the CBA

language on disabled employees); *Williams v. ABM Parking Servs. Inc.*, 296 F.Supp.3d 779, 790

(E.D. Va. 2017) ("statistical evidence is unnecessary to prove a prima facie disparate impact

claim under the ADA"). Indeed, when considering whether to require statistics to prove disparate

impact under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, the precursor to the

ADA, Congress expressly rejected the requirement. See 45 C.F.R. Pt. 84, App. A; 42 Fed. Reg.

22685, 22688-89 (May 4, 1977) (rejecting proposed requirement of "a statistical showing of

adverse impact on handicapped persons …  because the small number of handicapped persons

taking tests would make statistical showings of 'disproportionate, adverse effect' difficult and

burdensome."); *see also* 42 U.S.C. § 12201(a) (nothing in the ADA shall be construed to provide

lesser protections than provided by the Rehabilitation Act or regulations issued thereunder).

Requiring statistical evidence is also inconsistent with the plain language of the ADA. As

discussed above, unlike disparate impact claims brought under Title VII, which must adversely

affect a *class* of individuals, Section 102(b)(6) extends to standards that screen out an *individual or* class of individuals with disabilities. Requiring plaintiffs bringing a claim under Section 102(b)(6) to prove via statistical evidence that an employment test or other selection criteria that screens out or tends to screen out *an individual* with a disability also affects an entire *class* of individuals would be incompatible with the plain language of the ADA. EEOC TAM § I-4.3.2.

Further, requiring statistical evidence in an ADA case is highly impractical given the diverse nature of disability. It would be "difficult, if not impossible, to make general determinations about the effect of various standards, criteria and procedures on people with disabilities." EEOC TAM § I-4.3.2; *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 756 (7th Cir. 2006) (Easterbrook, J., concurring) (reading into the majority opinion a holding that distinguishes disparate-impact theories in disability discrimination cases brought under Title II of the ADA from cases brought under Title VII; explaining that for disability-discrimination cases, "the circumstances of the affected persons may be so different … that statistical analysis would be impractical"). Unlike groups associated by their sex, race, or religion protected by Title VII, people with disabilities are not a group associated with a singular characteristic, but rather a wide variety of disabilities that defy uniformity.

The Seventh Circuit's decision in *Roberts v. City of Chicago*, 817 F.3d 561 (7th Cir. 2016) does not compel a different result. In *Roberts*, the plaintiffs challenged the validity of the hiring process mandated by the court in a separate class action, *Lewis v. City of Chicago*, No. 98-cv-5596 (N.D. Ill.), involving race discrimination in the City's hiring of firefighters. *Id.* at 563-64. The *Roberts* plaintiffs alleged that there were unfair delays caused by the defendant's medical examination, a question governed by the *Lewis* order and by 42 U.S.C. § 12112(d) (Section 102(d)), a provision of the ADA entirely distinct, both in form and purpose, from the one at issue

here. Neither the plaintiffs' complaint nor their appellate brief even addressed Section 102(b)(6). Though the Court noted that the *Roberts* plaintiffs did not plead facts sufficient to show a statistically significant disparity between them and nondisabled *Lewis* class members, the Court did not hold that a statistical disparity is a necessary prerequisite to a successful Section 102(b)(6) claim. Nor did the Court discuss, much less rule out, the possibility that plaintiffs can prevail by providing alternative – or more direct – methods of proof, such as Nick and Chad have provided here. *Roberts*, 817 F.3d at 566. Plaintiffs' undisputed evidence demonstrates that the CMS exam and the *Rutan* structured interview exclude them through direct evidence consisting of Defendants' own admissions, the self-evident nature of the exclusion, and credible expert testimony.

To the extent that *Roberts* is read, contrary to Plaintiffs' interpretation, to require evidence of disparate impact on a group even in individual ADA cases, Plaintiffs still prevail, as Plaintiffs have an abundance of evidence demonstrating the impact of Defendants' test and interview on people with similar disability-related limitations. Defendants have acknowledged for years the impact their application process has on people with certain disabilities (SUMF¶¶93-103) and Dr. Owens confirms that her expert opinions apply to "others with ASD with comparable limitations" (SUMF ¶¶73,92).

Further, even if this case were to be analyzed through the lens of a traditional disparate impact claim outside of Section 102(b)(6), statistical evidence is still unnecessary. While statistics are one way to establish a *prima facie* case of disparate impact, they are not required when plaintiffs have other methods of proof, including here, where the adverse impact is self-evident or

47

would occur in the ordinary course (SUMF ¶84),[6] is supported by credible expert testimony

(SUMF ¶¶68,72,87,91),[7] and has been admitted to by the defendants (SUMF ¶¶65,85,93-97,99-

104).[8] Simply put, Plaintiffs have demonstrated that the CMS automated test and the *Rutan*

structured interview screen out, or tend to screen out, them – and others with similar limitations.

Defendants have no evidence to the contrary.

> **3.      Defendants Have Not (and Cannot) Raise a Genuine Issue of Material Fact as to Whether its Hiring Process is Job-Related and Consistent with Business Necessity**

Once the plaintiffs have identified the problematic tests or selection criteria and

demonstrated that such tests or selection criteria screen out or tend to screen out an individual

with a disability, the burden shifts to the defendants to raise the affirmative defense that the

offending tests or selection criteria are job-related and consistent with business necessity and that

performance cannot be accomplished by reasonable accommodations. *Bates*, 511 F.3d at 993;

---

[6] *See, e.g., Lewis v. New York City Transit Auth.* 12 F.Supp.3d 418, 447 (E.D.N.Y. 2014) (explaining that while statistical evidence of disparity is one way to demonstrate an adverse impact, it is "not required" where a reasonable juror could conclude that the employer's headwear policy had a disproportionate adverse impact on Muslim women and Sikh men even without statistical evidence); *Garcia v. Woman's Hosp. of Texas,* 97 F.3d 810, 813 (5th Cir. 1996) (holding plaintiff was not required to provide statistical evidence given impact of neutral policy on "substantially all pregnant women"); *see also Dothard v. Rawlinson,* 433 U.S. 321, 331, 97 S.Ct. 2720, 2728, 53 L.Ed.2d 786 (1977) (observing plaintiffs "are not required to exhaust every possible source of evidence, if the evidence actually presented on its face conspicuously demonstrates a job requirement's grossly discriminatory impact").

[7] *See, e.g.*, *Lynch v. Freeman,* 817 F.2d 380, 387–88 (6th Cir. 1987) (finding "plaintiff was not required to prove her case by statistics" in light of credible, expert testimony, and noting that statistics are not the only way to prove disparate impact under Title VII); *see also Bradley v. Pizzaco of Nebraska, Inc.*, 939 F.2d 610, 613 (8th Cir. 1991) (relying on expert testimony and not statistical evidence).

[8] *See, e.g., Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1118 (11th Cir. 1993) (explaining the burden shifts to the defendants in a Title VII disparate impact claim where the "practice or action" has "admittedly cause[d] a disparate impact").

*Atkins v. Salazar*, 455 F. App'x 385, 398 (5th Cir. 2011) (outlining defendant's burden of proof);

*Hendricks-Robinson*, 154 F.3d at 698. *See also* 42 U.S.C. § 12113(a), stating:

> It may be a defense to a charge of discrimination under this chapter that
> an alleged application of qualification standards, tests, or selection criteria that
> screen out or tend to screen out or otherwise deny a job or benefit to an individual
> with a disability has been shown to be job-related and consistent with business
> necessity, and such performance cannot be accomplished by reasonable
> accommodation, as required under this subchapter.

Defendants cannot establish a genuine issue of material fact as to this affirmative defense

and thus, summary judgment should be granted for Plaintiffs on this claim.

For an employment test or selection criteria to be "job-related," it must be "necessary and

related to 'the specific skills and physical requirements of the sought-after position.'" *Atkins*, 455

F. App'x at 398 (quoting *Cripe v. City of San Jose,* 261 F.3d 877, 890 (9th Cir. 2001); *Belk v.

Sw. Bell Tel. Co.,* 194 F.3d 946, 951 (8th Cir. 1999)). To demonstrate that a challenged practice

is "consistent with business necessity," the employer must show that it "substantially

promote[s]" the business's needs. *Bates*, 511 F.3d at 996; *Atkins*, 455 F. App'x at 398. Selection

criteria that do not concern an essential function of the job are not consistent with business

necessity. 29 C.F.R. Pt. 1630, App. § 1630.10; *Belk,* 194 F.3d at 951. The "business necessity"

standard is quite high, and "is not [to be] confused with mere expediency." *Cripe*, 261 F.3d at

890; *Wright v. Ill. Dep't of Children & Family Servs*., 798 F.3d 513, 523 (7th Cir. 2015)

(employers must "show the asserted 'business necessity' is vital to the business," as opposed to a

"mere expediency").[9]

---

[9] Case law interpreting this standard under Section 102(b)(6) is limited; thus, courts have
sometimes found persuasive judicial interpretations of the same phrase under Section 102(d) of
the ADA. *See, e.g., Aurora Health Care*, 2015 WL 2344727, at *18 (quoting cases decided under
Section 102(d)).

To show that "performance cannot be accomplished by reasonable accommodation" the employer must demonstrate either that no reasonable accommodation would cure the performance deficiency or that such reasonable accommodation poses an "undue hardship." *Bates*, 511 F.3d at 996-98; *see also Hendricks-Robinson*, 154 F.3d at 699.

> ### a. Defendants Cannot Establish that the CMS Test is Job-Related and Consistent with Business Necessity

Defendants cannot establish that the CMS automated test is job-related and consistent with business necessity for a position within IDOT's Stats Unit. The overwhelming evidence— including admissions by Defendants' own witnesses—shows that the CMS tests for the positions of Office Associate and Office Assistant bear little resemblance to the job functions of employees in IDOT's Stats Unit. Indeed, the Bureau Chief of the Traffic Safety Division, someone with intimate familiarity with the job responsibilities of individuals in that position (SUMF ¶¶15-16), testified that the vast majority of skills and concepts tested on the CMS test were not required of an individual in this position (SUMF ¶¶56,62) and had even alerted CMS to this fact years before (SUMF ¶59). No one who worked in the position of Office Associate in the IDOT Stats Unit, the position IDOT agrees was the one most comparable to the work performed by Nick and Chad (SUMF ¶¶13-14), had to draft documents, determine the appropriate use of punctuation, ensure correct grammar, use appropriate syntax or sentence structure, understand mathematical principles, do basic mathematical calculations, file documents, arrange data alphabetically, file records chronologically, or read and comprehend written instructions (SUMF ¶56). Nor did anyone have to compute currency amounts, make computations with decimals and percentages, initiate and maintain a positive relationship with the public, resolve misunderstandings or handle complaints. (SUMF ¶62) Nonetheless, these are the very skills the CMS tests for Office Associate and Office Assistant purport to assess. (SUMF ¶¶56,62) Selection criteria that do not concern an

essential function of the job are not job-related and consistent with business necessity. *See* 29 C.F.R. Pt. 1630, App. § 1630.10.

Defendants defend the CMS tests by explaining that they are designed to apply to broad job classifications, not individual job positions. (SUMF ¶¶45,50) *But this is precisely what makes the tests problematic.* It is not surprising that the CMS tests assess skills that have no bearing on the actual work within the IDOT Stats Unit because the tests were never even intended to assess the job skills for a specific position; rather, the tests were designed to assess skills within broad job title classifications (SUMF ¶50). The classifications of Office Associate and Office Assistant are extremely broad and apply to a huge number of positions (SUMF ¶¶46,48), many of which have very different job responsibilities (SUMF ¶¶47,49). And, what is more, many of the questions used to test for the position of Office Associate and Office Assistant are exactly the same questions as those used to test a number of separate job classifications. (SUMF ¶¶58,60) CMS itself did not deny that its automated tests for Office Associate or Office Assistant ask questions about job skills that are not required for positions within the Stats Unit. (SUMF ¶¶57,63)

CMS's decision to create such broad classifications, while likely more expedient for CMS, cannot satisfy the high "business necessity" standard. *See Wright*, 798 F.3d at 523 (explaining that business necessity cannot be confused with "mere expediency").

In addition, even if the CMS tests did ask questions that relate to the job responsibilities at issue here (which they do not), the tests *still* do not assess an individual's ability to actually perform the job task. Instead, they test an individual's ability to read a question, understand the question, read an answer, and problem-solve as to what the answer is. (SUMF ¶71)

51

**b.    Defendants Cannot Establish that the *Rutan* Structured Interview is Job-Related and Consistent with Business Necessity**

Defendants lack sufficient evidence to establish a genuine issue of material fact regarding whether the *Rutan* structured interview is job-related and consistent with business necessity. The interview assesses applicants for skills unrelated to the job at issue, such as comprehension of complex questions (necessary to understand the question), expressive language skills (necessary to respond to the question), as well as questions about substantive topics unrelated to the Stats Unit. (SUMF ¶¶82-83) The language used for these questions is complex (SUMF ¶89) and must be asked in exactly the same way for all candidates (SUMF ¶80). Yet to succeed in a position in the Stats Unit, an individual is not required to comprehend and answer complex questions or use expressive language. (SUMF ¶¶17-18,24-26,56,62,87-91) Indeed, although Nick and Chad cannot communicate answers to complex questions during a structured interview (*see Section 2b, supra*), they could—and did—complete "all the usual duties required for" the position of Office Associate. (SUMF ¶17)

Similarly, some *Rutan* interview questions pertain to concepts not required for the work of Office Associate in the Stats Unit, including questions about mathematics and fatal crash records. (SUMF ¶¶82-83) *See* 29 C.F.R. Pt. 1630, App. § 1630.10 (selection criteria that does not concern an essential function of the job is not consistent with business necessity). Accordingly, Defendants cannot raise a genuine issue of material fact as to whether their interview process is job-related and consistent with business necessity.

**c.    Defendants Cannot Show that Performance Cannot Be Accomplished with a Reasonable Accommodation**

Even *assuming arguendo* that Defendants have put forth sufficient evidence to raise a genuine issue of fact as to whether the CMS tests and *Rutan* structured interview are job-related

and consistent with business necessity (which they have not), they certainly cannot meet the

second requirement, that no reasonable accommodation exists that would cure the performance

deficiency. To show that "performance cannot be accomplished by reasonable accommodation,"

Defendants must demonstrate that *no* reasonable accommodation would cure the performance

deficiency or that such reasonable accommodation poses an "undue hardship" on the employer.

*Bates*, 511 F.3d at 996-97; *see also Hendricks-Robinson*, 154 F.3d at 699 ("Even when 'physical

fitness' is a selection criterion that is related to an essential function of the job ... it 'may not be

used to exclude an individual with a disability if that individual could satisfy the criterion with the

provision of a reasonable accommodation.'") (quoting 29 C.F.R. Pt. 1630, App. § 1630.10).

Defendants cannot meet this high burden. Indeed, Defendants and Plaintiffs both

identified a viable and effective alternative—a hands-on demonstration of the job applicant's

ability to the actual work required. (SUMF ¶¶105,127) Through its Disability Hiring Initiative

Committee, CMS explored the possibility of assessing candidates with disabilities via a hands-on

job demonstration (SUMF ¶103) and determined that a demonstrative test or interview would

effectively enable a disabled individual to adequately demonstrate their job-related skills (SUMF

¶105). Dr. Owens identified the very same accommodation as a viable solution. (SUMF ¶127)

She testified that a hands-on demonstration can be an effective and reasonable way for individuals

with a significant social communication disability, like Nick and Chad, to demonstrate their

abilities in lieu of a traditional assessment. (SUMF ¶127)

In addition to a hands-on demonstration, there are a number of other ways Defendants

could have assessed Nick's and Chad's abilities. (SUMF ¶¶126-128) Possibilities include an

assessment based on Nick's and Chad's past performance at IDOT, education, or training; an

examination based only on the essential functions of the position at issue and not an ability to

respond to questions; a review of a video demonstrating abilities; having a parent/vocational

support professional answer questions during an interview; and more. (SUMF ¶127) Defendants

simply cannot demonstrate that were *no* accommodations that provide reasonable alternatives to

the CMS automated tests and *Rutan* structured interview. Thus, summary judgment should be

granted to Plaintiffs on Count III.

### C.     Defendants Failed to Provide Plaintiffs with a Reasonable Accommodation (Count I)

Plaintiffs also seek summary judgment on Count I, Defendants' failure to provide

Plaintiffs with a reasonable accommodation. The ADA requires employers to provide reasonable

accommodations to qualified applicants and employees with disabilities seeking equal access to

the job application process. 42 U.S.C. § 12112(b)(5). Modifications or adjustments to the job

application process "enable a qualified applicant with a disability to be considered for the position

such qualified applicant desires[.]" 29 C.F.R. § 1630.2(o)(1)(i).

To establish a failure to accommodate claim, Plaintiffs must show: (1) they are qualified

individuals with a disability; (2) their employer was aware of their disability; and (3) their

employer failed to reasonably accommodate their disability. *EEOC v. Sears, Roebuck & Co.,* 417

F.3d 789, 797 (7th Cir. 2005). Employers and employees have an obligation to engage in the

interactive process to identify a reasonable accommodation. *Baert v. Euclid Beverage, Ltd.*, 149

F.3d 626, 633 (7th Cir. 1998). The interactive process requires employers to "make a reasonable

effort to determine the appropriate accommodation," 29 C.F.R. App. § 1630.9, by, among other

actions, "working with the disabled individual to produce a reasonable solution if one is

available," *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1062 (7th Cir. 2014).

It is undisputed that Nick and Chad are qualified individuals with disabilities (SUMF ¶¶13-14,17-18,20-21,24-26); Defendants were aware of their disabilities (SUMF ¶¶10,37); and Defendants failed to accommodate them (SUMF ¶¶120-123).[10]

It is also undisputed that Plaintiffs requested an accommodation to the job application process (SUMF ¶37), triggering Defendants' obligation to engage in the interactive process. *See Sears, Roebuck & Co.,* 417 F.3d at 803-04 (after an individual requests an accommodation, the "employer and the employee must work together through an 'interactive process' to determine the extent of the disability and what accommodations are appropriate and available."); *EEOC v. Chevron Phillips Chemical Co., LP,* 570 F.3d 606, 621-22 (5th Cir. 2009) (Plaintiff "adequately communicated the nature of her condition and her requested accommodations;" she "was not required to come up with the solution . . . on her own. . . . [T]he employer is required to engage in the interactive process so that together they can determine what reasonable accommodations might be available").

Defendants cannot raise a genuine issue of material fact to dispute that they failed to engage in the interactive process. CMS did not communicate its ultimate decision to Plaintiffs (SUMF ¶121); propose any alternatives to Plaintiffs' requested accommodation (SUMF ¶122); or explain why the request had been rejected (SUMF ¶¶120,123), all of which would have provided Plaintiffs with an opportunity to consider alternative accommodation ideas. *See Nichols v. Ill. Dept. of Transp. and Ill. Dept. of Cent. Mgmt. Servs.*, 152 F.Supp.3d 1106, 1125 (N.D. Ill. 2016) ("An employer cannot sit behind a closed door and reject the employee's requests for accommodation without explaining why the requests have been rejected or offering

---

[10] As asserted in Count IV of Plaintiffs' Complaint, the ADA prohibits entities from participating in a contractual or other arrangement or relationship that has the effect of discrimination. *See* 42 U.S.C. § 12112(b)(2); 29 C.F.R. § 1630.6. Thus, neither Defendant can escape liability due to the administrative arrangement between Defendants in their hiring process.

alternatives."); *Gile v. United Airlines, Inc.*, 213 F.3d 365, 373 (7th Cir. 2000) (explaining if an employer disagreed with the "proposed accommodation," it "had the affirmative obligation to seek [the employee] out and work with her to craft a reasonable accommodation, if possible.").

Defendants may assert that the accommodation Plaintiffs initially requested, waiver of the test and interview process (SUMF ¶¶110,113), was not reasonable. Plaintiffs contend this proposal was entirely reasonable given that Defendants could have assessed their qualifications through their past job performance (SUMF ¶127) and that neither IDOT nor AFSCME objected to Plaintiffs' request (SUMF ¶¶34-35,111-112). However, *even if Plaintiffs initial request was not reasonable,* it does not prevent summary judgment from being granted to Plaintiffs. Defendants are squarely at fault for the breakdown of the interactive process, which prevented the Parties from considering other possible accommodations. *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996) ("A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.").

Among other possibilities (SUMF ¶128), the CMS automated test could have been adjusted or modified, an accommodation expressly recognized in the ADA. 42 U.S.C. § 12111(9)(B) (defining "reasonable accommodation" to include "adjustment or modifications of examinations"). (SUMF ¶127) Instead of requiring Nick and Chad to pass an automated test asking a series of questions, CMS could have required them to pass a performance-based exam focused exclusively on the essential functions of the position at issue. (SUMF ¶127) Alternatively, Nick and Chad could have been evaluated through a review of their training and education, consistent with CMS's approach to other classifications, or through a review of a video demonstrating their abilities. (SUMF ¶¶44,127)

Similarly, a reasonable accommodation could have been reached for the *Rutan* structured interview process. Among other options (SUMF ¶128), Nick and Chad could have been provided with a hands-on interview, where they demonstrate skills relevant to the job in the Stats Unit; or they could have provided responses through alternative means such as a work sample, video resume, work simulation, or by permitting a parent or job coach familiar with Nick's and Chad's skills and work histories to answer on their behalf. (SUMF ¶127) Defendants cannot possibly show that these alternatives are unreasonable given that CMS itself has recognized the importance of exploring these alternatives for nearly a decade. (SUMF ¶107) Thus, summary judgment should be granted to Plaintiffs on Count I.

## CONCLUSION

Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Summary Judgment on Counts I and III of Plaintiffs' Complaint.

RESPECTFULLY SUBMITTED,

s/ *Rachel M. Weisberg*_____
One of the Attorneys for Plaintiffs

Rachel M. Weisberg
Jin-Ho Chung
Equip for Equality
20 North Michigan Avenue, Suite 300
Chicago, Illinois 60602
(312) 895-7319
(312) 341-0022
RachelW@equipforequality.org
JinHo@equipforequality.org

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to Local Rule 7.1(B)(4), that Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment complies with the type volume limitation as the argument section in Plaintiffs' Memorandum does not contain more than 7,000 words or 45,000 characters. The argument section of Plaintiffs' Memorandum has 6,784 words and 44,473 characters, including all headings, footnotes, and quotations.

s/ *Rachel M. Weisberg*
One of the Attorneys for Plaintiff

Rachel M. Weisberg
Jin-Ho Chung
Equip for Equality
20 North Michigan Avenue, Suite 300
Chicago, Illinois 60602
(312) 895-7319
RachelW@equipforequality.org
JinHo@equipforequality.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 28, 2020, I electronically filed the foregoing **Plaintiffs'**

**Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment** with

the Clerk of the Court using the ECF system, which will send notice of such filing to all parties of

record.

<u>s/ *Rachel M. Weisberg*</u>
One of the Attorneys for Plaintiff

Rachel M. Weisberg
Jin-Ho Chung
Equip for Equality
20 North Michigan Avenue, Suite 300
Chicago, Illinois 60602
(312) 895-7319
RachelW@equipforequality.org
JinHo@equipforequality.org