**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**SPRINGFIELD DIVISION**

| | |
|---|---|
| NICHOLAS LESKOVISEK, by his next friend, LORI STANLEY, and CHAD UNDERWOOD, by his next friend, KIM UNDERWOOD, | |
| Plaintiffs, | No. 17-cv-03251 |
| v. | Hon. Judge Colin S. Bruce |
| ILLINOIS DEPARTMENT OF TRANSPORTATION and ILLINOIS DEPARTMENT OF CENTRAL MANAGEMENT SERVICES, | Hon. Mag. Judge Eric I. Long |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

i

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED
MATERIAL FACTS ...................................................................................................... 2

  A.   Undisputed Material Facts ................................................................................. 2

  B.   Disputed Material Facts ..................................................................................... 2

  C.   Disputed Immaterial Facts ............................................................................... 12

  D.   Undisputed Immaterial Facts ........................................................................... 13

  E.   Plaintiffs' Statement of Additional Material Facts ........................................... 18

III.    ARGUMENT ..................................................................................................... 25

  A.   Plaintiffs Have Established Their *Prima Face* Case ......................................... 25

    1. Plaintiffs are "Qualified Individuals" .......................................................... 25

    2. Defendants' Argument Regarding Vacancies Must be Rejected ....................... 29

    3. Plaintiffs' Accommodation Requests Were Reasonable, and Defendants' Failure to
Participate in the Interactive Process Prevented the Identification of Alternative Reasonable
Accommodations ............................................................................................... 32

      a.   Plaintiffs were not Seeking a "Promotion" as an Accommodation ............................ 34

      b.   Plaintiffs' Request for a Waiver Was Reasonable ....................................... 36

      c.   Defendants' Assertions about Job Coaches as a Reasonable Accommodation are
Unpersuasive ................................................................................................ 38

    4. Nick and Chad Raised Genuine Issues of Material Fact About the True Reason IDOT
Ended the SPWD Program and Their Employment ................................................ 40

  B.   Defendants Cannot Prevail on Their Affirmative Defenses ................................. 44

    1. Plaintiffs' Requests Would Not Pose an Undue Hardship ................................. 44

      a.   Defendants Cannot Show Accommodations Would Pose an Undue Hardship, Violate
a *Bona Fide* Seniority System ........................................................................ 45

      b    Defendants Cannot Show Accommodations Would Pose an Undue Hardship, Violate
the State's "Best-Qualified Hiring System" Stemming from the Personnel Code.............. 47

    2. Defendants Cannot Show the CMS Test and *Rutan* Structured Interview are Job-Related
and Consistent with Business Necessity ............................................................... 48

IV.     CONCLUSION ................................................................................................. 50

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................. 25

*Atkins v. Salazar*, 455 F. App'x 385 (5th Cir. 2011) ...................................................... 49

*Belk v. Sw. Bell Tel. Co.,* 194 F.3d 946, 951 (8th Cir. 1999) ........................................ 49

*Bettis v. Dep't of Human Serv. of State of Ill.*, 70 F.Supp.2d 865 (C.D. Ill. 1999) ...................... 35

*Billhartz v. C.I.R.*, 794 F.3d 794 (7th Cir. 2015).......................................................... 45

*Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131 (2nd Cir. 1995) ................................ 26

*Brown v. Milwaukee Bd. of Sch. Dir.*, 855 F.3d 818, 827-28 (7th Cir. 2017)................................ 35

*Brown v. Smith*, 827 F.3d 609 (7th Cir. 2016) ............................................................. 29

*Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281 (7th Cir. 1996) ........................... 33, 37, 40

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64, 126 S. Ct. 2405, 165 L.Ed. 2d 345 (2006)....................................................... 43

*Burrage v. United States*, 571 U.S. 204 (2014)............................................................. 43

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)............................................................. 25

*Coleman v. Caterpillar, Inc.,* 2017 WL 3840423 (C.D. Ill. Sept. 1, 2017).................................. 29

*Coleman v. Donahoe,* 667 F.3d 835 (7th Cir. 2012) ...................................................... 40

*Dalton v. Subaru-Isuzu Auto., Inc.*, 141 F.3d 667 (7th Cir. 1998) ................................ 31

*Diaz v. Kraft Foods Global, Inc.,* 653 F.3d 582 (7th Cir. 2011).............................................. 12, 38

*Dunderdale v. United Airlines, Inc.*, 807 F.3d 849 (7th Cir. 2015) .................................. 30, 45, 47

*EEOC v. Aurora Health Care, Inc.,* 2015 WL 2344727 (E.D. Wis. May 14, 2015) ................... 50

*EEOC v. Creative Networks, LLC*, 912 F. Supp. 2d 828 (D. Ariz. 2012)...................................... 38

*EEOC v. United Airlines, Inc.*, 693 F.3d 760 (7th Cir. 2012) ......................................... 30

*EEOC v. Wal-Mart Stores, Inc.*, 345 F. Supp. 3d 1046 (W.D. Wis. 2018)............................. 27, 39

*EEOC v. Wal-Mart Stores, Inc.*, 17-cv-739 (W.D. Wis. Oct. 10, 2019) ................................ 39

*EEOC. v. Sears, Roebuck & Co.*, 417 F.3d 789 (7th Cir. 2005) ...................................... 33

*Ekstrand v. Sch. Dist.*, 583 F.3d 972 (7th Cir. 2009) ..................................................... 44

*Fortino v. Vill. of Woodridge*, 2018 WL 1695363 (N.D. Ill. Apr. 7, 2018)................................... 29

*Frazier-White v. Gee*, 818 F.3d 1249 (11th Cir. 2016) ................................................... 47

*Gile v. United Airlines, Inc*., 213 F.3d 365 (7th Cir. 2000)............................................................. 33

*Haschmann v. Time Warner Entm't Co.*, 151 F.3d 591 (7th Cir. 1998).................................... 32, 36

*Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 698 (7th Cir. 1998) ........................................ 49

*Int'l Bros. of Teamsters v. United States*, 431 U.S. 324 (1977) ...................................................... 37

*Kauffman v. Petersen Health Care VII, LLC*, 769 F.3d 958 (7th Cir. 2014) ................................. 29

*Madden v. Rolls Royce Corp.*, 563 F.3d 636 (7th Cir. 2009)........................................................... 35

*Majors v. General Electric*, 714 F.3d 527 (7th Cir. 2013).............................................................. 39

*Malabara v. Chi. Trib. Co*., 149 F.3d 690 (7th Cir. 1998)............................................................... 35

*Mary Jo C. v. New York State and Local Ret. Sys*., 707 F.3d 144 (2d Cir.2013)........................... 48

*Miller v. Ill. Dep't of Transp.*, 643 F.3d 190 (7th Cir. 2011) .................................................... 29, 34

*Nichols v. Ill. Dept. of Transp. and Ill. Dept. of Cent. Mgmt. Servs.*, 152 F.Supp.3d 1106 (N.D. Ill. 2016) ............................................................................................................................................ 33

*Oliphant v. Cook Cty. Dep't of Corr.*, 2012 WL 3835818 (N.D. Ill. Sept. 4, 2012) ....................... 4

*Ozlowski v. Henderson*, 237 F.3d 837 (7th Cir. 2001) .................................................................... 30

*Painter v. Ill. Dep't of Transp.*, 715 Fed. Appx. 538 (7th Cir. 2017) ............................................ 50

*Powers v. USF Holland, Inc.*, 2015 WL 1455209 (N.D. Ind. March 30, 2015) ............................. 33

*Quinones v. City of Evanston, Ill.*, 58 F.3d 275 (7th Cir. 1995)...................................................... 47

*Rowlands v. United Parcel Serv. - Fort Wayne*, 901 F.3d 792 (7th Cir. 2018) ............................. 40

*Searls v. Johns Hopkins Hosp*., 158 F. Supp. 3d 427 (D. Md. 2016)............................................... 27

*Severson v. Heartland Woodcraft, Inc*., 872 F.3d 476 (7th Cir. 2017) ........................................... 30

*Shell v. Smith*, 789 F.3d 715, 718 (7th Cir. 2015) ......................................................................... 28

*Shelton v. Indianapolis Pub. Sch.*, 2020 WL 509176 (S.D. Ind. Jan. 31, 2020) ........................... 35

*Sieberns v. Wal-Mart Stores, Inc*., 125 F.3d 1019 (7th Cir. 1997) ................................................. 44

*Smith v. Henderson*, 376 F.3d 529 (6th Cir. 2004) ........................................................................ 44

*Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055 (7th Cir. 2014)................................................ 32

*Stevens v. Ill. Dep't of Corr.*, 2015 WL 5686615 (C.D. Ill. Sept. 28, 2015)................................. 41

*Stewart v. Dep't of Transp.*, 2019 WL 2103387 (N.D. Ill. May 14, 2019) .................................... 43

*Stragapede v. City of Evanston*, 69 F. Supp. 3d 856 (N.D. Ill. 2014)............................................. 28

*Vande Zande v. State of Wisconsin Dep't of Admin.*, 44 F.3d 538 (7th Cir. 1995) ........................ 44

*U.S. Airways, Inc. v. Barnett* ................................................................................ 36, 44, 45, 46, 47

*Wright v. Ill. Dep't of Children & Family Serv.*, 798 F.3d 513 (7th Cir. 2015) ............................ 50


**Statutes**

Americans with Disabilities Act

42 U.S.C. § 12111(9) ................................................................................................. 30, 33

42 U.S.C. § 12111(10) ...................................................................................................... 44

42 U.S.C. § 12112(a) ........................................................................................................ 30

42 U.S.C. § 12112(b)(2) ...................................................................................... 30, 38, 49

42 U.S.C. § 12112(d) ........................................................................................................ 49

42 U.S.C. §12203 .............................................................................................................. 30


**Rules**

Fed. Civ. P. 8(c)(1) ........................................................................................................... 44


**Regulations**

29 C.F.R. § 1630.6 ............................................................................................................ 38

29 C.F.R. § 1630.2 ............................................................................................................ 28

29 C.F.R. Pt. 1630, App. § 1630.9 .................................................................................. 32

29 C.F.R. Pt. 1630, App. § 1630.10 ................................................................................ 49

Ill. Admin. Code. 420.300(a) ..................................................................................... 34, 48

## I.    INTRODUCTION

Defendants' Motion for Summary Judgment and accompanying Memorandum of Law rely almost entirely on three fundamental misunderstandings.

First, Defendants vigorously contend that summary judgment should be granted in their favor because Nick and Chad were not entitled to reassignment as a reasonable accommodation. But this argument disregards one key fact: Nick and Chad did not request reassignment as a reasonable accommodation. Nick and Chad do not claim that they should have been reassigned as an accommodation, did not reference reassignment in their charges of discrimination with the EEOC, and did not assert any violations related to failure to reassign in their federal court complaint. Thus Defendants' arguments about reassignment as an accommodation – that it requires a vacancy; cannot be in the form of a promotion; and would pose an undue hardship – are irrelevant to the issues of this case. Much of their motion fails on this basis alone.

Defendants' second misunderstanding is that Plaintiffs were interested in one and only one accommodation—waiver of the CMS test and *Rutan* interview. While this was Plaintiffs' initial request, it was but one possible way to provide Nick and Chad with meaningful access to Defendants' hiring process in light of the known barriers created by the mandatory testing and interview requirements. The ADA's interactive process requirement is intended to address this exact situation and provide a forum to discuss alternative accommodation options. Having failed to participate in the process, Defendants cannot now argue that Plaintiffs' initial request was unreasonable. Participation in the interactive process would have revealed multiple alternative accommodations, as discussed in Plaintiffs' Motion for Partial Summary Judgment.

Third, Defendants repeatedly claim that they went "above and beyond" and that now Plaintiffs are seeking to "punish" them for providing Plaintiffs with job skills in the first place.

This argument is as offensive as it is wrong. For years, Nick and Chad did the work of Office Associates in IDOT's Statistical Coding Unit (Stats Unit), contributing greatly to the Unit's production. Although Nick and Chad did comparable work at high production rates, they were paid significantly less than their counterparts who had permanent positions. Nick and Chad were also deprived of the generous benefits provided to State employees, including health insurance and paid time off. The ostensible purpose of the training program was to prepare participants for employment – whether with the State or in the private sector – on par with nondisabled employees, yet Defendants for years accepted Plaintiffs' labor, without giving them a status comparable to non-disabled workers. Suggesting that Nick and Chad are now seeking to "punish" IDOT by pursuing an opportunity to obtain permanent employment in a position they had done on a temporary basis for years should be seen for what it is – an attempt to skew the focus away from Defendants' own unlawful conduct. Defendants do not get a pass for violating the ADA because they *also* hosted a program that provided job training to people with disabilities.

For these reasons, as well as those in Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Summary Judgment (Pl. Memo.) (ECF No. 49), and those discussed below, Plaintiffs respectfully request that Defendants' Motion for Summary Judgment be denied in its entirety.

## II.     PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.     Undisputed Material Facts

Plaintiffs do not dispute the following material facts: 2, 3, 4, 5, 6, 8, 13, 16, 19, 20, 21, 36, 37, 38, 41, 45, 47, 51, 52, 53, 54, 58, 59, 60, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 77, 79, 80, 81, 82, 84, 85, 86, and 89.

### B.     Disputed Material Facts

Plaintiffs dispute the following material facts:

2

1.      With some exceptions, employment with the State of Illinois is governed by the

Personnel Code, 20 ILCS 415/1 *et seq*., and is based upon merit-based hiring principles. (Dep.

Tr., Jeffrey Shuck, Jan. 30, 2020, Ex. 17 at 38-45; Dep. Tr., Courtnay O'Connel, Sep. 20, 2019,

Ex. 18 at 13).

> **Response:** It is undisputed that with some exceptions, employment with the State of
> Illinois is governed by the Personnel Code. However, while the Personnel Code may
> purport to create a system based upon merit-based hiring principles, employment
> opportunities, in practice as implemented by CMS procedures is not based on merit-based
> hiring because it excludes applicants with certain disabilities (Plaintiffs' Statement of
> Undisputed Material Facts from Pl. Memo. ¶¶ 64-65, 68-73, 84-85, 87-89, 91-103; *see
> also* Pl. Memo. B(2) (Pl. SUMF) (ECF No. 49) and tests for skills that are not required for
> positions within the IDOT Stats Unit (*Id*. ¶¶ 26, 45-50, 56-63, 82-83, 87-91, 102; *see also*
> Pl. Memo. B(3)). Moreover, this statement is under inclusive. In addition to the Personnel
> Code, employment with the State of Illinois is also governed by a number of federal and
> state anti-discrimination laws, including the Americans with Disabilities Act (ADA). *See*
> 42 U.S.C. § 12101, *et seq*.

7.      Next, the hiring agency randomly selects applicants from the open competitive

eligible candidate list, first selecting applicants who received an A, then B, then C. (Ex. 6 at Resp.

No. 7).

> **Response:** According to Defendants' cited exhibit, the hiring agency does not always
> "randomly" select applicants from the open competitive list. When filling a vacancy, the
> hiring agency requests the appropriate list from CMS and selects candidates to interview.
> If there are a large number of applicants, the hiring agency may narrow the field by adding
> additional qualifications, such as educational requirements, *or* by selecting applicants at
> random.

9.      Finally, the hiring agency offers employment to the best-qualified candidate after

the interview process. *Id*.

> **Response:** Defendants' process does not always identify the best-qualified candidate
> because the hiring process screens out individuals with certain disabilities who may be
> best-qualified for the position (Pl. SUMF ¶¶ 64-65, 68-73, 84-85, 87-89, 91-103; *see also*
> Pl. Memo. B(2)) and tests for skills that are not required for positions within the IDOT
> Stats Unit (*Id*. ¶¶ 26, 45-50, 56-63, 82-83, 87-91, 102; *see also* Pl. Memo. B(3)).

10.    However, an individual with a disability can also access the job application process

for Office Assistant or Office *Associate* positions through the Successful Disability Opportunities

Program ("SD Program"). (ECF No. 32-2 ¶ 27; Def. IDOT's Resp. to Pls.' 1st Interrog., Ex. 5 at

Resp. No. 16; Ex. 6 at Resp. No. 8).

> **Response:** The SD Program does not provide individuals with disabilities access to all
> jobs because hiring agencies are not required to select applicants from the SD Program.
> Ex. 20, Singer Dep., 30:14-18; Ex. 16, Harmening Dep., 65:18-23 ("I don't know how
> willing departments, including IDOT, were willing to pick from there."). Further, even for
> this subset of jobs, the SD Program does not provide *all* individuals with disabilities
> access to the job application process. The SD Program still requires individuals to pass the
> CMS test; thus, it does provide access to an individual who, because of their disability, is
> unable to pass the CMS test, (Ex. 20, Singer Dep., 118:19-119:14), such as Nick and Chad
> (Pl. SUMF ¶¶ 1-9, 64-65, 68-72, 94-98, 100, 103; *see also* Pl. Memo. B(2)(a)). The SD
> Program still requires individuals to participate in the standard *Rutan* structured interview
> process; thus, it does not provide access to an individual who, because of their disability,
> is unable to participate in the *Rutan* structured interview (Ex. 20, Singer Dep., 115:24-
> 116:10), such as Nick and Chad (Pl. SUMF ¶¶ 1-9, 84-85, 87-89, 91, 94, 97, 100-102; *see
> also* Pl. Memo. B(2)(b)); Ex. 12, Owens Dep., 75:13-21).

22.    The content on the open-competitive exams test for knowledge and skills that are

common across all positions in the corresponding job classification throughout all State of Illinois

agencies. *Id*. ¶ 13.

> **Response:** While the CMS open competitive exams purport to test for knowledge and
> skills across all Office Associate and Office Assistant positions throughout all State
> agencies, they test for knowledge and skills that are not relevant to positions within the
> IDOT Stats Unit (Pl. SUMF ¶¶ 56-57, 59, 62-63, 71; *see also* Pl. Memo. B(3)(a)).

23.    It would be too difficult to tailor exams to each and every similar individual

position across State employment because thousands of applicants attempt the exams every year.

(ECF No. 32-2 ¶ 9; ECF No. 34-1 ¶¶ 10-11).

> **Response:** In support of this fact, Defendants rely exclusively on a conclusory opinion
> from CMS employees that it would be "too difficult" to tailor the exam to individual
> positions. It is undisputed that CMS employees believe it would be "too difficult" but
> Defendants' evidence does not establish that it would, in fact, be "too difficult" to tailor an
> exam to positions across State employment. *See also Oliphant v. Cook Cty. Dep't of Corr.*,
> 2012 WL 3835818, at *1 (N.D. Ill. Sept. 4, 2012) (holding it is "improper for a party to

include legal or factual conclusions … in a response to a statement of undisputed material facts"). Further, the number of individuals who take the CMS exam for a broad job classification on an annual basis has no connection to how difficult it would be to tailor an exam to individual positions – a finite number – in State government. The "thousands" of applicants that attempt the exams each year reflect the breadth of the job classification; the numbers of applicants would be smaller if tailored to the applications for individual positions.

40.    Pursuant to the CBA, permanent vacancies for the RC-14 unit "shall be posted for bid." *Id.* at 1640.

> **Response:** While the CBA states that permanent vacancies for the RC-14 unit "shall be posted for bid," the CBA also authorizes the parties to waive posting requirements by mutual agreement, a practice AFSCME and IDOT have used in the past. Ex. 68, Prochaska Supp. Decl. ¶2.

44.    In order to provide temporary employment and job-training opportunities for disabled individuals, IDOT previously collaborated with Springfield School District No. 186 in an affirmative action program known as the Student Professionals With Disabilities ("SPWD") program. (Defs.' Answer & Aff. Def., ECF No. 22 ¶ 12; Memo. of Understanding, 2012, Ex. 51).

> **Response:** There is no support for Defendants' statement that the SPWD program was an "affirmative action" program. Defendants' cited exhibits do not refer to the SPWD program as an affirmative action program.

46.    Participants in the program were supposed to only be eligible to work a total of three six-month cycles for a maximum of eighteen months. *Id.* at 9105 ¶ (4)(A)(f)).

> **Response:** Although the Memorandum of Understanding for the SPWD program that was in effect until June 2014 stated that participants were limited to three six-month cycles, SPWD program participants regularly stayed in the program well beyond the eighteen-month period. Ex. 16, Harmening Dep., 78:5-8. When revising the MOU for the 2014-2016 time period, IDOT's Acting Secretary Erica Borggren decided to eliminate the eighteen-month limitation for program participants. Ex. 82, Harmening email dated 7/13/2016, Def. No. 17813-14 ("There was a significant change made to the last one that is probably relevant to the issue. It changed the limit of 18 months in the program (3 sessions) to unlimited or as long as it takes."); Ex. 80, Harmening email dated 1/9/2015 with Memo of Understanding, Def. No. 17518-28, *17524 ("Students may apply for renewal terms with no limit on the terms of renewal, within the limits of the fact that the program is intended as developmental and transitional rather than as permanent employment"); Ex. 16, Harmening Dep., 38:24-40:8.

49.     On September 2, 2015, IDOT notified the Springfield School District that it was

terminating the SPWD program effective December 31, 2015. (Magalis IDOT SPWD

Termination Notice, Ex. 42).

> **Response:** The letter sent by IDOT that formally terminated its MOU with the Springfield
> School District was dated September 2, 2015. However, IDOT *notified* the Springfield
> School District that it was terminating the SPWD program on July 16, 2015. Ex. 77,
> Calendar Invitation for 7/16/2015, Def. No. 11084; Ex. 76, Harmening email dated
> 12/18/2015, Def. No. 11057-58 (referencing meeting in July with school district
> discussing termination of program); Ex. 83, Harmening email dated 7/16/2015, Def. No.
> 17819; Ex. 16, Harmening Dep., 119:25-120:9.

50.     IDOT ended the SPWD program for several reasons: (1) IDOT's ADA coordinator

retired and IDOT was unable to replace him; (2) ballooning costs; (3) potential non-compliance

with the collective bargaining agreement if participants were performing the same functions as

AFSCME employees; and (4) the potential for noncompliance with best-qualified hiring

principals. (Ex. 5 at Resp. No. 9; Dep. Tr., Bruce Harmening, Sep. 27, 2019, Ex. 16 at 72-75, 103-

4, 113-14, 158-59; Harmening Email with Memo., Ex. 69).

> **Response:** IDOT gave no official reason for terminating the SPWD program. Ex. 75,
> Harmening email dated 4/20/2017, Def. No. 9091-93. In an email dated December 18,
> 2015, Harmening told IDOT's Chief Counsel that, in addition to other reasons, he thinks
> IDOT terminated the SPWD program due to: "threatened lawsuits and EEO complaints
> over ADA … issues." He added: "Publicly I would say that: a review of the program upon
> Dave's retirement concluded that IDOT was not properly equipped and did not have the
> properly experienced and trained staff to administer the program." Ex. 76, Harmening
> email dated 12/18/2015, Def. No. 11057-58.

> **50(1).** IDOT did not end the SPWD program because IDOT's ADA coordinator retired
> and IDOT was unable to replace him. While Dailey did retire, his retirement was known
> as far back as fall 2014 and IDOT decided that instead of replacing him, it would contract
> out the Program Manager role through the School District. Ex. 16, Harmening Dep.,
> 34:11-36:9. IDOT amended its Intergovernmental Agreement (IGA), and Memorandum of
> Understanding (MOU) to include information about the new Program Manager who
> would be a contract position with the School District and would oversee the SPWD
> program.  Ex. 80, Def. No. 17518-28, *17518, 23-24, Harmening email dated 1/9/2015
> with MOU; Ex. 81, Stoddard email dated 11/20/2014 with IGA, Def. No. 17550-63, *51.
> Harmening testified that although he does not recall whether the MOU had been officially

signed, IDOT had agreed to it in concept (Ex. 16, Harmening Dep., 43:19-44:9), operated as if the MOU was in effect (*Id*. at 44:23-45:2) and was trying to abide by the MOU's terms (*Id*. at 45:3-5).

**50(2).** IDOT did not end the SPWD program because of ballooning costs. When asked about the reason for terminating the SPWD program, CMS Director of Governmental Affairs, Wendy Butler, told a State Representative that the "program is not being ended due to budget issues." Ex. 73, Butler email dated 12/23/2015, Def. No. 3662.

**50(3).** IDOT did not end the SPWD program because of potential non-compliance with the collective bargaining agreement. The SPWD program had existed for nine years prior to its termination. During that entire time, AFSCME filed no grievances and expressed no desire to have the SPWD program eliminated. Ex. 68, Prochaska Supp. Decl. ¶4. After the termination of the SPWD program, in January 2017, IDOT sought to use other Tech Trainees to assist the Stats Unit to help with the backlog; thus, temporary employees were still performing AFSCME work. Ex. 79, Keldermans email dated 1/23/2017, Def. No. 14787-89. Finally, even if this practice was problematic, the SPWD program had been in existence since 2005 (Ex. 64) and Defendants did not decide to terminate the program on this basis until after Plaintiffs filed their charge of discrimination with the EEOC in 2015. Answer, ECF No. 22 ¶45; Ex. 77, Calendar Invitation for 7/16/2015, Def. No. 11084; Ex. 76, Harmening email dated 12/18/2015, Def. No. 11057-58 (referencing meeting in July with school district discussing termination of program); Ex. 83, Harmening email dated 7/16/2015, Def. No. 17819; Ex. 16, Harmening Dep., 119:25-120:9.

**50(4).** IDOT did not end the SPWD program because of potential non-compliance with best-qualified hiring principles. IDOT had already addressed this issue by amending the MOU to set forth a selection process. Ex. 80, Def. No. 17518-28, *17527, Harmening email dated 1/9/2015 with MOU. Even if this practice was problematic, the SPWD program had been in existence since 2005 (Ex. 64) and Defendants did not decide to terminate the program on this basis until after Plaintiffs filed their charge of discrimination with the EEOC in 2015. Answer, ECF No. 22 ¶45; Ex. 77, Calendar Invitation for 7/16/2015, Def. No. 11084; Ex. 76, Harmening email dated 12/18/2015, Def. No. 11057-58 (referencing meeting in July with school district discussing termination of program); Ex. 83, Harmening email dated 7/16/2015, Def. No. 17819; Ex. 16, Harmening Dep., 119:25-120:9.

55.    Leskovisek was provided a job coach at all times who observed him working and

checked his work for mistakes. (ECF No. 22 ¶ 18; Ex. 1 at Resp. No. 6; Ex. 12 at 43-44, 74-75;

Dep. Tr., Jessica Keldermans, Aug. 9, 2019, Ex. 13 at 131-32, 214-16).

**Response:** This statement suggests that at all times, Nick's job coach was observing him working and checking his work for mistakes. This is not correct. First, Nick and Chad shared a job coach. Ex. 57, Harmening email dated 9/2/2014, Def. No. 17786 ("One job coach is required for both combined"). Nick's job coach did not assist him with his duties,

which he performed himself. Ex. 63, SSA Questionnaire, PL001439-1442, *1439 (stating "The job coach did not assist with Nick's duties. Nick performed them all himself."); Ex. 13, Keldermans Dep., 149:17-25. Instead, Nick's job coach provided him with "interpretation or direction" (Ex. 57, Harmening email dated 9/2/2014, Def. No. 17786) and "observed [him] working, periodically checking [his] work for accuracy, and guided [him] with correcting any mistakes" (Answer, ECF No. 22, ¶18). Nick's job coach Christina Benton described her role as to train, support and monitor Nick; not to do his work for him. Ex. 69, Benton Decl. ¶4.

Further, to the extent this fact suggests that Nick had a significant number of mistakes, this is disputed. Nick had a high level of accuracy. Ex. 78, Kaufman email dated 12/23/2014, Def. No. 11098 (noting that Nick processed a high volume of reports with few errors); Ex. 69, Benton Decl. ¶6.

57.    As Leskovisek's Tech Trainee position was temporary, at the end of each 6-month period he resigned his position and was rehired for the following 6-month session. (Ex. 1 at Resp. No. 5).

**Response:** While Nick signed resignation paperwork and was rehired every six months, the transition from term to term was seamless. Nick never had a break in service as a result of SPWD's six-month periods and there was nothing to indicate any difference between these terms. Ex. 71, Stanley Decl. ¶3, Ex. 69, Benton Decl. ¶9.

61.    In early 2011, Underwood began working in the Statistical Coding Unit within IDOT's Traffic Safety Division performing data entry tasks. (ECF No. 22 ¶¶ 14-17; Ex. 2 at Resp. No. 6).

**Response:** Chad began working in the Stats Unit performing data entry tasks in August 2013. Answer, ECF No. 22, ¶14; Ex. 45, Keldermans email dated August 16, 2013, Def No. 3183-84, *84.

62.    Underwood was provided a job coach at all times who observed him working and checked his work for mistakes. (ECF No. 22 ¶ 18; Ex. 2 at Resp. No. 6; Ex. 12 at 74; Ex. 13 at 214-16).

**Response:** This statement suggests that at all times, Chad's job coach was observing him working and checking his work for mistakes. This is not correct. First, Nick and Chad shared a job coach. Ex. 57, Harmening email dated 9/2/2014, Def. No. 17786 ("One job coach is required for both combined"). Chad's job coach did not assist him with his duties, which he performed himself. Ex. 63, SSA Questionnaire, PL001439-1442, *1439 (stating

8

"The job coach did not assist with Nick's duties. Nick performed them all himself."); Ex. 13, Keldermans Dep., 149:17-25; 151:21-152:4 (explaining that she would have given the same answers if asked about Chad). Instead, Chad's job coach provided him with "interpretation or direction" (Ex. 57, Harmening email dated 9/2/14, Def. No. 17786) and "observed [him] working, periodically checking [his] work for accuracy, and guided [him] with correcting any mistakes" (Answer, ECF No. 22, ¶18). Chad's job coach Christina Benton described her role as to train, support and monitor Chad; not to do his work for him. Ex. 69, Benton Decl. ¶4.

Further, to the extent this fact suggests that Chad had a significant number of mistakes, this is disputed. Chad had a high level of accuracy. Ex. 78, Kaufman email dated 12/23/2014, Def. No. 11098 (noting that Chad processed a high volume of reports with few errors); Ex. 7, IDOT RTA 30 (noting that "Chad is profoundly autistic but his typing and data entry skills are excellent. He can type 50 words a minute with 0 errors."); Ex. 69, Benton Decl. ¶6.

63.    Underwood could not go to work at IDOT if a job coach were not available. (Dep. Tr., Kim Underwood, Nov. 7, 2019, Ex. 15 at 21, 35).

Response: As stated, this fact suggests that Chad was unable to work without a job coach present, which is disputed. It is undisputed that IDOT provided Chad with a job coach and IDOT required the job coach to be present in the workplace when Chad was there. Ex. 69, Benton Decl. ¶8; Ex. 70, Underwood Decl. ¶5. However, Chad's job coach did not think this was necessary and believed that Chad would be able to work at IDOT without a full-time shared job coach. Ex. 69, Benton Decl. ¶8.

65.    As Underwood's Tech Trainee position was temporary, at the end of each 6-month period he resigned his position and was rehired for the following 6-month session. (Ex. 2 at Resp. No. 5).

Response: While Chad signed resignation paperwork and was rehired every six months, the transition from term to term was seamless. Chad never had a break in service as a result of SPWD's six-month periods and there was nothing to indicate any difference between these terms. Ex. 70, Underwood Decl. ¶3, Ex. 69, Benton Decl. ¶9.

76.    On October 17, 2014, Jeffrey Shuck ("Shuck"), Deputy General Counsel for CMS, sent a response letter to Lowy. (Ex. 58).

Response: It is undisputed that on October 17, 2014, Jeffrey Shuck, Deputy General Counsel for CMS, sent a letter to Lowy. However, it is disputed that Shuck's letter provided a meaningful response to Lowy's letter. Instead, Shuck stated that CMS was in the process of researching the feasibility of bypassing the test and interview requirements

9

generally required for *Rutan*-covered, Personnel Code-covered vacancies. Ex. 58, Shuck letter dated 10/17/2014, Def. No. 17841; Answer, ECF No. 22, ¶39.

78. On December 19, 2014, Prochaska from AFSCME explained to Lowy the reasons why Lowy's accommodation requests may not be proper. (Ex. 62).

**Response:** Prochaska did not give any indication in his December 19, 2014 email or otherwise that the accommodation requests made by Lowy on behalf of Nick and Chad were improper. Instead, he explained the reasons why he was having a difficult time getting in contact with IDOT and that he would have to wait until the new administration was in place. Ex. 68, Prochaska Supp. Decl. ¶6; Ex. 62, Prochaska email dated 12/19/2014, PL001381-82.

83. There are *no* Office Assistant data entry positions within the Statistical Coding Unit at IDOT. (Ex. 5 at Resp. No. 6).

**Response:** IDOT, who controls the Office Associate position openings and functions (Answer, ECF No. 22, ¶88), agreed that Nick and Chad would be able to work in an Office Assistant data entry position within the Stats Unit at IDOT so long as AFSCME stood by its agreement to waive the bidding and posting requirement and CMS agreed to waive the testing and interview requirements. Ex. 8, IDOT Supp. RTA 13; Ex. 33, IDOT EEOC Position Statement, Def. No. 1101-03, *1101.

87. From fall 2014 through January 2018, IDOT's Traffic Safety Division, which encompasses the Statistical Coding Unit, was subject to a hiring freeze mandated by CMS. (Ex. 5 at Resp. Nos. 4, 10).

**Response:** Defendants' cited evidence does not establish that IDOT was under a hiring freeze mandated by CMS from fall 2014 to January 2018. In Ex. 5, IDOT states that in fall 2014, IDOT imposed a hiring freeze and no vacancies were posted until 2018; this response does not indicate when the hiring freeze ended or that it was mandated by CMS. To the contrary, Keldermans testified that she thinks the hiring freeze ended in 2016. Ex. 13, Keldermans Dep., 186:22-187:3.

Further, Defendants were unable to provide Plaintiffs with dates of this purported hiring freeze during discovery. In response to Plaintiffs' Interrogatories, which asked IDOT for the specific dates under which it was under an AFSCME hiring freeze, IDOT stated it "is unable to determine the specific dates that an AFSCME hiring freeze was in place during the time frame." Ex. 66, IDOT 1st Supp. Resp. to Interrog. Nos. 9, 19, 20, 25, ¶19. In response to Plaintiffs' Requests for Production regarding the purported hiring freeze, Defendants produced a number of documents, none of which conclusively establish any dates of hiring freezes and instead suggest that the freeze started and stopped at various

10

points between 2012 and 2017. Ex. 67, IDOT Second Supp. Resp. to RFP, No. 6; Ex. 74, Hiring Freeze Documents, Def. No. 7362-69. Finally, CMS produced a list of an "SD Requisition List" which shows when hiring agencies asked for a list of SD candidates to fill vacant positions, and this list reveals that IDOT did have a vacant position in January 2015, during the claimed freeze. Ex. 84, SD Requisition List, Def. No. 18157-18163, *18161.

88.     During the hiring freeze, IDOT was unable to post any vacancies or hire applicants

into Office *Associate* positions within the Statistical Coding Unit. (Ex. 5 at Resp. Nos. 4, 10; *see*

Ex.'s 1-2, each at Resp. Nos. 8-9 (in which Pls. are unable to identify any vacant positions)).

**Response:** Defendants' cited evidence does not establish that IDOT was unable to post any vacancies or hire applicants into Office Associate positions within the Statistical Coding Unit. In Ex. 5, IDOT states that in fall 2014, IDOT imposed a hiring freeze and no vacancies were posted until 2018; this response does not indicate when the hiring freeze ended or that IDOT was unable to post during this time.

Further, statements and actions by IDOT employees demonstrate that IDOT was able to hire applicants into positions within the Stats Unit. IDOT controlled the Office Associate position openings and functions (Answer, ECF No. 22, ¶88) and IDOT made clear that it was able to hire Nick and Chad, as long as CMS provided an accommodation to the hiring process and AFSCME stood by its agreement to waive bidding/posting. Ex. 29, Forti letter dated 7/9/2014; Def. No. 726; Ex. 8, IDOT Supp. RTA, No. 13. In January 2015, during the time of IDOT's claimed hiring freeze, IDOT identified for CMS the specific job description available for Plaintiffs, *see* Ex. 72, Kaufmann email dated 1/21/2015, Def. No. 918-919, which shows that there was a position and avenue for hiring Nick and Chad, as long as CMS agreed to waive the test and interview requirements. Ex. 68, Prochaska Supp. ¶8 ("Because Nick and Chad were already employees of IDOT, the hiring freeze should not have been a barrier to their quest for permanent employment").

Similarly, in response to Plaintiffs' accommodation request, CMS responded by stating that it was researching the feasibility of bypassing the test and interview requirements generally required for *Rutan*-covered, Personnel Code-covered vacancies. Ex. 58, Shuck letter dated 10/17/2014, Def. No. 17841; Answer, ECF No. 22, ¶39. CMS never told Nick, Chad or Lowy that there was no reason to have this conversation because a hiring freeze prevented IDOT from considering them for permanent employment. Ex. 9, CMS RTA 9 ("CMS did not instruct Plaintiffs whether any vacancy did or did not exist within IDOT"); Ex. 14, Lowy Dep., 60:12-17; Ex. 3, Nick/CMS Interrog. 2(b); Ex. 4, Chad/CMS Interrog. 2(b).

Moreover, in June 2015, there were 13 vacant positions for the position of Office Associate Option II in the Stats Unit (Ex. 13, Keldermans Dep., 77:7-23) and in December 2015, IDOT's Stats Unit had 20 vacant positions (Ex. 7, IDOT RTA 18).

### C.     Disputed Immaterial Facts

Plaintiffs dispute the following immaterial facts:

17.     CMS routinely provides accommodations to individuals with a disability so that

they may access the job application process through its Accommodated Testing Program. (Ex. 6

at Resp. Nos. 8, 13; Ex. 20 at 16, 46; CMS Accom. Testing Program, Ex. 59).

> **Response:** This fact is disputed because CMS did not provide an accommodation to Nick
> or Chad to access the job application process, so it does not "routinely" provide
> accommodations. Pl. SUMF ¶¶ 120-123. This fact is immaterial because, whether CMS
> provided accommodations to other individuals with disabilities during the job application
> process is of no relevance here, as CMS did not propose any of these accommodations as
> possible alternatives in response to Plaintiffs' request for a reasonable accommodation. *Id.*
> *See Diaz v. Kraft Foods Global, Inc.,* 653 F.3d 582, 587-88 (7th Cir. 2011) (holding that
> good treatment of one employee does not justify discriminatory treatment against another
> in the same class).

18.     Examples of accommodations provided by CMS include, but are not limited to:

providing extra time, quiet space, a calculator, use of braille, use of a reader, accompaniment by a

parent or job coach, etc. (Ex. 6 at Resp. Nos. 7, 13; Ex. 20 at 16, 46; Ex. 59).

> **Response:** This fact is disputed because Defendants' cited exhibits do not reference the
> accommodation of being accompanied by a parent or a job coach. This fact is immaterial
> because whether CMS has provided accommodations to other individuals with disabilities
> during the job application process is of no relevance here, as CMS did not propose any of
> these accommodations as possible alternatives in response to Plaintiffs' request for a
> reasonable accommodation. Pl. SUMF ¶¶ 120-123. *See Diaz,* 653 F.3d at 587-88 (holding
> that good treatment of one employee does not justify discriminatory treatment against
> another in the same class).

34.     The goal is that the exam—both the multiple choice and skills components—will

test for critical competencies across all agencies that use the exam. *Id.* ¶ 29.

> **Response:** There are significant differences in job responsibilities among the many types
> of positions that fall within the broader job classification of Office Associate and Office
> Assistant, making it disputed whether there are "critical competencies across all agencies."
> Pl. SUMF ¶¶ 47, 49. This fact is immaterial because CMS's "goal" for the exam is not
> relevant; what is material is whether the exams actually test for skills required in the Stats
> Unit which, Plaintiffs' evidence shows, they do not. Pl. SUMF ¶¶ 56-57, 59, 62-63, *see
> also* Pl. Memo. B(3)(a).

### D.    Undisputed Immaterial Facts

Plaintiffs do not dispute the following immaterial facts:

11.    An applicant in the SD Program must be a customer of the Division of

Rehabilitation Services ("DORS") within the Illinois Department of Human Services. (Ex. 5 at

Resp. No. 16; Ex. 20 at 23-24, 53); *see also*

https://www2.illinois.gov/sites/work/pages/disabpgm.aspx#sdo (last accessed

Apr. 16, 2020).

> **Response:** The SD Program would not provide Nick and Chad with access to the job
> application process for the reasons explained in Pl. Resp. to Def. UMF, No. 10.
> Accordingly, this fact is immaterial to the issues in this case.

12.    An applicant in the SD Program must have a Certificate of Eligibility completed

by his DORS counselor on file at the time an applicant attempts a CMS exam. (Dep. Tr., Brandon

Singer, Aug. 22, 2019, Ex. 20 at 23-24, 53).

> **Response:** The SD Program would not provide Nick and Chad with access to the job
> application process for the reasons explained in Pl. Resp. to Def. UMF, No. 10.
> Accordingly, this fact is immaterial to the issues in this case.

14.    An applicant in the SD Program who receives a passing grade on the Program

Office Assistant or Office *Associate* exams then has his name placed on a corresponding "SD

Program eligible candidate list." (Ex. 6 at Resp. No. 13).

> **Response:** The SD Program would not provide Nick and Chad with access to the job
> application process for the reasons explained in Pl. Resp. to Def. UMF, No. 10.
> Accordingly, this fact is immaterial to the issues in this case.

15.    When a State agency seeks applicants for a vacant Office Assistant or Office

*Associate* position, it can request the corresponding SD Program eligible candidate list from CMS

in addition to requesting the open-competitive eligible candidate list. *Id.*

13

**Response:** The SD Program would not provide Nick and Chad with access to the job application process for the reasons explained in Pl. Resp. to Def. UMF, No. 10. Accordingly, this fact is immaterial to the issues in this case.

24.    In 2017, 5,599 applicants took the exam for the Office Assistant classification, and

3,471 applicants took the exam for the Office *Associate* classification. (ECF No. 34-1 ¶¶ 10).

**Response:** The number of individuals who take the CMS exam for a broad job classification on an annual basis has no logical connection to the difficulty in tailoring the CMS exam to individual positions in State government. If anything, these numbers are reflective of the breadth of the job classification; they would be smaller if tailored to the applications for a particular job.

25.    In 2018, 5,051 applicants took the exam for the Office Assistant position, and

4,192 applicants tested for the Office *Associate* classification. *Id*. ¶ 11.

**Response:** The number of individuals who take the CMS exam for a broad job classification on an annual basis has no logical connection to the difficulty in tailoring the CMS exam to individual positions in State government. If anything, these numbers are also reflective of the breadth of the job classification; they would be smaller if tailored to the applications for a particular job.

26.    The Test Development Section within CMS conducts regular statistical analyses of

the exams and results, and also strives to review the content of any given exam approximately

every five years. *Id*. ¶ 19. Exams also are reviewed based on numerous factors, such as requests

from agencies, results of statistical analyses, changes to classification structures, and changes in

technology. *Id*.

**Response:** What CMS does or does not do when reviewing and analyzing its open-competitive tests is immaterial except to the extent that CMS evaluates whether its exams actually assess the skills required for the position at issue. The CMS exam for Office Associate and Office Assistant does not test for the skills required for a position doing data entry in IDOT's Stats Unit. Pl. SUMF ¶¶ 56-57, 59, 62-63, 71; *see also* Pl. Memo. B(3)(a).

27.    The Test Development Section also conducts a reconstruction process for the

exams. *Id*. ¶¶ 22-29.

14

**Response:** CMS's process for reconstructing its open-competitive exam is immaterial except to the extent that CMS evaluates whether its tests actually assess the skills required for the position at issue. The CMS exam for Office Associate and Office Assistant does not test for the skills required for a position doing data entry in IDOT's Stats Unit. Pl. SUMF ¶¶ 56-57, 59, 62-63, 71; *see also* Pl. Memo. B(3)(a).

28.    To begin the reconstruction process, the Test Development Section targets State agencies with the greatest activity in that job classification. *Id*. ¶ 23. In other words, they look to agencies that most frequently use the exam for that job classification. *Id*.

**Response:** CMS's process for reconstructing its open-competitive exam is immaterial except to the extent that CMS evaluates whether its exams actually assess the skills required for the position at issue. The CMS exam for Office Associate and Office Assistant does not test for the skills required for a position doing data entry in IDOT's Stats Unit. Pl. SUMF ¶¶ 56-57, 59, 62-63, 71; *see also* Pl. Memo. B(3)(a).

29.    CMS then notifies the agencies and asks if the agencies wish to make substantive changes to the exam, such as significantly changing the job qualifications or changing the type of selection process from a multiple-choice test to a structured evaluation of training and experience. *Id*. ¶ 24. An example of this would be testing for additional computer literacy skills that have become more common and necessary since the exam was last reconfigured. *Id*.

**Response:** CMS's process for reconstructing its open-competitive test is immaterial except to the extent that it evaluates whether its exams actually assess the skills required for the position at issue. The CMS exam for Office Associate and Office Assistant does not test for the skills required for a position doing data entry in IDOT's Stats Unit. Pl. SUMF ¶¶ 56-57, 59, 62-63, 71; *see also* Pl. Memo. B(3)(a).

30.    CMS then asks the agencies to put together a team of job experts familiar with a specific job classification in their particular agency. *Id*. ¶ 25. CMS then conducts conferences with the job experts and discusses the specific duties and job descriptions for the positions at t heir agencies. *Id*. CMS asks them to delineate the critical competencies of the positions, including job tasks, work behaviors, knowledge, skills and abilities in their particular agency, down to individual divisions and sections within an agency. *Id*. ¶ 25.

**Response:** CMS's process for reconstructing its open-competitive exam is immaterial. What is material is whether the CMS exam tests for the skills required for the position at issue. The CMS exam for Office Associate and Office Assistant does not test for the skills required for a position doing data entry in IDOT's Stats Unit. Pl. SUMF ¶¶ 56-57, 59, 62-63, 71; *see also* Pl. Memo. B(3)(a).

31.    The conferences with the agencies direct what CMS does and help determine what CMS should include in the exam, such as math, understanding policy and procedures, English usage, and computer skills. *Id.* ¶ 26. The conferences also help CMS determine the weight for each topic area tested. *Id.* ¶ 25.

**Response:** CMS's process for determining the content and weight for each topic area tested in its open-competitive test is immaterial except to the extent it evaluates whether its exams actually assess the skills required for the position at issue. The CMS exam for Office Associate and Office Assistant does not test for the skills required for a position doing data entry in IDOT's Stats Unit. Pl. SUMF ¶¶ 56-57, 59, 62-63, 71; *see also* Pl. Memo. B(3)(a).

32.    Even if the agencies do not want to make substantive changes to the exam, CMS does not know this until the Test Development Section meets with the agency. *Id.* ¶ 27.

**Response:** CMS's process for reconstructing its open-competitive test is immaterial except to the extent it evaluates whether its tests actually assess the skills required for the position at issue. The CMS exam for Office Associate and Office Assistant does not test for the skills required for a position doing data entry in IDOT's Stats Unit. Pl. SUMF ¶¶ 56-57, 59, 62-63, 71; *see also* Pl. Memo. B(3)(a).

33.    After the conference, CMS drafts new questions and answers and meets with the agencies again for the test-review process. *Id.* ¶ 28. During that meeting, CMS and the agencies also discuss scoring standards for the exams. *Id.*

**Response:** CMS's process for reconstructing its open-competitive test is immaterial except to the extent that it evaluates whether its exams actually assess the skills required for the position at issue. The CMS exam for Office Associate and Office Assistant does not test for the skills required for a position doing data entry in IDOT's Stats Unit. Pl. SUMF ¶¶ 56-57, 59, 62-63, 71; *see also* Pl. Memo. B(3)(a).

35.    The reconstruction process previously described in UMF ¶¶ 27-33 typically takes approximately three months to complete. *Id.* ¶ 32.

**Response:** CMS's process for reconstructing its open-competitive test is immaterial except to the extent that it evaluates whether its exams actually assess the skills required for the position at issue. The CMS exam for Office Associate and Office Assistant does not test for the skills required for a position doing data entry in IDOT's Stats Unit. Pl. SUMF ¶¶ 56-57, 59, 62-63, 71; *see also* Pl. Memo. B(3)(a).

39.    Pursuant to the CBA, the collective bargaining units "exclude temporary ... employees." *Id*. at 1544.

**Response:** Nick and Chad are not asserting that they had any rights under the CBA during their positions as Tech Trainees. Whether the CBA does or does not exclude temporary employees has no relevance to the issues at hand.

42.    Pursuant to the CBA, "[s]election for promotion ... shall be in the following order of priority from among employees certified in their current position classification ... (i) Employees in the next lower classification within the classification series ...; (ii) employees in the next succeeding lower classification within the classification series; [and] (iii) all other qualified and eligible bidders (including parallel pay grade bidders)." *Id*. at 1654.

**Response:** The selection process for promotion of AFSCME employees pursuant to the CBA is not relevant to the facts in this case. The position identified as a possible fit for Nick and Chad was the lowest possible position available; it would not have been a "promotion" pursuant to the CBA for any AFSCME members. Ex. 68, Prochaska Supp. Decl. ¶9.

43.    Pursuant to the CBA, collective bargaining unit employees are entitled to: (i) paid vacations; (ii) paid holidays; (iii) potential overtime; and (iv) insurance, pension, employee assistant and indemnification. *Id*. at 1543-1785; Ex. 5 at Resp. No. 15.

**Response:** The benefits of collective bargaining unit employees have no bearing on the matters at issue in this case. Defendants include this to support their contention that Plaintiffs were seeking a promotion as a reasonable accommodation, which is not true. *See* Section III.3(a); Ex. 68, Prochaska Supp. Decl. ¶3.

48.    The temporary Technical Trainee positions the disabled individuals held were not covered by the State's collective bargaining agreement. (Ex. 17 at 58-59).

17

**Response:** Nick and Chad are not asserting that they had any rights under the CBA during their positions as Tech Trainees. Whether the CBA does or does not exclude temporary employees has no relevance to the issues at hand.

56.     Leskovisek does not know whether he could calculate the exact motor vehicle

collision locations while performing data entry tasks for IDOT. (Ex. 1 at Resp. No. 10).

**Response:** Whether Nick could calculate the exact motor vehicle collision locations while performing data entry tasks for IDOT is not material, as calculating the exact motor vehicle collision location is not an essential function of the job which Nick sought. *See infra* at Section III(A)(1). Further, the only reason Nick does not know if he could do this task, commonly referred to as Location Entry, is because IDOT made the decision not to train him on this task, given that Nick excelled at Data Entry. Ex. 13, Keldermans Dep., 102:16-103:13; 218:7-14. Allowing employees to focus on a task on which they excelled was a common practice within the IDOT Stats Unit. *Id*. at 96:24-98:6, 98:25-100:5.

64.     Underwood does not know whether he could calculate the exact motor vehicle

collision locations while performing data entry tasks for IDOT. (Ex. 2 at Resp. No. 10).

**Response:** Whether Chad could calculate the exact motor vehicle collision locations while performing data entry tasks for IDOT is not material, as calculating the exact motor vehicle collision location is not an essential function of the job which Chad sought. *See infra* at Section III(A)(1). Further, the only reason Chad does not know if he could do this task, commonly referred to as Location Entry, is because IDOT made the decision not to train them on this task, given that Chad excelled at Data Entry. Ex. 13, Keldermans Dep., 102:16-103:13; 218:7-14.  Allowing employees to focus on a task on which they excelled was a common practice within the IDOT Stats Unit. *Id*. at 96:24-98:6, 98:25-100:5.

**E.     Plaintiffs' Statement of Additional Material Facts (PL. AMF)**

*Termination of the SPWD Program*

1.     On July 8, 2015, IDOT Chief Counsel Philip Kaufmann, William Barnes and

Special Assistant to the Chief Counsel Bruce Harmening discussed the EEOC charges of

discrimination filed by Nick and Chad. In the same email chain, these IDOT employees also

discussed the termination of the Student Professionals with Disabilities program. Ex. 7, IDOT

RTA 34.

2.     Just over a week later, on July 16, 2015, a number of IDOT employees, including

Bruce Harmening, met with representatives from Springfield School District No. 186. Ex. 77,

Calendar Invitation for 7/16/2015, Def. No. 11084.

3.     On July 16, 2015, following IDOT's meeting with the School District, Harmening

indicated that the "[m]eeting went well" and asked Forti for assistance drafting IDOT's

termination letter. Ex. 83, Harmening email dated 1/16/2015, Def. No. 17819.

4.     Harmening testified that while he did not recall the exact date, there was a meeting

with the School District where he "broke the news" that IDOT was terminating the program. Ex.

16, Harmening Dep., 119:25-120:9; Ex. 76, Harmening email dated 12/18/2015, Def. No. 11057-

58 (referencing meeting in July with school district discussing termination of program). There is

no evidence in the record of any other date of a meeting between IDOT and the School District

regarding termination of the SPWD program.

5.     IDOT denies that it decided to terminate the Student Professionals with Disabilities

program in July 2015. Ex. 7, IDOT RTA 35.

6.     IDOT did not tell Nick, Chad, or anyone acting on their behalf that it was

terminating the SPWD program until December 2015. Ex. 69, Benton Decl. ¶10; Ex. 71, Stanley

Decl. ¶4; Ex. 70, Underwood Decl. ¶4.

**Positions within IDOT's Statistical Coding Unit (Stats Unit)**

7.     IDOT controlled the Office Assistant and Office Associate position openings and

functions. Answer, ECF No. 22, ¶88.

8.     On January 21, 2015, IDOT's Chief Counsel Philip Kaufmann identified for

CMS's Senior Personnel Counsel Courtnay O'Connell, the position description "for the job Chad

and Nick would be placed into." Ex. 72, Kaufmann email dated 1/21/2015, Def. No. 918-19.

9.    In June 2015, there were 13 vacant positions for the position of Office Associate Option II in the Stats Unit (Ex. 13, Keldermans Dep., 77:7-23) and in December 2015, there were 20 vacant positions (Ex. 7, IDOT RTA 18).

10.    IDOT's Traffic Safety Division was responsible for entering crash data information within 45 days after a crash occurs according to the Illinois Vehicle Code (ILCS 5/7-201.1). Ex. 26, Keldermans letter dated 3/16/2012, Def. No. 719-720; Ex. 13, Keldermans Dep., 54:19-55:21.

11.    Data Entry is the most timely requirement when seeking to meet this statutory deadline. Ex. 13, Keldermans Dep., 54:19-55:21.

12.    In December 2015, the IDOT's Stats Unit had a backlog of 335,000 crash reports that needed to be entered into the data system. Ex. 7, IDOT RTA 17.

13.    From March 7, 2016 and November 15, 2017, IDOT's Coding Unit employed 50 contractual temporary employees. Of these 50 temporary employees, 47 performed Data Entry functions and 27 performed exclusively Data Entry functions. Ex. 7, IDOT RTA 26. There were approximately 11-15 temps at any given point during this time frame. Ex. 13, Keldermans Dep., 186:8-14.

14.    Keldermans testified that the Stats Unit had enough people that it was no problem to assign different people to different tasks based on who was faster at certain functions, and they had enough people so they could move them around. Ex. 13, Keldermans Dep., 96:24-98:6.

15.    Nick and Chad earned $11.10 per hour in their positions of Tech Trainee. Ex. 11, Stanley Dep., 23:10-13; Ex. 15, Underwood Dep., 20:19-21. They did not receive benefits, such as insurance or paid leave time. Ex. 13, Underwood Dep., 21:1-5.

20

16.    Effective July 1, 2014, the starting salary for the position of Office Assistant was $2,782 and for Office Associate at IDOT was $2,935. Ex. 5, IDOT Interrog. No. 15.

17.    AFSCME and the State of Illinois have an established practice of waiving the CBA's posting and bidding requirements in certain circumstances. AFSCME agreed to waive bidding and posting for the position of Office Assistant in the Stats Unit because, as an entry-level, bottom-rung position, it would not have been considered a "promotion" for any of its membership at the time; thus, it would not have infringed on the rights of any AFSCME members by bumping them or violating a seniority system. Ex. 68, Prochaska Supp. Decl. ¶5.

18.    Some IDOT employees did work that did not align with their job description or had placements outside of their official positions in the IDOT organization chart. *See* Ex. 13, Keldermans Dep., 83:2-6 (explaining that Debra Iams was classified as a Grant Specialist but was doing data correction); 79:10-80:6 (explaining that one employee is considered a Teamster and does work in the case prep unit, although she is not formally considered part of the Case Prep Unit and is not listed as such in IDOT's organization chart); 81:13-82:8 (explaining that another employee works in the case prep unit although his position is technically under the Bureau of Business Services and this was permitted as both an accommodation for his disability and because it was "consistent with … [IDOT's] business needs").

*Nick and Chad's Job Coach*

19.    IDOT was supportive of hiring Nick and Chad as permanent employees, even if that required a full-time job coach. Ex. 16, Harmening Dep., 138:6-16.

20.    Christina Benton, Nick and Chad's job coach from approximately September 2014 to December 2015, stated that it was not her job to enter data or correct data for Nick and Chad. Ex. 69, Benton Decl. ¶1.

21.     As a job coach, Benton's role is to train, support and monitor her clients and, when possible, help them transition to natural supports within the work environment. *Id.* ¶ 4.

22.     Benton explained that it is not her role to do the work for the employee with a disability. Consistent with her role of a job coach generally, Benton "did not do Nick's or Chad's job for them." *Id.* ¶¶ 4-5.

23.     Instead, Benton "spot checked" their work and, if she "found mistakes (which did not happen frequently), [she] provided Nick and Chad with direction and training and then they made the corrections. *Id.* ¶6.

24.     Other employees in the Stats Unit also had their work reviewed and, when mistakes were found, received additional direction and training as needed. Ex. 13, Keldermans Dep. 133:24-134:24. Ex. 69, Benton Decl. ¶7.

25.     All employees in the Stats Unit had their work audited so that mistakes could be identified and corrected. Ex. 13, Keldermans Dep. 135:3-8.

26.     Based on Benton's observations, Nick and Chad loved their jobs and took pride in their work. They had great attendance, took their breaks on time, were very dependable, were great co-workers, and were all around excellent employees. *Id.* ¶11.

27.     IDOT required Nick and Chad to have a job coach at all times. Ex. 69, Benton Decl. ¶8; Ex. 71, Stanley Decl. ¶5; Ex. 70, Underwood Decl. ¶5.

28.     No one from IDOT ever expressed any concern with providing Nick and Chad with a shared job coach or asked to talk about alternatives to providing Nick and Chad with a shared job coach. Ex. 71, Stanley Decl. ¶5; Ex. 70, Underwood Decl. ¶5.

29.     Benton did not think either Nick or Chad required a shared job coach on a full-time basis. Ex. 69, Benton Decl. ¶8.

30.     Dr. Owens testified that she did not believe that Nick or Chad would need a job coach 100% of the time to take a data entry sampling test. Dr. Owens explained that when she was working with them, she was not standing next to them as they did the test. Instead, she explained it and they worked independently. Ex. 12, Owens Dep., 67:24-68:22.

31.     IDOT provided job coaches as a reasonable accommodation for full-time employees who were not participants in the SPWD program. Ex. 16, Harmening Dep., 72:19-24; Ex. 57, Harmening email dated 9/2/2014, Def. No. 17786.

32.     Funding is available for individuals with developmental disabilities who require job coaches to work. These services pay for, or supplement, the cost of job coaches for people with developmental disabilities. *See* 89 Ill. Adm. Code 530.130 (g)(3)(E)(Follow-up services, including when appropriate on-site job coaching services and off-site job retention counseling, shall be provided in accordance with the customer's needs and are designed to ensure the customer's successful job retention); *See* Adults with Developmental Disabilities Waiver, available at:

www.illinois.gov/hfs/SiteCollectionDocuments/AdultswithDevelopmentalDisabilitiesApprovedW aiver.pdf ("Individual Employment Support services are individualized and may include one or more of the following components: ... Supports to maintain individualized integrated employment or self-employment including job analysis, on-the-job training and systematic instruction, job coaching including as-needed employer consultation/support … and other workplace assistance services including services not specifically related to job skill training that enable the waiver participant to be successful in integrating into the job setting").

***Reasonable Accommodation Requests***

23

33.     IDOT has a reasonable accommodation policy that outlines a time frame within which IDOT must respond to requests for accommodation. Harmening testified that it is important to have a time frame to respond and that the requester "needs to be notified of the result and not left hanging, whether its in their favor or not." Harmening Dep., 56:14-58:10.

34.     Former CMS Deputy General Counsel Jeffrey Shuck testified:

Q:  And based on your experience regularly reviewing requests for reasonable accommodations, if there was a request that wasn't reasonable, what would have been your general practice in responding?

A.   Well, it would be generally to try and understand what it is that's prompting the request so that we could then figure out, well, perhaps is there something that we can approve.

Q.   Okay.

A.   You know, are there alternatives that would be reasonable, that sort of thing.

Q.   Why is discussing alternatives to the proposed accommodation something that you would have done in your general practice?

A.   Well, the idea is to try and accommodate the employee if we can appropriately do so, you know, it's -- and is called for by the law. There's supposed to be an interactive process, where we go back and forth and discuss what it is that's being requested, and why, and how that works, and how it might work, and what we might be able to offer as an alternative if what's proposed is not workable and engaging in that interactive process.

Ex. 17, Shuck Dep., 22:6-23:4.

35.     Although Nick and Chad, through Lowy, asked IDOT and CMS to waive the CMS test and Rutan structured interview as a reasonable accommodation under the ADA, Nick and Chad did not insist that this request was the only accommodation that would work for them. Ex. 71, Stanley Decl. ¶2; Ex. 70, Underwood Decl. ¶2.

36.     If given the opportunity to discuss alternatives, other possible reasonable accommodations would have been identified. These accommodations include: (1) modifying the

24

pre-employment test to include only the essential functions of the position at issue; (2) conducting

a "hands-on" interview where skills are demonstrated through alternative means; (3) permitting

Nick and Chad to provide evidence of past successful job experience in similar positions by,

among other ways, showing a video of himself performing the position; (4) permitting a

vocational support professional and/or parent to read and interpret the preemployment test to

them; and/or (5) permitting a vocational support professional and/or parent to participate in the

interview process. Ex. 3, Nick/CMS Interrog., No. 3, Ex. 4, Chad/CMS Interrog., No. 3.

## III.    ARGUMENT

Defendants are not entitled to summary judgment because they have failed to show "that

there is no genuine issue as to any material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986). Defendants "bear[] the initial responsibility of informing the district court of the basis for

its motion, and identifying" the evidence which "demonstrate[s] the absence of a genuine issue of

material fact." *Id*. at 323. All facts must be construed in a light most favorable to Plaintiffs, and

all reasonable inferences must be viewed in their favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 255 (1986).

### A.    Plaintiffs Have Established Their *Prima Face* Case

#### 1.    Plaintiffs are "Qualified Individuals"

Testimony from Plaintiffs' supervisor firmly establishes that they were qualified

individuals who could perform the essential functions of the Office Associate (or retitled Office

Assistant) position. (Pl. SUMF ¶¶13-14,17-18,20-21,24-26). Nick and Chad completed "all the

usual duties required for" the position of Office Associate Option II, within the "same amount of

time" and "without special assistance." (*Id*. ¶18) Nick and Chad were 100% as productive as other

employees (*Id*. ¶21), with production rates often towards the top when compared to other IDOT

employees (*Id*. ¶26). As a result, their supervisor and others in IDOT management wanted to hire Nick and Chad for permanent positions. (*Id*. ¶30).

Defendants' arguments to the contrary do not establish that Nick and Chad were not qualified as a matter of law. Defendants assert Nick and Chad "cannot perform the essential function [of keying in correct data] because their job coaches must check their work for accuracy at all times" (Def. Memo at 22), a statement completely rebutted by the record. First, Nick and Chad *shared* a job coach (Pl. Resp. to Def. UMF ¶¶55,62), so any attempt to suggest they both need 1:1 support is incorrect. Further, Nick and Chad's supervisor testified that their "job coach did not assist with [their] duties" and that they "performed them all [themselves]." (*Id*.) Other evidence establishes that Nick and Chad's shared job coach provided "interpretation or direction" and "observed them working, *periodically* checking their work for accuracy, and *guided them* with correcting any mistakes." (*Id*.) (emphasis added). Indeed, Nick and Chad's job coach herself confirmed that she "did not do Nick's or Chad's job for them" but instead, "spot checked" their work and, if she "found mistakes (which did not happen frequently), provided Nick and Chad with direction and training and then they made the corrections." (Pl. AMF ¶¶22-23).

The fact that Nick and Chad's shared job coach provided this kind of support in no way establishes, as a matter of law, that Nick and Chad were not performing the essential functions of their position, especially in light of the evidence that Nick and Chad processed a high volume of reports with few errors (Pl. Resp. to Def. UMF ¶¶55,62), their production rates were regularly some of the highest when compared to permanent employees (Pl. SUMF ¶26), and notably, other employees also had their work reviewed and audited for accuracy and received additional training and direction when necessary (Pl. AMF ¶¶24-25). *See Borkowski v. Valley Cent*. *Sch. Dist*., 63 F.3d 131, 141 (2nd Cir. 1995) (an employee's reader "does not eliminate an essential function but

26

rather permits the individual with a disability to perform that essential function"); *Searls v. Johns Hopkins Hosp.*, 158 F. Supp. 3d 427, 436-37 (D. Md. 2016) (granting summary judgment for plaintiff, rejecting the employer's argument that sign language interpreter who helped deaf nurse communicate performed the essential function of the job).

Defendants' similar assertion that Chad is not qualified because he "could not even work at IDOT if a job coach were not available" (Def. Memo at 22) is incorrect and misleading. During Chad's participation in the SPWD program, IDOT insisted on providing him and Nick with a shared job coach. (Pl. Resp. Def. UMF ¶63). While Nick and Chad's job coach did not think she needed to be there at all times, IDOT required it and never raised any issue with providing one. (*Id.*; Pl. AMF ¶¶27-30). Defendants cannot insist on an accommodation, provide it without exploration of alternatives, and then argue that Plaintiffs are not qualified because they had this accommodation. Regardless, as explained *infra* in Section III(B)(3)(c), even if Plaintiffs did require a full-time job coach (which, again, they did not as they shared a job coach), this is not unreasonable as a matter of law. *See EEOC v. Wal-Mart Stores, Inc.*, 345 F. Supp. 3d 1046, 1057-60 (W.D. Wis. 2018) (rejecting argument that employee was not qualified because he needed a full-time permanent job coach).

Finally, Defendants argue Plaintiffs cannot perform the other essential functions of the Office Associate job but fail to identify what purported essential function Plaintiffs allegedly cannot do. To the extent Defendants are arguing that Plaintiffs are not qualified because they "do not know whether they are able to calculate the exact motor vehicle collision locations" (Def. Memo. 22), this argument lacks merit because this task, commonly referred to as "Location Entry," was not an essential function of their desired job.

27

Defendants reference three factors of the seven factors considered when determining whether a particular task is an essential function: employer judgment, job descriptions, and the terms of a collective bargaining agreement, but only claim one of these factors—IDOT's written job description—has been satisfied. *See* 29 C.F.R. 1630.2(n)(3) (outlining seven factors).

Job descriptions are not given total deference under any circumstances, and especially when they are not accurate. *See*, *e.g.*, *Shell v. Smith*, 789 F.3d 715, 718 (7th Cir. 2015) (finding jury could discount job description which had not been updated in 12 years and included tasks plaintiff had not done). Here, Defendants admit that the very job description they cite to support this argument is inaccurate. (Def. UMF ¶86). Indeed, IDOT's job descriptions—and even employee titles—often do not accurately describe employees' actual work. (Pl. AMF ¶18).

Defendants also fail to recognize there are other factors that must be evaluated when considering whether a particular task is an essential function: the work experience of past incumbents in the job; the current work experience of incumbents in similar jobs; the consequences of not performing the function; and the amount of time spent performing the function. 29 C.F.R. 1630.2(n)(3).

These regulatory factors demonstrate that Location Entry is not an essential function. Not all Office Associates performed the various types of data input completed by the Stats Unit as a whole, including Data Entry, Location Entry, Main Entry, and Data Correction. (Pl. SUMF ¶19). Moreover, at least one other permanent IDOT employee did Data Entry exclusively because he had a difficult time with Location Entry, (*id*.), demonstrating that it was perfectly acceptable that not all employees performed Location Entry. *See, e.g., Stragapede v. City of Evanston,* 69 F. Supp. 3d 856, 865-66 (N.D. Ill. 2014) (finding genuine issue of fact as to whether computer-use is an essential function because, among other reasons, "not all employees use the computer

28

programs in the field"); *Coleman v. Caterpillar, Inc.,* 2017 WL 3840423, at \*5 (C.D. Ill. Sept. 1, 2017) (courts consider whether an employer "actually requires all employees in a particular position to perform the allegedly essential functions").

Further, IDOT management testified that they have the flexibility to assign different people to different assignments, that it was no problem to do so, and that they regularly did so after determining who was faster at certain functions. (Pl. SUMF ¶19; Pl. AMF ¶14). *Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 198-200 (7th Cir. 2011) (holding reasonable fact-finder could conclude that not every member of the bridge crew needed to perform every function after looking to "evidence of the employer's actual practices in the workplace"); *Kauffman v. Petersen Health Care VII, LLC*, 769 F.3d 958, 962 (7th Cir. 2014) (finding function "wasn't essential" if it "could be reassigned to other employees at a negligible cost to the employer").

Finally, the only reason Nick and Chad do not know if they could do Location Entry is because IDOT decided not to train them to do that work, as Nick and Chad were excelling at Data Entry. (Pl. Resp. Def. UMF ¶¶56,64). Accordingly, Defendants cannot show that Location Entry was an essential function as a matter of law. *See Brown v. Smith*, 827 F.3d 609, 613 (7th Cir. 2016) (holding essential function inquiry is a question of fact, not law).

### 2.    Defendants' Argument Regarding Vacancies Must be Rejected

Defendants' entire argument rests on their incorrect assertion that Nick and Chad were asking for reassignment as a reasonable accommodation. Reassignment to a vacant position, as Defendants point out, is a reasonable accommodation for an individual who, because of his disability, can no longer perform the essential functions of his position. *See, e.g., Fortino v. Vill. of Woodridge*, 2018 WL 1695363, at \*4 (N.D. Ill. Apr. 7, 2018) (permitting reassignment claim

29

to proceed where patrol officer, who could no longer do the essential functions of his job due to a knee injury, requested reassignment to non-patrol duty).

But that is not the issue in this case. Nick and Chad did not ask to be placed in a different position because they could do not their current job. They sought the exact opposite – to continue doing the work that they were doing because they were good at it. Nick and Chad asked for a reasonable accommodation to access a hiring process that was known to be a barrier to them, with the end goal of being permanently hired to do the job they had already been doing in a temporary capacity. (Pl. SUMF ¶¶93-102,108-110,113-114; Pl. AMF ¶35). As such, all of the cases cited by Defendants are inapposite because they analyze the issue of vacancy only in the context of reassignment as a reasonable accommodation.[1]

This distinction is critical to the analysis of whether a vacancy is required in this case because the ADA explicitly requires a "vacant position" for reassignment. 42 U.S.C. § 12111(9) ("The term 'reasonable accommodation' may include … reassignment to a vacant position."). In contrast, there is no "vacancy" language attached to the statutory protections surrounding hiring, failure to accommodate, qualification standards, or retaliation. *Id*. §§ 12112(a), 12112(b)(5), 12212(6), 12203. Indeed, in this case, anyone can take the CMS test – the subject of Plaintiffs' request for accommodation – even if there are no vacancies available. (Pl. SUMF ¶42).

Defendants also argue they are not required to create positions as a reasonable accommodation—another claim Plaintiffs neither make nor need to prevail. Unlike in the case law cited by Defendants, Plaintiffs do not assert that the ADA required IDOT to create a position for them as an accommodation and that IDOT refused to do so. Here, IDOT *did* identify

---

[1] *See Severson v. Heartland Woodcraft, Inc*., 872 F.3d 476 (7th Cir. 2017) (discussing reassignment); *EEOC v. United Airlines, Inc*., 693 F.3d 760 (7th Cir. 2012) (addressing reassignment); *Dunderdale v. United Airlines, Inc*., 807 F.3d 849 (7th Cir. 2015) (evaluating reassignment); *Ozlowski v. Henderson*, 237 F.3d 837 (7th Cir. 2001) (concerning reassignment).

permanent positions for Plaintiffs. (Pl. SUMF ¶112; AMF ¶8; Def. UMF ¶72). Plaintiffs' legal claims do not allege that IDOT was required to create a position for them, but rather that Defendants were required to provide an accommodation that would give Plaintiffs meaningful access to the job application process. This is a different question and one not addressed by Defendants' arguments or cited cases.

Assuming *arguendo* that identifying a vacant position is required, Plaintiffs' claims must still be allowed to proceed because the record shows IDOT had vacant positions. IDOT controlled its Office Assistant and Office Associate position openings and functions (Pl. AMF ¶7) and IDOT made clear that it could hire Nick and Chad, as long as CMS provided an accommodation to the hiring process and AFSCME stood by its agreement to waive posting (Pl. SUMF ¶112). In July 2014, IDOT was willing to hire Nick and Chad subject to these conditions (*id*.) and in January 2015, IDOT not only told CMS that there was a position for Nick and Chad, IDOT even identified the specific job description and title (Pl. AMF ¶8). Whether vacancies existed, whether IDOT was subject to a hiring freeze, and whether IDOT had an Office Assistant position—are all disputed questions of fact. (AMF ¶8; Pl. Resp. to Def. UMF ¶¶83, 87-88).

Further, in December 2015, the Stats Unit had a significant backlog of data to enter to comply with statutorily-required timeframes. (Pl. AMF ¶10-12). As a result, beginning shortly after Nick and Chad's termination, IDOT used approximately 50 temporary employees (11-15 at a time) over the course of 18 months to perform (mostly) Data Entry tasks. (*Id*. ¶13). While IDOT argues its decision to use temps is not relevant, a reasonable jury could find this decision important to resolving the question of whether IDOT had a vacant position for Plaintiffs. *Cf. Dalton v. Subaru-Isuzu Auto., Inc*., 141 F.3d 667, 679–80 (7th Cir. 1998) ("If any of the plaintiffs had been able to point to a particular job that was filled by a temporary worker while a plaintiff

was on disability leave, and then had been able to show that he or she could have done that job consistently with the relevant qualifications, summary judgment would have been wrong.").

Finally, if the Court determines that identifying a specific vacancy is required and that Plaintiffs failed to do so, this should not bar any claims other than Plaintiffs' failure to hire claim.

> **3.    Plaintiffs' Accommodation Requests Were Reasonable, and Defendants' Failure to Participate in the Interactive Process Prevented the Identification of Alternative Reasonable Accommodations**

Defendants' arguments about the reasonableness of Plaintiffs' requested accommodations demonstrate the consequences of failing to participate in the interactive process. In Sections 3(a) - 3(c), *infra*, Plaintiffs explain why their initial request for an accommodation was not unreasonable as a matter of law. However, even if Nick and Chad's initial request is determined to be unreasonable, the inquiry cannot end there. Employers and employees are legally obligated to engage in the interactive process, which requires employers to "make a reasonable effort to determine the appropriate accommodation" by, among other actions, "working with the disabled individual to produce a reasonable solution if one is available." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1062 (7th Cir. 2014); 29 C.F.R. Pt. 1630, App. § 1630.9.

Plaintiffs requested an accommodation (Pl. SUMF ¶37), which by law triggered Defendants' obligation to engage in the interactive process. *See Haschmann v. Time Warner Entm't Co.*, 151 F.3d 591, 601 (7th Cir. 1998) ("Under the ADA, once an employer's responsibility provide reasonable accommodation is triggered, the employer must engage with the employee in an interactive process to determine the appropriate accommodation under the circumstances.") (internal citations omitted).

However, despite acknowledging its importance (Pl. AMF ¶¶33-34), Defendants failed to engage in this process in any meaningful way. CMS did not communicate its ultimate decision to

Plaintiffs (Pl. SUMF ¶121); propose any alternatives to Plaintiffs' requested accommodation (*Id.* ¶122); or explain why it rejected Plaintiffs' request (*Id.* ¶¶120,123). *See Nichols v. Ill. Dept. of Transp. and Ill. Dept. of Cent. Mgmt. Servs.*, 152 F.Supp.3d 1106, 1125 (N.D. Ill. 2016) ("An employer cannot sit behind a closed door and reject the employee's requests for accommodation without explaining why the requests have been rejected or offering alternatives."); *EEOC. v. Sears, Roebuck & Co.*, 417 F.3d 789, 806–07 (7th Cir. 2005) (even though "the employer believed that the employee's proposed accommodation would have been ineffective, it 'had the affirmative obligation to seek [the employee] out and work with her to craft a reasonable accommodation.'") (citing *Gile v. United Airlines, Inc*., 213 F.3d 365, 373 (7th Cir. 2000)).

Defendants' failure to meaningfully respond to Plainitffs' request renders them responsible for the breakdown of the interactive process. *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996) ("A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility."); *Powers v. USF Holland, Inc*., 2015 WL 1455209, at *12 (N.D. Ind. March 30, 2015) (denying summary judgment where the employer stated that it would get back to plaintiff on the requested accommodation, but never did).

Likely recognizing their failure to engage in the interactive process, Defendants argue that this alone is not a stand-alone violation of the ADA. Plaintiffs do not dispute this. However, had Defendants engaged in the interactive process, the Parties could have identified alternative accommodations. The CMS automated test could have been adjusted or modified to be a performance-based exam focused exclusively on the essential functions of the job they were seeking (Pl. SUMF ¶127; AMF ¶36), an accommodation expressly recognized in the ADA. 42 U.S.C. § 12111(9)(B) (defining "reasonable accommodation" to include "adjustment or

33

modifications of examinations"). CMS could have evaluated Plaintiffs through a review of their past successful job experience, training and education, consistent with CMS's approach to other classifications, or through a review of a video demonstrating their abilities. (Pl. SUMF ¶¶44,127; AMF ¶36). In fact, this type of alternative evaluation is specifically contemplated by the Personnel Code. Ill. Admin. Code. 420.300(a) (stating examination may include "physical demonstration of skill or an evaluation of education and experience").

For the *Rutan* structured interview, among other options (Pl. SUMF ¶128), Plaintiffs could have been provided with a hands-on interview, where they demonstrated skills relevant to the job in the Stats Unit. (Pl. SUMF ¶127; AMF ¶36). Plaintiffs could have provided responses through alternative means, such as a work sample, video resume, work simulation, or by permitting a parent or job coach familiar with their skills and work histories to answer on their behalf. (*Id*.). Defendants cannot possibly show that these alternatives are unreasonable as a matter of law, given that CMS itself has recognized the importance of exploring these alternatives for nearly a decade. (Pl. SUMF. ¶¶104,107). *See Miller v. Ill. Dep't of Transp*., 643 F.3d 190, 199 (7th Cir. 2011) ("The law requires an employer to rethink its preferred practices or established methods of operation … even where established practices or methods seem to be the most efficient or serve otherwise legitimate purposes in the workplace."). Thus, Defendants' Motion for Summary Judgment on Plaintiffs' accommodation claims should be denied.

### a.    Plaintiffs were not Seeking a "Promotion" as an Accommodation

In support of this argument, Defendants cite cases analyzing situations where employees can no longer do their current job due to a disability and, as a result, seek transfer to a different job. Courts consider whether the sought-after job constitutes a promotion, in which case the reassignment is not required. *See*, *e.g.*, *Shelton v. Indianapolis Pub. Sch.*, 2020 WL 509176 (S.D.

Ind. Jan. 31, 2020) (seeking reassignment from bus driver to different roles, including

Coordinator of Internal Affairs and Investigations); *Brown v. Milwaukee Bd. of Sch. Dir.*, 855

F.3d 818, 827-28 (7th Cir. 2017) (seeking reassignment from assistant principal to Grant

Administrator or Title I Coordinator).[2]

However, as explained *supra*, Nick and Chad were not seeking reassignment or transfer to

a *different* job as an accommodation for their disability. They were seeking a reasonable

accommodation that would enable them to access the State's job application process in a

meaningful way, given the well-established fact that Defendants' job application process was not

accessible to them, with the end goal of obtaining permanent employment doing the same job

they had done for years, but for which they had been paid less and received fewer benefits than

their colleagues. (Pl. SUMF ¶¶93-102,108-110,113-114; Pl. AMF ¶15-16,35).

It was this end goal – permanent State employment in IDOT's Stats Unit, with the benefits

that their temporary positions were lacking – that Plaintiffs' former attorney Barry Lowy was

referring to when he used the word "promotion." (Def. UMF ¶82). Had Plaintiffs been hired by

IDOT, the change in their employment status would most likely been referred to as being "hired"

as Plaintiffs had been employed only in a temporary capacity (*Id.* ¶¶45,47) and would have been

hired as permanent employees (Pl. SUMF ¶112). This is how Plaintiffs have conceptualized the

transition and why Plaintiffs' complaint includes a failure-to-hire claim.[3] Yet regardless of

whether Plaintiffs' ultimate end-goal is best characterized as being hired or being promoted, their

---

[2] Defendants also cite *Malabara v. Chi. Trib. Co.*, 149 F.3d 690 (7th Cir. 1998) and *Bettis v. Dep't of Human Serv. of State of Ill.*, 70 F.Supp.2d 865 (C.D. Ill. 1999), which are also irrelevant given their focus on reassignment.

[3] Courts have also conceptualized the move from a temporary employee to a permanent employee as a failure to hire. *See*, *e.g*., *Madden v. Rolls Royce Corp.*, 563 F.3d 636 (7th Cir. 2009).

case is certainly not the type of "promotion" contemplated in cases regarding reassignment, and thus, Defendants' cases and arguments are distinguishable on that basis.

### b.    Plaintiffs' Request for a Waiver Was Reasonable

Nick and Chad asked Defendants to waive the CMS test and *Rutan* interview (Pl. SUMF ¶¶108-110,113-114) because despite wanting an opportunity to obtain permanent employment in a job they had done successfully for years (*Id*. ¶¶13-14,17-18,20-21,24-26), and despite IDOT wanting to hire them (*Id*. ¶30), they knew—and IDOT knew—that they would not be able to pass the traditional job application because of their autism (*Id*. ¶¶36,64-65,68-73,84-85,87-89,93-102 ). Thus, Plaintiffs sought a waiver from a process that was not accessible to them and significantly, both AFSCME and IDOT supported this request. (*Id*. ¶34-35).

Plaintiffs were not suggesting Defendants "simply hire every disabled applicant as an accommodation." (Def. Memo. 28). Nick and Chad had a well-established job history at IDOT. (Pl. SUMF ¶¶13-14,17-18,20-21,24-26). Their request for a waiver was asking Defendants to consider that work history as an alternative to a screening process that would disqualify them for a position they had a proven ability to do. (Def. UMF ¶70-71,74-75). Accordingly, a reasonable jury could find Plaintiffs' request for a waiver reasonable. *See Haschmann*, 151 F.3d at 601 ("The reasonableness of a requested accommodation is a question of fact.").

Defendants' citation to *U.S. Airways, Inc. v. Barnett* , 535 U.S. 391, 397 (2002) for the legislative history stating an employer has "no obligation to prefer applicants with disabilities over other applicants" is misleading. (Def. Memo. 29). In *Barnett*, U.S. Airways cited this legislative history to argue that a seniority system almost always trumps a conflicting accommodation request. *Id*. The Supreme Court, however, rejected that argument, explaining "that preferences will sometimes prove necessary to achieve the Act's basic equal opportunity

goal." *Id.* Given the known obstacles caused by Defendants' job application process, a reasonable jury could conclude that this case is a situation where some accommodations (i.e., "preferences") are necessary to comply with the ADA.

Buried in their argument about waiver as an accommodation, Defendants make the unrelated argument that Plaintiffs cannot succeed on Count III of their complaint regarding impermissible qualification standards because Plaintiffs refused to participate in the job application process. Nick and Chad did not "refuse" to participate in the job application process. They knew – as did IDOT and CMS – that participating in the job application process would be futile as it was known that the CMS test and *Rutan* interview would pose an absolute barrier for them. (Pl. SUMF ¶¶64-65,68-73,84-85,87-89,91-102). The law does not require them to experience this certain humiliation. *See, e.g., Int'l Bros. of Teamsters v. United States*, 431 U.S. 324, 365-66 (1977) (establishing the futile gesture doctrine,  stating: "[w]hen a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application").

Other courts have similarly found the submission of applications or other steps to be futile gestures, relieving plaintiffs of any obligation to put themselves through meaningless, self-defeating processes when employers have demonstrated past discriminatory conduct or an unwillingness to provide reasonable accommodations. *See*, *e.g*., *Bultemeyer,* 100 F.3d at 1285 (excusing plaintiff with mental illness from requesting reasonable accommodation because he "may have thought it was futile to ask, after [his employer] told him he would not receive any more special treatment"); *EEOC v. Creative Networks*, *LLC*, 912 F. Supp. 2d 828, 829 (D. Ariz.

2012) (applying the futile gesture doctrine in an ADA case involving accommodations in the defendant's application process).

Instead, Nick and Chad did exactly what the ADA sets forth to avoid encountering this known barrier: they addressed it head-on. They contacted AFSCME, IDOT and CMS, explained why the application process was problematic for them and proposed a solution. (Pl. SUMF ¶¶33,37,108-110,113-114). They even used the magic words "reasonable accommodation" to make the meaning of their request clear. (*Id*.). And, in response, AFSCME and IDOT agreed, to the extent they had the authority to do so. (*Id*. ¶¶34,111-112).[4] CMS, however, did not even bother to provide Plaintiffs with a final response. (*Id*. ¶¶117,120-123).

Finally, CMS asks this Court to shield it from liability by claiming it "routinely" provides reasonable accommodations to other people with disabilities. But CMS cannot use its purported record of providing accommodations to others as an excuse of its failure to accommodate Nick and Chad, especially when it failed to suggest any alternatives to their request. (Pl. Resp. Def. UMF ¶¶17-18). *See Diaz v. Kraft Foods Global,* 653 F.3d 582, 587-88 (7th Cir. 2011) (holding good treatment of one employee does not justify discriminatory treatment against another in the same protected class).

### c.    Defendants' Assertions about Job Coaches as a Reasonable Accommodation are Unpersuasive

The record shows that Plaintiffs' job coach did not perform portions of the essential functions of their position. As discussed *supra*, Nick and Chad's coach provided them with direction and training, and Nick and Chad performed their essential functions. (Pl. AMF ¶¶22-23; Pl. Resp. to Def. UMF ¶¶55,62).

---

[4] IDOT is still ultimately responsible in light of the administrative relationship between CMS and IDOT, as addressed in Count IV of Plaintiff's Complaint. *See* 42 U.S.C. § 12112(b)(2); 29 C.F.R. § 1630.6.

Defendants' argument that Nick and Chad's request for an indefinite, full-time job coach is unreasonable as a matter of law conflicts with recent case law. The recent case, *EEOC v. Wal-Mart Stores, Inc.*, 345 F. Supp. 3d 1046 (W.D. Wis. 2018), cited in Defendants' Memorandum, held that a full-time job coach can be a reasonable accommodation.[5] In *Wal-Mart*, Paul Reina, a deaf and blind man with a developmental disability worked as a cart pusher. Wal-Mart argued Reina was not qualified because he required a full-time permanent job coach who performed his duties. The court held that the fact that the coach assisted Reina on a permanent, full-time basis was not the relevant question, but rather, it was the "type and amount of assistance provided." *Id.* at 1059. The EEOC presented evidence that Reina was able to perform his job with "physical and verbal prompts from his job coach, such as helping steer a long line of carts … identifying carts to collect or pointing out items that needed to be loaded," leading the court to deny Wal-Mart's motion for summary judgment. *Id.* at 1061. Following that decision, a jury returned a verdict of $5.2 million for the EEOC.[6]

Here, Nick and Chad did not require a full-time permanent job coach because their coach was shared between the two of them. (Pl. Resp. Def. UMF ¶¶55,62). Further, the type of work performed by Nick and Chad's shared job coach was substantially less than the type found sufficient to create a genuine issue of fact (and subsequently, a favorable jury finding) in *Wal-Mart*. (*Id.*; Pl. AMF ¶¶22-23).

---

[5] Defendants cite three additional cases analyzing whether a permanent job coaches can be a reasonable accommodations, all of which were evaluated and found unpersuasive by the *Wal-Mart* court. *Wal-Mart*, 345 F. Supp. at 1059 (rejecting the contention that a "permanent job coach is never a reasonable accommodation" noting that the "Court of Appeals for the Seventh Circuit has not adopted such a role"). Defendants also cite *Majors v. General Electric*, 714 F.3d 527 (7th Cir. 2013), which stands for the unremarkable conclusion that an employer is not required to restructure an individual's job to eliminate essential functions, a question not at issue in this case.

[6] *EEOC v. Wal-Mart*, 17-cv-739 (W.D. Wis. Oct. 10, 2019) (ECF No. 193) (describing jury verdict returned in favor of the EEOC awarding punitive damages in the amount of $5,000,000 and compensatory damages in the amount of $200,000).

Further, Defendants cannot seriously argue that a shared job coach is unreasonable when it was IDOT who insisted on providing one during Plaintiffs' employment. (Pl. AMF ¶27). IDOT never expressed any concern about providing a shared job coach either during Nick and Chad's employment (*Id*. ¶28) or in response to Plaintiffs' request for a reasonable accommodation (Pl. SUMF ¶¶120-123). Indeed, IDOT provides job coaches for permanent employees (Pl. AMF ¶31) and was supportive of hiring Nick and Chad, even if that required a full-time job coach (*Id*. ¶19).

If IDOT or CMS had any concern about Plaintiffs having a shared job coach, such as the cost or the amount of hours the coach worked, they could have raised those issues and enabled the parties to discuss various options per the interactive process, including available funding for individuals with developmental disabilities who may need to pay for a job coach, or decreasing the job coach's hours, which Plaintiffs' coach believed was possible. (*Id*. ¶¶30,32). These options were never explored because Defendants never raised any concerns. *See Bultemeyer*, 100 F.3d at 1285 (holding employee may have been qualified but employer did not give him a chance where it did not simply sit down with him and talk about the situation).

### 4. Nick and Chad Raised Genuine Issues of Material Fact About the True Reason IDOT Ended the SPWD Program and Their Employment

Employees can successfully raise a genuine issue of fact regarding whether they were subjected to retaliation in violation of the ADA by pointing to a combination of "suspicious timing" and evidence that an employer's offered reason was "pretextual." *Rowlands v. United Parcel Serv. - Fort Wayne*, 901 F.3d 792, 802 (7th Cir. 2018)*; see also Coleman v. Donahoe,* 667 F.3d 835, 861 (7th Cir. 2012) (based on "suspicious timing" and "pretext").

As in *Rowlands* and *Coleman*, Plaintiffs support their retaliation claim with evidence of suspicious timing and pretext. Nick and Chad filed charges of discrimination with the EEOC on June 15, 2015. (Def. UMF ¶81). On July 8, 2015, employees in IDOT's Chief Counsel's office

40

discussed their EEOC charges and the termination of the SPWD program in the same email conversation (Pl. AMF ¶1) and just over a week later, on July 16, 2015, IDOT notified the School District that it planned to end the SPWD program (*Id*. ¶2-4). *Stevens v. Ill. Dep't of Corr.*, 2015 WL 5686615, at *9 (C.D. Ill. Sept. 28, 2015) ("Time periods as long as a month between adverse employment actions and their causes have been found sufficiently short to infer retaliatory motive.").

This timing becomes even more suspect in light of IDOT's claim that it notified the School District in September 2015 that it planned to end the program, without mentioning its earlier notification in July (Pl. Resp. Def. UMF ¶49); its similar denial that it made any termination decisions in July 2015 (Pl. AMF ¶5); and its failure to inform Plaintiffs about this decision until December 2015 (*Id*. ¶6).

In addition to suspicious timing, the record demonstrates the pretextual nature of Defendants' explanations for terminating the SPWD program. IDOT admitted that "EEO charges on ADA issues" was one reason it terminated the program, but made sure to have a different reason "to provide publicly." (Pl. Resp. Def. UMF ¶50). A reasonable jury could conclude that all of IDOT's "publicly" offered reasons for having terminated the program are pretextual. While IDOT offered no "official" reason for ending the program (*id*.) it now proffers four reasons, which are discussed in detail below.

First, IDOT claims it ended the program because Dave Dailey retired and they were unable to replace him. This is untrue. While Dailey did retire, Dailey's plan for retirement was known as far back as fall 2014 and IDOT decided that instead of replacing him, it would contract out the Program Manager role through the School District. (*Id*. ¶50(1)). IDOT amended its Intergovernmental Agreement and Memorandum of Understanding to reflect this change. (*Id*.).

41

Second, IDOT claims it ended the SPWD program due to "ballooning costs." This is untrue. When questioned about the reasons for terminating the SPWD program, CMS's Director of Government Affairs told a member of the Illinois General Assembly that the program was not ending for budget-related reasons. (*Id*. ¶50(2)).

Third, IDOT claims it ended the SPWD program due to potential non-compliance with the CBA if participants were performing the same functions as AFSCME employees. This is untrue. AFSCME filed no grievances and had expressed no desire to end the SPWD program.  (*Id*. ¶50(3)). Further, even if the SPWD program did raise potential issues with the CBA, those issues had existed since the inception of the program in 2005, yet Defendants did not decide to terminate the program until shortly after Plaintiffs filed their charge of discrimination with the EEOC in 2015. (*Id*.). Indeed, even after ending the SPWD program, IDOT sought to use Tech Trainees to assist with AFSCME-covered tasks in the Stats Unit, creating another situation where temporary employees were performing AFSCME work. (*Id*.).

Finally, IDOT claims it ended the SPWD program due to potential non-compliance with the best-qualified hiring principles. (*Id*. ¶50(4)). Yet IDOT amended its MOU to establish a neutral selection process to choose SPWD participants. Moreover, even if the SPWD program did raise potential issues with best-qualified hiring principles, those issues had existed since 2005, yet Defendants did not decide to terminate the program until shortly after Plaintiffs filed their charge of discrimination with the EEOC in 2015. (*Id*.).

Simply put, a reasonable jury could conclude that while one or more of IDOT's four proffered reasons may have been issues considered at some point, they were not – individually or collectively – the true reason IDOT ended the SPWD program and terminated Plaintiffs' jobs and that instead, Plaintiffs' EEOC complaint was the proverbial straw that broke the camel's back.

This, by definition, is "but-for" causation. *See Burrage v. United States*, 571 U.S. 204, 210-11 (2014) (explaining "but-for" causation as "if the predicate act combines with other factors to produce the result, so long as the other factors alone would not have done so—if, so to speak, it was the straw that broke the camel's back").

Moreover, Defendants' suggestion that Plaintiffs did not suffer an adverse action because they had no expectation of continued employment is completely off the mark. The standard for assessing whether an action constitutes an "adverse employment action" in retaliation and discrimination claims. *See, e.g., Stewart v. Dep't of Transp.*, 2019 WL 2103387, at *3 (N.D. Ill. May 14, 2019) (noting that IDOT cited "an outdated standard" in a retaliation claim by referencing the standard for discrimination claims). Thus, Defendants' citation to *Tillman v. Verizon*, 118 F. Supp. 3d 515, 534 (E.D.N.Y. 2015), which was decided in the context of a discrimination claim, not a retaliation claim, is irrelevant.[7]

For retaliation claims, the standard is whether the action would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Stewart*, 2019 WL 2103387, at *3 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64, 126 S. Ct. 2405, 165 L.Ed. 2d 345 (2006)). A reasonable jury could find an employee would be dissuaded from filing a charge of discrimination if he knew it would result in the termination of a program that benefited people with disabilities (himself included) that had been in existence for nearly a decade, or that he would lose his job, regardless of whether his position was intended to be temporary. This is especially so given that many SPWD program participants, including Nick and Chad, had already been extended numerous times and IDOT had decided to eliminate the 18-month limitation moving forward. (Pl. Resp. Def. UMF ¶¶46,57,65).

---

[7] *Tillman* also addressed a claim for retaliation, but that question was decided on different grounds. 118 F. Supp. 3d at 542-43.

Defendants return to their unsupported assertion that they should not be "punished" for their actions in creating a job training program for people with disabilities. Defendants' reliance on *Vande Zande v. State of Wisconsin Department of Administration*, 44 F.3d 538 (7th Cir. 1995) and *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019 (7th Cir. 1997) is misplaced. *Vande Zande* considered whether telework is a reasonable accommodation, which has no relevance here, and *Sieberns* is distinguishable because the plaintiff admitted he was not qualified for the position he applied for. Neither case provides any basis to excuse Defendants' ADA violations.

### B.    Defendants Cannot Prevail on Their Affirmative Defenses

As an initial matter, Defendants did not plead these affirmative defenses, and they are therefore waived. Fed. Civ. P. 8(c)(1) (a party must affirmatively state any avoidance or affirmative defense in its answer). Even if they had been plead, however, Defendants cannot satisfy their burden of proving their affirmative defenses as a matter of law.

### 1.    Plaintiffs' Requests Would Not Pose an Undue Hardship

Once an employee provides documentation of his need for a reasonable accommodation, the employer is obligated to provide it absent an undue hardship. *Ekstrand v. Sch. Dist.*, 583 F.3d 972, 977 (7th Cir. 2009). Under the ADA, "undue hardship" means "an action requiring significant difficulty or expense" considering factors such as the nature and cost of the accommodation, the overall financial resources of the facility and entity, the number of employees, and the type of operation in question. 42 U.S.C. § 12111(10). It is a fact-intensive inquiry on which the employer bears the burden of proof. *See, e.g.*, *Barnett*, 535 U.S. 391, 402 (2002). Summary judgment is inappropriate without concrete evidence that the undue hardship actually exists. *See, e.g., Smith v. Henderson*, 376 F.3d 529, 536-37 (6th Cir. 2004) (employer's

failure to provide "specific facts indisputably demonstrating" that the accommodation imposed an undue hardship defeats summary judgment).

Defendants' entire argument regarding undue hardship focuses only on Plaintiffs' request for "waiver" and "promotion." (Def. Memo at 33). But as discussed above, there were a number of ways Plaintiffs could have been accommodated had CMS engaged in the interactive process. (Pl. SUMF ¶¶127-128; AMF ¶¶36-37), none of which would have posed an undue hardship. Defendants do not reference any of these accommodations and thus, have waived any argument that they would pose an undue hardship. *See Billhartz v. C.I.R.*, 794 F.3d 794, 801 n.4 (7th Cir. 2015) ("[I]t is well-settled that arguments first made in the reply brief are waived.").

Yet even if the Court focused only on Plaintiffs' initial request, Defendants' arguments still fail for the reasons set forth below.

### a. Defendants Cannot Show Accommodations Would Pose an Undue Hardship, Violate a *Bona Fide* Seniority System

Defendants' argument fails for four reasons. First, Plaintiffs' request would not violate the CBA because while the CBA requires IDOT to post vacant positions, this requirement can be waived by agreement of the parties and, in fact, AFSCME and the State of Illinois have an established practice of waiving the CBA's posting and bidding requirements in certain circumstances. (Pl. Resp. Def. ¶40; Pl. AMF ¶17). That is precisely what was contemplated here. AFSCME – the party to the CBA that benefits from the posting requirement – agreed to waive the posting requirement for Nick and Chad, and IDOT also agreed. (Pl. SUMF ¶¶33-35). Thus, this situation is easily distinguishable from the cases cited by Defendants, where there was no indication that either the union or the employer agreed to waive the posting requirement. *See Barnett*, 535 U.S. at 391; *Dunderdale*, 807 F.3d at 854-57.

Second, Plaintiffs' request would not have violate violated a bona fide seniority system or usurp the rights of employees protected by a seniority system, as established in *Barnett*. In *Barnett*, the Supreme Court found that the ADA does not require an employer to "assign a disabled employee to a particular position *even though another employee is entitled to hold the position* under the employer's 'established seniority system.'" 535 U.S. at 395-96 (emphasis added). In contrast, Nick and Chad sought an entry-level, bottom-rung position, to which no one else was entitled under Defendants' seniority system. (Pl. AMF ¶17). AFSCME agreed to waive the posting requirement because, as an entry-level, bottom rung position, it would not have constituted a "promotion" for any AFSCME members by bumping them or violating a seniority system. (*Id.*).

Third, in *Barnett*, the Supreme Court held that even if an employer has a bona fide seniority policy, there may be special circumstances that make an exception reasonable. 535 U.S. at 394-96. Here, AFSCME and IDOT recognized that although Nick and Chad were doing union-type work, they would never be able to obtain a permanent position through the traditional CMS job application due to the barriers created by Defendants' job application process, (Pl. SUMF ¶¶65,93-97,111-112), and thus, an exception needed to be made—precisely the circumstances contemplated in *Barnett. See also Beem v. Providence Health & Servs.*, 2011 WL 4852301, at *9–10 (E.D. Wash. Oct. 13, 2011) (rejecting employer argument that employee's request would violate the CBA and seniority system, recognizing that *Barnett* considered the possibility of special circumstances).

Finally, Defendants' undue hardship argument fails as that it (again) relies on arguments and case law about the rights of employees seeking reassignment, which are irrelevant in this case. Even assuming reassignment principles do apply, the cases cited by Defendants (*Barnett* and

*Dunderdale*) are distinguishable because they do not involve situations where, as here, the plaintiffs assert that the job application process itself is discriminatory.

> **b.    Defendants Cannot Show Accommodations Would Pose an Undue Hardship, Violate the State's "Best-Qualified Hiring System" Stemming from the Personnel Code**

Defendants' argument again rests on the incorrect assertion that Plaintiffs are seeking reassignment. As Plaintiffs' case is not about reassignment, it should not be evaluated under the legal framework that considers when it is appropriate to deviate from a best-qualified policy in response to a request for reassignment. Defendants' reliance on *Frazier-White v. Gee*, 818 F.3d 1249 (11th Cir. 2016), is misplaced because it focused on reassignment and includes no allegations that the employer's hiring process itself was discriminatory.

Even if reassignment principles were relevant, Defendants still cannot show Plaintiffs' request would pose an undue hardship as a matter of law because their requested accommodation—contrary to Defendants' assertion—did not involve the property rights or administrative concerns presented by a seniority system. As explained *supra*, Plaintiffs sought a reasonable accommodation to obtain a bottom-rung position that no state employees were already entitled to, which is why AFSCME agreed to waive posting rights. (Pl. AMF ¶17). Further, the unique circumstances would enable a reasonable jury to conclude that deviation from the typical job application process would not pose an undue hardship. *See Barnett*, 535 U.S. at 394-96.

To the extent Defendants are suggesting that they were required to comply with the Personnel Code without modification, they are again incorrect, this time by ignoring the Constitution's Supremacy Clause. *See, e.g., Quinones v. City of Evanston, Ill.*, 58 F.3d 275, 277 (7th Cir. 1995) ("[The defendant] believes that it is compelled to follow the directive from the state, but the Supremacy Clause of the Constitution requires a different order of priority.  A

discriminatory state law is not a defense to liability under federal law; it is a source of liability under federal law."); *Mary Jo C. v. New York State and Local Ret. Sys*., 707 F.3d 144, 163 (2d Cir.2013) (noting if "all state laws were insulated . . . the ADA would be powerless to work any reasonable modification in any requirement imposed by state law.").

This is especially so because nothing in the Personnel Code itself requires Defendants to administer the specific tests at issue. Indeed, its regulations state examinations may include "physical demonstration of skill or an evaluation of education and experience," Ill. Admin. Code. 420.300(a), two of the accommodations identified by Plaintiffs (Pl. SUMF ¶127; AMF ¶36).

Finally, Defendants' attempt to discredit Plaintiffs by claiming they refused to avail themselves of the Successful Disability Opportunities Program (SD Program) is specious. The SD Program would not help Plaintiffs because it still requires individuals to pass the CMS test and participate in the standard *Rutan* interview process, which Plaintiffs cannot do due to their autism. (Pl. Resp. to Def. UMF ¶10). Finally, hiring agencies, like IDOT, are not required to use the SD Program so there is no guarantee anyone on the SD list would be considered for a position. (*Id.*).

### 2.    Defendants Cannot Show the CMS Test and *Rutan* Structured Interview are Job-Related and Consistent with Business Necessity

Defendants offer only irrelevant information related to the CMS test and no information related to the *Rutan* structured interview in support of this argument. Regarding the CMS test, Defendants describe the steps CMS takes to monitor, analyze and refine its tests to tailor them to the appropriate CMS job classification. However, none of that is relevant. The material question when determining whether Defendants' application process is job-related and consistent with business necessity is not whether CMS makes a good effort to try to ensure that its tests – which apply to over 1,000 different jobs (Pl. SUMF ¶¶46,48) – assess applicants for job skills required across entire job classifications. Rather, the relevant question is whether the CMS exam (and the

*Rutan* interview) *actually* test for the "specific skills" required for the particular position at issue. *Atkins v. Salazar*, 455 F. App'x 385, 398 (5th Cir. 2011); 29 C.F.R. Pt. 1630, App. § 1630.10.

Here, the record shows that they do not. As discussed extensively in Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment, the overwhelming evidence shows that the CMS exams for the positions of Office Associate and Office Assistant bear little relevance to the job functions of employees in IDOT's Stats Unit. (Pl. SUMF ¶¶15-16,56,62). Even if the CMS exam did ask questions that relate to the job responsibilities at issue here (which it does not), the exam still does not assess an individual's ability to actually perform the job task. (*Id*. ¶71). Similarly, the *Rutan* structured interview assesses applicants for skills unrelated to the job at issue. (*Id*. ¶¶82-83).

Defendants also suggest that case law interpreting the requirement that a job application process be actually "job-related" and "consistent with business necessity" should not apply because those cases involved medical examinations or physical fitness tests, whereas this case involves "standard pre-employment exams." (Def. Memo. at 38). This argument is without merit. First, physical fitness tests are analyzed under the very same section of the ADA as standard pre-employment exams, so Defendants' argument is contrary to the clear language of the ADA. *See Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 698 (7th Cir. 1998) (evaluating physical fitness requirement under Section 102(b)(6)). Although, as Defendants point out, the validity of medical examinations are governed by a different section of the ADA, that section uses nearly identical language as the section addressing pre-employment exams to describe when medical examinations are permissible,[8] which is why courts have interpreted the language of the sections

---

[8] *Compare* 42 U.S.C. § 12112 (d)(4)(A) (Section 102(d) ("unless such examination or inquiry is shown to be job-related and consistent with business necessity") *with* 42 U.S.C. § 12112(b)(6) (Section 102(b)(6)) ("unless the standard, test or other selection criteria, as used by the covered

interchangeably.[9] Accordingly, Defendants' suggestion that case law interpreting the "job-related" and "consistent with business necessity" requirements should not apply is contrary to established law. *See Wright v. Ill. Dep't of Children & Family Serv.*, 798 F.3d 513 (7th Cir. 2015) and *Painter v. Ill. Dep't of Transp.*, 715 Fed. Appx. 538 (7th Cir. 2017).

## IV.    CONCLUSION

For the reasons discussed herein, as well as those found in Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment, Plaintiffs respectfully request that Defendants' Motion for Summary Judgment be denied.

---

entity, is shown to be job-related for the position in question and is consistent with business necessity.")

[9] *See, e.g.*, *EEOC v. Aurora Health Care, Inc.,* 2015 WL 2344727, *18 (E.D. Wis. May 14, 2015) (noting courts often cite cases decided under Section 102(d) when analyzing job-related and consistent with business necessity under Section 102(b)(6)).

## <u>CERTIFICATE OF NON-COMPLIANCE</u>

I certify that Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment does not comply with the type volume limitation as the argument section in Plaintiffs' Memorandum contains more than 7,000 words or 45,000 characters. The argument section of Plaintiffs' Memorandum has 8,099 words, 51,714 characters (with spaces), and 43,634 characters (no spaces), including all headings, footnotes, and quotations. Accordingly, Plaintiffs filed a Motion for Leave to File Enlarged Brief Instanter.

s/ *Rachel M. Weisberg*
One of the Attorneys for Plaintiff

Rachel M. Weisberg
Jin-Ho Chung
Equip for Equality
20 North Michigan Avenue, Suite 300
Chicago, Illinois 60602
(312) 895-7319
RachelW@equipforequality.org
JinHo@equipforequality.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 1, 2020, I electronically filed the foregoing **Plaintiffs'**

**Memorandum in Opposition to Defendants' Motion for Summary Judgment** with the Clerk

of the Court using the ECF system, which will send notice of such filing to all parties of record.


<u>s/ *Rachel M. Weisberg*</u>
One of the Attorneys for Plaintiff

Rachel M. Weisberg
Jin-Ho Chung
Equip for Equality
20 North Michigan Avenue, Suite 300
Chicago, Illinois 60602
(312) 895-7319
RachelW@equipforequality.org
JinHo@equipforequality.org