E-FILED
Friday, 11 December, 2020  06:10:40 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

| | |
|---|---|
| **NICHOLAS LESKOVISEK,** ) | |
| **by his next friend, LORI STANLEY, and** ) | |
| **CHAD UNDERWOOD,** ) | |
| **by his next friend, KIM UNDERWOOD,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| **v.** ) | **Case No. 17-cv-3251** |
| ) | |
| **ILLINOIS DEPARTMENT OF** ) | |
| **TRANSPORTATION and ILLINOIS** ) | |
| **DEPARTMENT OF CENTRAL** ) | |
| **MANAGEMENT SERVICES,** ) | |
| ) | |
| **Defendants.** ) | |

## OPINION

On January 29, 2018, Plaintiffs Nicholas Leskovisek and Chad

Underwood (Nick and Chad) filed their First Amended Complaint

(d/e 14) against Defendants, Illinois Department of Transportation

(IDOT) and Illinois Department of Central Management Services

(CMS).   On April 28, 2020, Plaintiffs filed a Motion for Partial

Summary Judgment (d/e 48), and Defendants filed a Motion for

Summary Judgement (d/e 54).

For the reasons that follow, Plaintiffs' Motion (d/e 48) is

DENIED, and Defendants' Motion (d/e 54) is GRANTED in part and

DENIED in part.   Defendants' Motion is DENIED as to Counts I, II,
IV, and V.   Defendants' Motion is GRANTED in part and DENIED
in part as to Count III.

## I.   FACTS

The facts are taken from the parties' statements of Undisputed
Material Facts and Additional Material Facts and from the
documents submitted by the parties.   The Court has only included
facts which are material to the issues raised and adequately
supported by evidence in the record.

### A.   Background on Plaintiffs, Nick Leskovisek and Chad Underwood

Nick Leskovisek and Chad Underwood are adults with Autism
Spectrum Disorder (ASD) who participated in the Student
Professionals with Disabilities (SPWD) program.

Nick is non-verbal and has significant deficits in expressive
language.   His primary form of communication is vocalization –
such as soft sounds that are not words – and gestures – such as
pointing or giving high fives.   He is largely unable to engage in
written communication.   He can write or use a communication
board, but only for simple requests, such as a grocery list.

Nick has substantial deficits in executive functioning. Executive functioning relates to the set of mental skills that include working memory, flexible thinking and self-control, and skills used to learn, focus, handle emotions, and make decisions.   These deficits impair Nick's ability to plan, stay organized, and make decisions.

Chad is verbal, but his expressive language skills are significantly limited.   While he is able to say words, he is unable to have a conversation or put those words together into a cohesive sentence.   He has echolalic tendencies, where, instead of answering a question, he repeats the last part of the question asked.   He is unable to answer complex questions either by speaking or by writing, and he has substantial deficits in executive functioning that impair his ability to plan, stay organized, and make decisions.

## B.  Plaintiffs' Participation in the SPWD Program

The SPWD program was administered by IDOT in collaboration with School District 186 and United Cerebral Palsy Land of Lincoln.

The program was intended to provide job training and employment experience to individuals with disabilities, with the goal of enabling them to obtain permanent, competitive employment.

Under the program, IDOT would hire up to 10 students with disabilities into paid temporary positions for six-month sessions. Prior to 2014, participants in the program were supposed to be eligible to work only a total of three six-month cycles for a maximum of eighteen months.   However, some participants stayed longer than eighteen months.   After 2014, the time limit of eighteen months was changed "to unlimited or as long as it takes," but with the program still "intended as developmental and transitional rather than as permanent employment."   See Harmening Email, d/e 61-17.   SPWD program participants were listed as holding Technical Trainee ("Tech Trainee") positions.

Through the SPWD program, Nick and Chad were assigned to work in IDOT's Traffic Safety Division, Statistical Coding Unit ("Stats Unit").   They were placed in the Stats Unit based on their data entry skills.   Nick entered the SPWD program in 2008, and he began working in the Stats Unit in early 2011.   Chad entered the

SPWD program in 2011, and he began working in the Stats Unit in August 2013.   Nick and Chad earned $11.10 per hour.   They did not receive benefits, such as insurance or paid leave time.   Their Tech Trainee positions were continually renewed until IDOT ended the SPWD program effective December 31, 2015.

Nick and Chad had a full-time job coach who observed them working.   From approximately September 2014 until December 2015, Christina Benton was their job coach, employed by United Cerebral Palsy.   She described her role as training, supporting, and monitoring Plaintiffs, not doing their work.   She provided them with interpretation or direction, periodically checking their work for accuracy and guiding them by correcting mistakes, which Benton said did not happen often.

Defendants dispute the role of the job coach, pointing to testimony from Jessica Keldermans.   Keldermans was the Bureau Chief of the Traffic Safety Division, and she oversaw the Stats Unit. She testified that, to prevent Nick from "pushing through" cases with errors in entry submissions, a job coach sat next to Nick "watching him" and "checking everything" before "then pushing . . .

the button to . . . push the [data entry] case though."   *See*
Keldermans Deposition, d/e 52-13, p. 131-32, 215.   She stated
that Nick and Chad would "get a little upset when [the job coach]
wasn't there," resulting in noise disturbances, and that "[w]ithout [a
job coach] they can get very agitated."   *Id.* at 131, 215-16.

Keldermans filled out a Social Security Administration form
about Plaintiffs' abilities to successfully complete all of their Tech
Trainee duties "without special assistance" and in "the same
amount of time as employees in similar position[s]."   *Id.* at 148.
She testified that she thought Nick and Chad "did a great job."   *Id.*
at 175.

## C.   Plaintiffs Seek Permanent Employment in the Stats Unit

The Stats Unit was responsible for entering data from vehicle
crash reports submitted by law enforcement agencies across
Illinois.   While Nick and Chad held temporary Tech Trainee
positions through the SPWD program, they expressed a desire to be
considered for permanent positions doing data entry at IDOT.

### 1.   Job Classifications and Descriptions

Employment with the State of Illinois is, with some exceptions not applicable here, governed by the Personnel Code, 20 Ill. Comp. Stat. 415/1 *et seq.*   Positions within State employment are grouped into job title classifications which apply to all State agencies that fall within CMS's personnel administration.   Two of the different job title classifications are Office Associate and Office Assistant.   In 2014 and 2015, there were over 1500 employees across the various State agencies within the classification of Office Associate, and about 800 employees within the classification of Office Assistant.

Both of the Office Associate and Office Assistant job classifications are covered by a collective bargaining agreement ("CBA") with the American Federation of State, County and Municipal Employees ("AFSCME").   The CBA does not cover temporary employees.

The permanent positions in the Stats Unit are civil service positions subject to an "open competitive exam" including a computer-based "automated test" and a structured "*Rutan*" interview.

Through Equip for Equality attorney Barry Lowy, Nick and Chad contacted AFSCME, corresponding with Frank Prochaska, Staff Representative for AFSCME Council 31.   AFSCME agreed to waive its posting and bidding rights, to enable Nick and Chad to work with a job coach in a position comparable to what would be an Office Associate classification without a job coach, but only if the position were classified at the lower level of Office Assistant.   At the time, the Stats Unit's data entry positions were all Office Associate positions, not Office Assistant positions.   Effective July 1, 2014, the monthly starting salary for the position of Office Assistant was $2,782, and the monthly starting salary for the position of Office Associate at IDOT was $2,935.

IDOT had about ten to fifteen permanent employees whose jobs included data entry functions similar to the data entry functions of the Tech Trainees.   Those permanent employees held the title of Office Associate, and those Office Associates also performed other functions including location entry, main entry, and data correction.

The Office Associate job description read, in part:

[P]rovides complex technical support in the establishment, maintenance and application of the Illinois Traffic Records System and the Fatal Accident Reporting System (FARS). Evaluates police reports and motor vehicle crash data to determine conformance to standards set by the Committee on Uniform Definitions of Motor Vehicle Accidents. Evaluates police reports and fatal crash documents of all traffic crash cases to determine a variety of crash date and location features and to ascertain the integrity of data compiled for the Traffic Records System and the Fatal Accident Reporting System. The accurate interpretation and application of crash data is essential in promoting and implementing traffic safety programs, traffic safety legislation and highway improvement programs. Perform duties primarily independently, referring only sensitive problems and situations to the supervisor for resolution. Operates the Crash Information System (CIS) terminal to access Imaging System and the Locator Tool within CIS in the performance of duties.

*See* d/e 52-46, p. 3.

Keldermans testified that there was a hiring freeze starting in 2014. After May 2014, IDOT could not hire any AFSCME employees until April 2018—even though Keldermans wanted to hire more employees. Keldermans thought the hiring freeze ended in 2016, but she was still told she could not hire until a bureau reorganization was done. Keldermans had an email exchange about posting positions at some point in 2015, but IDOT was unable to post them, and the positions were never filled. To get

work done while unable to hire permanent employees, IDOT employed temporary employees through a temporary employment agency.

### 2.   Testing and Interview Requirements

Applicants seeking employment in Office Assistant or Office Associate positions must receive a passing letter grade of A, B, or C on the open competitive exam to be placed on a list for the job classification under which a specific job vacancy is grouped.   When a State agency seeks applicants for a vacant position, the agency requests the candidate list for the relevant job classification.   The agency selects applicants from the list, first those who received an A, then B, then C, then the agency interviews applicants and ranks them based on predetermined uniform criteria.   The exam is periodically reconfigured with input from agencies.

The automated test for the position of Office Associate has a total of sixty multiple choice questions, plus an additional skills-based test depending on the option level.

Due to Nick's and Chad's disabilities, neither could sit down for a test, read examination questions, or provide answers in response to written questions.

The *Rutan* structured interview process is named for the U.S. Supreme Court case, *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990), which held that hiring, promotion, transfer, and recall of employees may not be based on party affiliation or support and, instead, must be based on the merits and qualifications of candidates.

CMS sets the parameters for the *Rutan* interview process. CMS then trains and certifies employees of other state agencies on the *Rutan* interview process. The hiring agency develops the specific questions and scoring within the CMS parameters. The *Rutan* interview is scored based on applicant responses.

Due to their significant limitations in expressive language, Nick and Chad cannot meaningfully participate in the *Rutan* structured interview process. Nick would not be able to respond verbally. Chad's verbal abilities are such that he would only be able to respond with a one-word answer, likely repeating the last

word he heard.   Nick and Chad can comprehend and process simple questions, comments, and commands.   They cannot comprehend complex questions, including questions that have been asked in prior *Rutan* structured interviews.   They can sit quietly while working on their computers, but they would be unable to sit quietly and listen to questions for an extended period of time in an interview setting.

### 3.   Plaintiffs Requested Accommodations

On June 11, 2014, through Equip for Equality attorney Barry Lowy, Nick and Chad requested accommodations and modifications to the testing and interview process.   Lowy communicated with Michael Forti, IDOT's Chief Counsel.   Lowy told IDOT that Nick and Chad were incapable of passing the entrance exam or interviewing, due to their autism.   Lowy's letters to Forti requested that IDOT "waive" the testing and interview requirements as a reasonable accommodation because the requirements as applied to Nick and Chad were not job-related and consistent with business necessity where Nick and Chad had already demonstrated their ability to perform the essential job functions.   Lowy's letters stated that Nick

and Chad "desire[d] to be promoted into a bargaining unit full-time position doing the tasks of data entry[.]"   *See* Lowy Letters, d/e 52-28.

Regarding the AFSCME situation, Lowy stated that AFSCME initially "would not agree to waive its posting and bidding rights" but "upon learning that [Nick and Chad were] supported by a job coach, [AFSCME] agreed to waive its posting and bidding rights if the position into which Nick [and Chad] would be promoted would be classified as an Office Assistant position which is one grade lower than the Office Associate Option II position."   *See* d/e 52-28.

The letter Lowy sent to Forti about Nick continued:

> In light of AFSCME's accommodation of Nick to waive posting and bidding rights, I am requesting as an accommodation, pursuant to the ADA, that IDOT promote Nick into an Office Assistant position performing the same tasks and duties he currently performs in his Tech-Trainee position.   In addition, I am requesting, pursuant to the ADA, that the requirement of interviewing and testing be waived in order for Nick to be promoted into the position and that IDOT take the appropriate steps with CMS to establish this accommodation.

*Id.*

Lowy's letter about Chad also contained that language.   In his deposition, Lowy stated that his letters used the term "promotion" because Nick and Chad were not in the union, and "[i]t would have been an increase in pay and an increase in benefits."   *See* Lowy Deposition, d/e 52-14, p. 38.

Forti responded that the "request to IDOT to promote Chad and Nick is premature" because CMS's and AFSCME's agreement were "necessary predicate events to IDOT's ability to place Chad and Nick in Office Assistant positions" and CMS had not yet agreed to waive the testing and interview requirements.   *See* Forti Letter, d/e 52-29.   He wrote, "If CMS is willing to waive the testing and interviewing requirements and AFSCME stands by its agreement to waive posting for Chad and Nick to fill an Office Assistant position, then IDOT can begin the process to place Chad and Nick in those positions."   *Id.*

On August 28, 2014, after being informed by Forti that CMS administers the testing and interview requirements, Lowy contacted CMS, through Colleen Alderman, CMS's head of labor relation, with much the same information he had sent to Forti.   Lowy's letters to

CMS stated that Nick and Chad were "currently receiving the reasonable accommodation of a job coach" and mentioned that AFSCME had asked about reclassifying the positions to an Office Assistant level because Nick and Chad performed their duties "with an accommodation" consisting of "the support of [a] job coach." *See* Accommodation Request, d/e 52-30.   Lowy asked CMS to "waive the testing and interviewing requirements and allow IDOT to place" them "into a permanent full-time position."   *Id.*

In October of 2014, CMS Deputy General Counsel Jeffrey Shuck emailed Lowy, stating that CMS was in the process of researching the feasibility of bypassing the test and interview generally required for *Rutan*-covered, Personnel Code-covered vacancies.

On December 10, 2014, Lowy asked Shuck for a date by which CMS would respond.

On December 19, 2014, Shuck emailed Lowy asking for more information.   That same day, Lowy provided Nick's and Chad's job evaluations and performance studies, which described the role of the job coaches as "Basically, the coach sits behind Nick and Chad

and watches them work then from time to time spot checks their work for accuracy and has them correct any mistakes."

IDOT has a reasonable accommodation policy that outlines a time frame within which IDOT must respond to requests for accommodation.   Shuck testified that in reviewing a request for reasonable accommodations, if there was a request that was not reasonable, CMS would generally try to figure out what prompted the request, to be able to discuss what might be offered as an alternative.   However, after Lowy sent CMS the information CMS had requested about Plaintiffs on December 19, 2014, CMS did not respond to Lowy.

Having ceased responding to Lowy in December 2014, CMS did not propose alternative accommodation ideas at any time.   The State has an alternative application process for individuals with disabilities, but CMS never proposed that process be used to provide any accommodations to Plaintiffs, and Plaintiffs did not use the alternative process.

**D.  Plaintiffs Complained to the EEOC, and the SPWD Program Ended.**

On June 15, 2015, Plaintiffs filed charges of discrimination with the EEOC.

On July 8, 2015, IDOT Chief Counsel Philip Kaufmann, William Barnes, and Special Assistant to the Chief Counsel Bruce Harmening discussed the termination of the SPWD program via email.   They discussed Plaintiffs' EEOC complaints in the same email chain that day.

On July 16, 2015, Harmening and other IDOT employees met with School District representatives.   They discussed terminating the SPWD program.   In response to a request to admit, IDOT denied that it had decided to terminate the program in July 2015.

On September 2, 2015, IDOT sent a letter to the School District formally terminating the program, effective December 31, 2015.   IDOT did not notify Plaintiffs that IDOT was terminating the program until December 2015.

In a December 18, 2015 email, Harmening wrote that he thought that IDOT terminated the SPWD program "for a number of reasons; IDOT was not the proper agency for such a program,

Page **17** of **51**

several problems with the participant selection process, allowing

several of the participants to stay for years, Dave [Dailey] using

participants as his personal assistants, threatened lawsuits and

EEO complaints over ADA and labor issues." *See* Harmening

Emails, d/e 61-11. He added, "Publicly I would say that: a review

of the program upon Dave[] [Dailey's] retirement concluded that

IDOT was not properly equipped and did not have the properly

experienced and trained staff to administer the program." *Id.*

In an April 2017 email, Harmening stated that he was not

aware of any "official reason" why the program ended, but he

"believe[d] it was terminated for a variety of reasons," which he

listed as:

> 1) Dave Dail[e]y retired
> 2) There was no approved job description for his
> replacement
> 3) [IDOT's] compliance with Rutan rules was questionable
> and under investigation by the OEIG
> 4) [IDOT's] compliance with the AFSCME CBA was
> questionable (the 2 gentlemen in question were doing
> AFSCME work)
> 5) The total cost of the program had more than doubled
> over the years to several hundred thousand dollars

*See* April 2017 Emails, d/e 61-10.

Page **18** of **51**

Dailey was IDOT's ADA coordinator.   Before he retired, IDOT and the School District were working on contracting out the Program Manager role through the School District.

CMS Director of Governmental Affairs, Wendy Butler, wrote in a December 2015 email that the program was "not being ended due to budget issues."   *See* Wendy Butler Email, d/e 61-8.

In the nine years the SPWD program existed, AFSCME did not file any grievances about the SPWD program or express a desire to see the SPWD program eliminated.   The document governing the SPWD program briefly set forth a selection process.

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).   In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

"[T]he district court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."  *Winters v. Fru-Con, Inc.*, 498 F.3d 734, 744 (7th Cir. 2007).

In making this determination, the Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010).   However, a court's favor toward the nonmoving party does not extend to drawing "[i]nferences that are supported by only speculation or conjecture."  *Singer*, 593 F.3d at 533, quoting *Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008).

"The mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004).   Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of

fact to accept its version of events." *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004), quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Specifically, to survive summary judgment, "the nonmoving party must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007), citing *Celotex Corp.*, 477 U.S. at 322-23.

When cross motions for summary judgment have been filed, this court must review the record construing all inferences in favor of the party against whom the motion under consideration is made. *See BASF AG v. Great Am. Assur. Co.*, 522 F.3d 813, 818 (7th Cir. 2008).

## III. ANALYSIS

In Plaintiffs' Amended Complaint (d/e 14), Plaintiffs bring five claims.   Four claims allege a violation of Title I of the Americans with Disabilities Act (ADA): (1) failure to accommodate (Count I); (2) failure to hire (Count II); (3) maintaining qualification standards that screen out people with disabilities (Count III); and (4)

participating in an arrangement that has the effect of discriminating against a qualified applicant (Count IV).   In the fifth claim, against IDOT only, Plaintiffs allege retaliation in violation of Title V of the ADA (Count V).

Plaintiffs move for summary judgment on Counts I and III. Defendants move for summary judgment on all five counts.

**A.   Defendants' Motion for Summary Judgment Is Denied as to Plaintiffs' Count I, Failure to Accommodate.**

In Count I, Plaintiffs allege that Defendants failed to provide them with a reasonable accommodation for the job application process.   Plaintiffs and Defendants both seek summary judgment in their favor on this claim.

The ADA states: "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to *job application procedures*, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (emphasis added).   The statute clearly prohibits disability discrimination in the job application process.

To establish a failure to accommodate claim, Plaintiffs must show that: (1) they are qualified and have a disability; (2) Defendants were aware of their disability; and (3) Defendants failed to accommodate their disability.   *See Rowlands v. United Parcel Service - Fort Wayne*, 901 F.3d 792, 798 (7th Cir. 2018).

Plaintiffs argue that the material, undisputed facts show that all three of those elements are met.

Defendants do not dispute that Plaintiffs have a disability, of which Defendants were aware.   Defendants argue that Plaintiffs are not "qualified individuals" under the ADA, and that Defendants did not fail to accommodate Plaintiffs' disabilities.[1]

## 1.   A Reasonable Jury Could Find Plaintiffs as Qualified Individuals.

Under the ADA, a "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."   42 U.S.C. § 12111(8).   Defendants argue that

---

[1] Defendants also argue that the affirmative defenses of undue hardship and business necessity apply.   However, the Court previously ruled that Defendants failed to properly raise those affirmative defenses. See October 14, 2020 Order (d/e 74).

Plaintiffs are not "qualified individuals" because they cannot

perform the essential functions of the Office Associate position.

"[T]he essential functions are the 'fundamental job duties' of a

position, rather than the position's 'marginal functions[.]'"

*Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 853-54 (7th Cir.

2015), quoting 29 C.F.R. § 1630.2(n).   To determine what

constitutes an essential function of a position, "consideration shall

be given to the employer's judgment as to what functions of a job

are essential, and if an employer has prepared a written description

before advertising or interviewing applicants for the job, this

description shall be considered evidence of the essential functions

of the job."   42 U.S.C. § 12111(8).

Other evidence of whether a particular function is essential

includes:

(iii) The amount of time spent on the job performing the
function;
(iv) The consequences of not requiring the incumbent to
perform the function;
(v) The terms of a collective bargaining agreement;
(vi) The work experience of past incumbents in the job;
and/or
(vii) The current work experience of incumbents in
similar jobs.

29 C.F.R. § 1630.2(n)(3).

Defendants claim that Plaintiffs are not qualified individuals because (1) Plaintiffs cannot perform the essential function of keying in correct data, as "their job coaches must check their work for accuracy at all times," and Chad could not work at IDOT without a job coach; (2) Plaintiffs do not know whether they can calculate collision locations; (3) Plaintiffs can perform some data entry tasks, but not other essential job functions listed in the Office Associate job description.

The Court finds a triable issue of fact as to whether Plaintiffs were "qualified individuals" under the ADA.   Defendants' arguments rely on disputed material facts, including the role of the job coach and what job functions are essential.

The role of the job coach is disputed.   While IDOT required Plaintiffs to have a job coach, they shared one.   The job coach testified that Plaintiffs did not make mistakes very often and that she did not do their jobs for them, periodically spot checking their work.   On the other hand, the Bureau Chief of the Traffic Safety Division testified that a job coach sat next to Nick "watching him"

and "checking everything" before submitting data entries in order to prevent Nick from "pushing through" cases with errors in entry submissions.   She stated that Plaintiffs got agitated, resulting in noise disturbances, if a job coach was not there.

What tasks were "essential" is also disputed.   Plaintiffs could perform some data entry tasks.   While the Office Associate job description listed other tasks, and it is unknown whether Plaintiffs could do location entry, many factors must be considered in determining whether location entry or the other tasks are essential. This is another disputed area, and the parties have both presented sufficient evidence that a jury could find in their favors as to whether a potential job involved essential tasks other than data entry and whether Plaintiffs would be able to do those tasks.

Because an element of Plaintiffs' claim in Count I—whether Plaintiffs were "qualified individuals"—hinges on material facts that are disputed, Plaintiffs are not entitled to summary judgment on Count I.   Plaintiffs' Motion for Summary Judgment is DENIED as to Count I.

While Plaintiffs are not entitled to summary judgment as to Count I, they have presented sufficient evidence that a reasonable jury could find them "qualified individuals."   Defendants' Motion for Summary Judgment also argues that the material, undisputed facts show the Plaintiffs cannot prove other elements of their Count I claim.   The Court now turns to those elements.

## 2.   A Reasonable Jury Could Find in Favor of Plaintiffs as to Failure to Accommodate Plaintiffs' Disabilities.

Defendants make two arguments as to whether they failed to accommodate Plaintiffs.   They argue that (1) no vacant positions existed at the time of the request for accommodations or when Plaintiffs were terminated, and (2) that Plaintiffs' accommodation requests were unreasonable.

Plaintiffs argue that Defendants failed to engage in the interactive process to identify a reasonable accommodation to the job application process, preventing such an accommodation from being identified.

### a.   Whether a Vacancy Existed

At this stage, Defendants' argument about whether a vacancy existed does not entitle Defendants to summary judgement.

Whether or not a vacancy existed, and whether the existence of a vacancy even matters, are both disputed issues.   There was a hiring freeze at some point, but how long the freeze lasted is unclear, and the need for additional employees was evident while IDOT used additional temporary employees to get work done during the hiring freeze.   The successful completion of the testing requirement allowed candidates to be placed on an eligible list from which agencies could select applicants to interview when openings did arise.   And, Plaintiffs were seeking to continue doing the same job functions they had been doing on a permanent basis rather than seeking to have new or different duties—but they were seeking a different job title.   The material, disputed issues concerning the existence of a vacancy must be decided at trial.

### b.   Whether the Accommodation Requests Were Unreasonable

Defendants also argue that Plaintiffs' accommodation requests were unreasonable.   Plaintiffs argue that the material undisputed facts show that Defendants failed to accommodate their disabilities to allow meaningful access to the job application process.

After learning of an accommodations request, the ADA requires an employer to "engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances."   *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005), quoting *Gile v. United Airlines, Inc.*, 213 F.3d 365, 373 (7th Cir. 2000).

The interactive process is a means for identifying a reasonable accommodation, not an end in itself, so an employer cannot be liable solely for refusing to take part in it. *Sansone v. Brennan*, 917 F.3d 975, 979–80 (7th Cir. 2019).   "But when a reasonable accommodation was possible and the employer did not offer it, the third element of a 'failure to accommodate' claim turns on the 'interactive process' requirement" and "responsibility will lie with the party that caused the breakdown [in the interactive process]." *Id.* at 980, citing *Sears, Roebuck & Co.*, 417 F.3d at 805.

In this case, Defendants did not offer any accommodations to the job application process.   The Court finds that whether a reasonable accommodation was possible is a disputed question of fact.   Defendants' argument concerns only one possible

Page **29** of **51**

accommodation: a waiver of the testing and interview requirements and placement into Office Assistant positions.   That is the request that Plaintiffs made in letters to IDOT and CMS, and it is disputed whether it would have been possible for Defendants to grant that request.   IDOT did not object to a waiver of the testing and interview requirements, but IDOT indicated that such a waiver could only come from CMS.   CMS never discussed any alternative accommodation.   CMS simply stopped responding to Lowy.

Plaintiffs contacted CMS in late August 2014.   CMS responded in October 2014, but only to say it was researching the issue.   On December 10, 2014, Plaintiffs asked for a firm date by which CMS would provide a response to Plaintiffs' requests for reasonable accommodations.   CMS responded that it needed additional information, which Plaintiffs immediately provided. Then, after December 19, 2014, neither CMS nor IDOT contacted Plaintiffs or Lowy to seek additional information, to discuss the request, or to grant or deny the requested accommodation.

Defendants never meaningfully responded to Plaintiffs' accommodations request.   Had Defendants done so, it may have

been possible to identify an alternative, reasonable accommodation to the testing and interview requirements.   Plaintiffs suggest alternatives, including that the test could have been modified, CMS could have administered a performance-based test focusing only on relevant essential job functions, Defendants could have reviewed a video demonstrating Plaintiffs' abilities, or Defendants could have spoken with individuals familiar with Plaintiffs' skills and work histories.   Because Defendants did not respond, it is unknown what reasonable accommodations, if any, could have been settled upon to enable Plaintiffs to access the job application process.

The Court finds that whether Defendants failed to accommodate Plaintiffs' disabilities is a question for trial, hinging on disputed facts concerning whether Plaintiffs were "qualified individuals" under the ADA and whether a reasonable accommodation to the job application process was possible that Defendants failed to offer.

Plaintiffs have identified sufficient evidence from which a trier of fact could find in their favor on every element of their failure to

accommodate claim.   Thus, Defendants' Motion for Summary
Judgment is DENIED as to Count I.

## B.   Defendants' Motion for Summary Judgment on Count II Is Denied.

Defendants seek summary judgment in their favor on
Plaintiffs' failure to hire claim.   Plaintiffs do not seek summary
judgment on this claim.

Defendants' arguments on this Count are identical to their
arguments on Count I.   Defendants treat Plaintiffs' Counts I-IV as
a single failure-to-accommodate claim.   The Court found
Defendants' arguments unavailing when analyzing Count I.   They
are equally unsuccessful as to Count II.   Defendants' Motion for
Summary Judgment is DENIED as to Count II.

## C.   Plaintiffs' Motion for Summary Judgment Is Denied as to Count III, and Defendants' Motion for Summary Judgment on Count III Is Granted in Part and Denied in Part.

Plaintiffs and Defendants both seek summary judgment in
their favor on Plaintiffs' Count III, which alleges discrimination in
violation of 42 U.S.C. § 12112(a) through the definition in 42 U.S.C.
§ 12112(b)(6).

The general rule of 42 U.S.C. § 12112 provides, "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."   42 U.S.C. § 12112(a).   One definition of the term "discriminate against a qualified individual on the basis of disability" is:

> using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity[.]

42 U.S.C. § 12112(b)(6).

Plaintiffs present this claim as a disparate impact claim, while also noting that this part of the ADA is different from other anti-discrimination statutes in that it also applies to criteria that screen out "an individual."   Defendants argue that the claim is actually a failure to accommodate claim and, alternatively, that Plaintiffs have

not established a prima facie case of disparate treatment or
disparate impact.

There is sparse Seventh Circuit precedent concerning
disparate impact claims within the context of the ADA.   The issue
was discussed in *Roberts v. City of Chicago*, 817 F.3d 561, 566-67
(7th Cir. 2016).   *Roberts* noted that the complaint did not mention
disparate impact, but the court analyzed the disparate impact issue
anyway because the substance of the plaintiffs' allegations
resembled a disparate impact claim.   *Roberts*, 817 F.3d at 566.

*Roberts* noted that "[d]isparate impact claims under the ADA
'involve employment practices that are facially neutral in their
treatment of different groups but that in fact fall more harshly on
one group than another and cannot be justified by business
necessity.'" *Id.* at 566, quoting *Raytheon Co. v. Hernandez*, 540 U.S.
44, 52 (2003).   The court found that the plaintiffs failed to state a
disparate impact claim under the ADA, reasoning:

> The complaint alleges that the City discriminated against
> Hill and Roberts, not disabled applicants generally. And
> the complaint is devoid of any "factual content ... tending
> to show that the City's testing process, or some
> particular part of it, caused a relevant and statistically
> significant disparity between" disabled and non-disabled

applicants. *Adams v. City of Indianapolis*, 742 F.3d 720,
733 (7th Cir. 2014), cert. denied, --- U.S. ----, 135 S.Ct.
286, 190 L.Ed.2d 140 (2014).

*Roberts*, 817 F.3d at 566.

*Adams v. City of Indianapolis*, cited in *Roberts*, is a Title VII

case, not an ADA case.   However, the Seventh Circuit has long

imported analytical approaches from Title VII cases into ADA cases.

*See Swan v. Board of Educ. of City of Chicago*, 2013 WL 4401439, at

*12 n.5 (N.D. Ill. 2013).   *Swan* used a Title VII disparate impact

framework when analyzing an ADA disparate impact claim,

explaining:

> The Seventh Circuit has not directly addressed the
> elements of a prima facie case of disparate impact
> discrimination under the ADA.   In analyzing claims
> under the ADA, however, the Seventh Circuit "borrow[s]
> from [its] approach to the respective analog under Title
> VII."  *Miranda v. Wis. Power & Light Co.*, 91 F.3d 1011,
> 1017 (7th Cir. 1996). Thus, the Court applies the Title VII
> disparate impact analysis here. This is consistent with
> the analysis other circuits have developed in cases that
> have directly addressed the elements of a prima facie
> case of disparate impact discrimination under the ADA.

2013 WL 4401439, at *12 n.5.

*Swan* found, in an ADA context:

> To establish a disparate impact claim, a plaintiff must (1)
> isolate and identify specific practices that are allegedly
> responsible for any observed statistical disparities; and

(2) establish causation by "offer[ing] statistical evidence of a kind and degree sufficient to show that the practice in question has caused the [alleged harm] because of their membership in a protected group." *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 717 (7th Cir. 2012).

2013 WL 4401439, at *12.

Few cases mention *Roberts*' disparate impact discussion. A district court in this circuit that did so is *Marx v. Richland County, WI*, 2018 WL 3520509, at *6-7 (W.D. Wis. July 20, 2018). In *Marx*, the court applied *Roberts* at the summary judgment stage, where a plaintiff alleged, as a disparate impact ADA claim, that a requirement discriminated against veterans with debilitating PTSD. *Marx*, 2018 WL 3520509, at *7. *Marx* stated, "To state a claim for discrimination under a disparate impact theory, however, plaintiff had to offer some objective evidence showing that the in-person meeting policy caused a 'relevant and statistically significant disparity' between veterans with PTSD and non-disabled veterans." *Id.*, citing *Roberts*, 817 F.3d at 566. The court concluded that the plaintiff could not succeed on a disparate impact theory where he had neither offered proof nor alluded to any other instances in which veterans other than himself were affected by the policy at issue. *Id.*

*Patton v. Shulkin*, 2018 WL 1321589, at *12 (W.D. Va. March 14, 2018), a case briefly mentioned in Defendants' Response and Plaintiff's Reply, cites *Roberts* in discussing how various courts have analyzed disparate impact claims under the ADA (and, by extension, the Rehabilitation Act, which "incorporates the standards set forth in Title I of the ADA").   In *Patton*, the defendant moved for summary judgment on a disparate impact claim, arguing that it was "not supported by statistical evidence sufficient to show that the alleged practice operated to discriminate against disabled employees[.]"   *Id.*

*Patton* examined how courts in other circuits had handled "whether a plaintiff must present statistical evidence to establish a prima facie case of disparate-impact discrimination under the ADA or the Rehabilitation Act," noting that "a number of courts have held that such evidence is typically required."   *Id.* at *13.   It described *Roberts* as "holding that the complaint failed to state a claim of disparate-impact discrimination under the ADA since it was 'devoid of any factual content ... tending to show that the City's testing process ... caused a relevant and statistically significant disparity between disabled and non-disabled applicants,'" a view

consistent with the views of three other circuits.   *Id.*, quoting

*Roberts*, 817 F.3d at 566.

> *Patton* continued:

> On the other hand, based on the plain language of 42
> U.S.C. § 12112(b)(6), which prohibits "employment tests
> or other selection criteria that screen out or tend to
> screen out an individual with a disability or a class of
> individuals with disabilities," some courts have held that
> statistical evidence is not required to establish a prima
> facie case under the "screen out disparate impact
> theory." *Williams v. ABM Parking Servs.*, No.
> 1:16-cv-1259, 2017 WL 4999562, at *6, 2017 U.S. Dist
> LEXIS 182148, at *18 (E.D. Va. Oct. 31, 2017).

*Patton* described *Williams* as joining the Fifth and Ninth Circuits in

recognizing "that an individual advancing an ADA disparate impact

claim need not present statistical evidence if he or she can show

that a job qualification screens out the plaintiff on the basis of his

or her disability." *Id.*

The *Patton* court ultimately concluded that "the analysis of a

disparate-impact claim under the disability statutes is somewhat

more nuanced" than simply relying on Title VII decisions.   *Id.* at

*14.   The court found that the plaintiff needed to show that the

challenged employment practice had "a significant discriminatory

effect on disabled individuals as a group," which he was unable to

do.  *Id.* ("Patton has not offered any evidence, statistical or
otherwise, demonstrating that the alleged practice of terminating
employees based on their use of accrued leave had a disparate
impact on disabled employees as a group.").   Evidence concerning
two people in addition to the plaintiff did not sufficiently support
the conclusion that the practice in question had a significant
discriminatory effect.   *Id.*   The court further noted that even if it
were to recognize an exception for claims based on the "screen out
disparate impact theory," that exception would not apply because
the plaintiff did not make a claim under the relevant statutory
provision.   *Id.*

The Court now turns to Plaintiffs' Count III.   In denying
Defendants' Motion to Dismiss Count III, the Court stated:

> Although *Roberts* is binding on this Court, the Court will
> allow Count III to proceed with leave for Defendants to
> raise the issue again after discovery. First, § 12112(b)(6)
> specifically defines discrimination to include
> qualifications standards that screen out an individual
> with a disability, not just a class of individuals with a
> disability. Second, Plaintiffs have alleged sufficient facts
> to permit them to proceed to discovery to obtain evidence
> that Defendants' testing process caused a relevant and
> statistically significant disparity between disabled and
> non-disabled applicants. Therefore, the Court will not
> dismiss Count III at this time.

*See* Opinion, d/e 21, p. 24.

Now at the summary judgment stage, *Roberts* remains binding on the Court, and Plaintiffs did not obtain evidence in discovery that Defendants' testing process caused a relevant and statistically significant disparity between disabled and non-disabled applicants. The Court concludes that, based on *Roberts,* Plaintiffs' disparate impact ADA claim does not survive summary judgment when analyzed through the disparate impact analysis imported from the Title VII context.

However, the Court agrees with Plaintiffs that § 12112(b)(6)'s language does permit claims of discrimination against individuals. The strands of case law discussing the need for statistical evidence do not actually conflict with cases noting that § 12112(b)(6)'s language permits claims screening out "an individual" with a disability.   Looking again at the statutory language, an employer can "discriminate against a qualified individual on the basis of disability" by:

> using qualification standards, employment tests or other selection criteria that screen out or tend to screen out *an individual* with a disability *or a class* of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be

> job-related for the position in question and is consistent
> with business necessity[.]

42 U.S.C. § 12112(b)(6) (emphasis added).   The critical language is

"an individual with a disability or a class of individuals with

disabilities."   That language allows for a disparate impact type of

claim when "a class of individuals with disabilities" is involved.

When "an individual with a disability" is involved, the claim is more

similar to a disparate treatment claim, relying on a showing that the

plaintiff was a qualified individual screened out by the employer's

selection criteria.   Plaintiffs argued both types of § 12112(b)(6)

claims.

The Court finds that a trial is warranted on Count III's

§ 12112(b)(6) claim as a disparate treatment type of claim.

Plaintiffs have shown that the testing and interview requirements

are "qualification standards, employment tests or other selection

criteria" that screen them out as individuals.   However, as

discussed above, contested issues of material fact remain as to

whether Plaintiffs are "qualified individuals."   If a trier of fact were

to find that Plaintiffs were qualified individuals, then the testing

and interview requirements that screened them out would

constitute discrimination pursuant to 42 U.S.C. § 12112(b)(6).[2]

Neither party is therefore entitled to summary judgment on Count

III.

Plaintiffs argue that statistical evidence is not required to

prove a disparate impact claim in this case, arguing that

"Defendants have [ ] admitted both that their job application

process screened out Plaintiffs and that it screens out people with

significant disabilities."   The Court agrees that statistical evidence

is not required because Plaintiffs can show a § 12112(b)(6) violation

even if the selection criteria only impacted them as individuals with

disabilities.   However, Plaintiffs must show they were qualified

individuals, following the above analysis.   While Defendants admit

that Plaintiffs were screened out, Defendants do not admit that any

discrimination occurred.   Defendants insist that Nick and Chad

were not "qualified individuals," and Defendants have not admitted

that the testing and interview requirements are discriminatory

against any class of individuals.   While Plaintiffs argue that a

---

[2] The Court found in a prior Order (d/e 74) that Defendants forfeited the
affirmative defenses of undue hardship and business necessity.

group of disabled individuals is at issue, they have identified no other affected individuals.   The group allegedly discriminated against "others with similar limitations" is defined in reference to Plaintiffs' individual abilities.   The Court finds a disputed material issue of fact remains as to whether the Defendants discriminated against Plaintiffs in violation of § 12112(b)(6) as it applies to "an individual with a disability."

Plaintiffs' Motion for Summary Judgment is denied as to Count III.   Defendants' Motion for Summary Judgment is granted in part and denied in part as to Count III.   The Motion is granted to the extent that Plaintiffs cannot pursue a disparate impact type of theory at trial.   The Motion is denied to the extent that § 12112(b)(6) allows a disparate treatment type of claim.

## D.   Defendants' Motion for Summary Judgment as to Count IV Is Denied.

Defendants seek summary judgment in their favor on Plaintiffs' Count IV.   Plaintiffs do not seek summary judgment in their favor on this claim.

Another way to "discriminate against a qualified individual on the basis of disability," as prohibited by the ADA, is by:

participating in a contractual or other arrangement or
relationship that has the effect of subjecting a covered
entity's qualified applicant or employee with a disability
to the discrimination prohibited by this subchapter (such
relationship includes a relationship with an employment
or referral agency, labor union, an organization providing
fringe benefits to an employee of the covered entity, or an
organization providing training and apprenticeship
programs)[.]

42 U.S.C. § 12112(b)(2).

Defendants' arguments on this count are the same as their
arguments on Counts I, II, and III.   The Court above found those
arguments unavailing.   Defendants' Motion for Summary
Judgment is DENIED as to Count IV.

## E.   Plaintiffs' Claim for Retaliation Proceeds, and Defendants' Motion for Summary Judgment as to Count V Is Denied.

Count V, against IDOT only, alleges retaliation in violation of
Title V of the ADA.   Defendant IDOT seeks summary judgment on
this claim.   Plaintiffs do not seek summary judgment on this claim.

The standard for a retaliation claim "is simply whether the
evidence would permit a reasonable factfinder to conclude that the
plaintiff's race, ethnicity, sex, religion, or other proscribed factor
caused the discharge or other adverse employment action." *Sanford
v. Thor Industries, Inc.*, 286 F. Supp. 3d 938, 947-48 (N.D. Ind.

2018), quoting *Ortiz v. Werner Enter.*, 834 F.3d 760, 765 (7th Cir. 2016).   The ADA states, "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."   42 U.S.C. § 12203.

Here, Plaintiffs claim they were retaliated against for engaging in protected activity when IDOT ended the SPWD program, terminating their jobs, because Plaintiffs filed charges with the EEOC.   The parties do not dispute that Plaintiffs engaged in protected activity when they filed charges of employment discrimination with the EEOC.   The issue, then, is whether the evidence would permit a reasonable factfinder to conclude that Plaintiffs' making EEOC complaints caused an adverse employment action.   Defendant IDOT argues that Plaintiffs cannot demonstrate causation for their retaliation claim and that Plaintiffs did not suffer an adverse employment action.   In *Alderson v. Ferrellgas, Inc.*, 127 F. Supp. 3d 937, 953 (N.D. Ind. 2015), the court discussed the standards that apply to an ADA retaliation claim:

The Plaintiff asserts that the circumstantial evidence
raises an inference that her employer took action to
terminate her employment in retaliation for requesting an
accommodation. Under this approach, "the plaintiff must
connect the circumstantial evidence to the employment
action such that a reasonable juror could infer the
employer acted for discriminatory reasons." *Fleishman v.
Cont'l Cas. Co.*, 698 F. 3d 598, 603 (7th Cir. 2012). Such
circumstantial evidence may include "(1) suspicious
timing; (2) ambiguous statements or behavior towards
other employees in the protected group; (3) evidence,
statistical or otherwise, that similarly situated employees
outside of the protected group systematically receive
better treatment; and (4) evidence that the employer
offered a pretextual reason for an adverse employment
action." *Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d
654, 659-60 (7th Cir. 2013) (quoting *Dickerson*, 657 F. 3d
at 601). "The ultimate question the parties and the court
always must answer is whether it is more likely than not
that the plaintiff was subjected to the adverse
employment action because of his protected status or
activity. To answer that question, the individual 'bits and
pieces' presented by the plaintiff must be put into context
and considered as a whole." *Hobgood v. Ill. Gaming Bd.*,
731 F.3d 635, 644 (7th Cir. 2013).

*Alderson v. Ferrellgas, Inc.*, 127 F. Supp. 3d 937, 953 (N.D. Ind.

2015).

Defendant IDOT claims that the ending of the SPWD program

had nothing to do with Plaintiffs' EEOC complaint.   IDOT argues

that it ended the program because its ADA coordinator retired and

could not be replaced, costs were ballooning, the program

potentially did not comply with the CBA, and the program

potentially did not comply with best-qualified hiring principles. Plaintiffs argue that a factfinder could reasonably conclude that their EEOC complaints caused the SPWD program to end, despite IDOT's now-stated reasons for ending it.   Plaintiffs argue that there is sufficient evidence of suspicious timing and pretext.

Plaintiffs presented evidence of suspicious timing.   Plaintiffs filed charges of discrimination with the EEOC on June 15, 2015. On July 8, 2015, IDOT's Chief Counsel's office employees emailed about those EEOC charges in the same email chain in which they discussed ending the SPWD program.   On July 16, 2015, IDOT discussed ending the program with the School District.   The fact that the official letter ending the program was not sent until September 2015 does not show that the decision to end the program had not been in the works earlier, and there is evidence that the letter officially ending the program was set in motion in July.   And, IDOT did not tell Plaintiffs about the decision until December 2015, the month the program ended.

Plaintiffs also presented evidence of pretext.   In an email dated December 18, 2015, Harmening wrote that he thought that IDOT terminated the SPWD program "for a number of reasons," one

of which was "threatened lawsuits and EEO complaints over ADA."
He added, "Publicly I would say that: a review of the program upon
Dave's retirement concluded that IDOT was not properly equipped
and did not have the properly experienced and trained staff to
administer the program."   The fact that some reasons were given
privately with a separate reason to state publicly is evidence of
pretext.   Then, in 2017, there was no "official reason" why the
program ended.   Plaintiffs present some evidence undermining
Defendants' now-stated reasons for ending the program.   Before
the ADA coordinator retired, IDOT and the School District were
working on contracting out the Program Manager role through the
School District.   CMS Director of Governmental Affairs, Wendy
Butler, wrote in a December 2015 email that the program was "not
being ended due to budget issues."   In the nine years the SPWD
program existed, AFSCME did not file any grievances about it or
express a desire to see it eliminated, and the program was updated
to include some selection processes.

   Defendant IDOT also argues that Plaintiffs cannot prove their
retaliation claim because Plaintiffs held temporary six-month
positions in an affirmative action program with no expectation of

continued employment or promotion.   The Court disagrees. Plaintiffs' terms were continually renewed for years, and the limits on the length of possible employment were eliminated in 2014. The ending of the SPWD program ended their years of employment with IDOT.   A factfinder could find that ending the program was an adverse employment action.

The question, then, is simply whether the evidence would permit a reasonable factfinder to conclude that Plaintiffs' filing EEOC charges caused IDOT to terminate the SPWD program. Construing the evidence in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, *Anderson*, 477 U.S. at 255, the Court finds the evidence sufficient to enable the jury to find for Plaintiffs on their retaliation claim.

IDOT suggests that it should not be punished for going out of its way to hire disabled individuals into affirmative action temporary job-training positions.   However, the existence of a program intended to assist disabled individuals does not insulate IDOT from liability if IDOT otherwise fails to comply with laws prohibiting discrimination.   If IDOT ended the program for an impermissible reason to retaliate against Plaintiffs for filing

complaints of discrimination with the EEOC, IDOT violated the
ADA, regardless of what laudable activity IDOT may have otherwise
engaged in. Defendants' Motion is DENIED as to Count V.

## IV. CONCLUSION

IT IS THEREFORE ORDERED THAT:

(1)   Plaintiffs' Motion for Partial Summary Judgment (d/e 48)
is DENIED.

(2)   Defendants' Motion for Summary Judgment (d/e 54) is
GRANTED in part and DENIED in part.   Defendants' Motion is
DENIED as to Counts I, II, IV, and V.   Defendants' Motion is
GRANTED in part and DENIED in part as to Count III.   Defendants'
Motion is granted as to Count III to the extent that Plaintiffs cannot
pursue a disparate impact type of theory at trial.   Defendants'
Motion is denied as to Count III to the extent that § 12112(b)(6)
allows a disparate treatment type of claim.

(3)   The Final Pretrial Conference currently set for February
22, 2021 at 10:30 a.m. before United States Judge Colin S. Bruce is
CONTINUED to April 26, 2021 at 10:00 a.m. in Courtroom I in
Springfield, Illinois before United States District Judge Sue E.

Myerscough.   The Jury Trial currently set for April 5, 2021 at 9:00 a.m. before United States Judge Colin S. Bruce is CONTINUED to May 18, 2021 at 9:00 a.m. in Courtroom I in Springfield, Illinois before United States District Judge Sue E. Myerscough.

**ENTERED: December 11, 2020**

**FOR THE COURT:**

_s/ Sue E. Myerscough_

**SUE E. MYERSCOUGH**
**UNITED STATES DISTRICT JUDGE**